

**MUNSCH HARDT**
DALLAS / HOUSTON / AUSTIN

Hartland Plaza
1717 W. 6th Street, Suite 250
Austin, Texas 78703
Main 512.391.6100
Fax 512.391.6149
munsch.com

JAMES R. RAY, III
Direct Dial 512.391.6177
Direct Fax 512.391.6149
jray@munsch.com

April 13, 2022

***Via Certified Mail and Email – matt.orme@dentons.com***

Mr. Matthew J. Orme
Dentons Durham Jones Pinegar P.C.
111 South Main Street, Suite 2400
Salt Lake City, Utah 84111

Re:   *Cause No. CC24097; Seth Cummings vs. Zenith Solar, LLC d/b/a Deca Solar, Camacho Electric, LLC and Paramount Equity Mortgage, LLC d/b/a Loanpal*; in the Midland County Court at Law

Dear Mr. Orme:

This letter is sent to formally notify your client, Lumio HX, Inc. ("Lumio"), successor to Zenith Solar, Inc. ("Zenith"), of its indemnity obligations to Goodleap, LLC f/k/a Loanpal, LLC f/k/a Paramount Equity Mortgage, LLC ("Goodleap") related to the above referenced lawsuit, (the "Lawsuit").

As you know, Zenith installed solar panels on the Cummings residence. Goodleap has been sued by Cummings for claims arising out of or resulting from Zenith's work. Enclosed as **Exhibit "A"** is a copy of Plaintiff's Original Petition alleging breach of contract, negligent misrepresentation, common-law fraud, violations of the DTPA, breach of implied warranty of good and workmanlike services, and breach of express warranty.

Attached as **Exhibit "B"** is a copy of the Installation Agreement entered into between Goodleap and Zenith (the "Agreement"). Under Section 7.1 of the Agreement, Zenith agreed to indemnify, defend and hold harmless Goodleap from and against claims, damages cost or expenses, including, but not limited to attorney's fees, arising out of or resulting from the performance of Zenith's work. Under the terms of Agreement and under Texas and Federal law, Lumio, as successor to Zenith, has a duty to defend and indemnify Goodleap. Accordingly, Goodleap demands that Lumio defend and indemnify Goodleap in this Lawsuit.

Please place all of Lumio's primary and excess insurance carriers on notice of this Lawsuit.



EXHIBIT
**D**

April 13, 2022
Page 2

Please confirm in writing that Lumio will fulfill its duty to defend, indemnity and hold Goodleap harmless pursuant to the Agreement by April 30, 2022.

Regards,

James R. Ray, III

# EXHIBIT A

 CT Corporation

**Service of Process Transmittal**
03/07/2022
CT Log Number 541173084

TO:  KRISTEN ABERNATHY, Licensing Manager
GOODLEAP, LLC
8781 SIERRA COLLEGE BLVD
ROSEVILLE, CA 95661-5920

RE:  **Process Served in Texas**

FOR:  Paramount Equity Mortgage, LLC  (Former Name)  (Domestic State: CA)
GOODLEAP, LLC (True Name)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | SETH CUMMINGS vs. ZENITH SOLAR, LLC |
| **DOCUMENT(S) SERVED:** | -- |
| **COURT/AGENCY:** | None Specified<br>Case # CC24097 |
| **ON WHOM PROCESS WAS SERVED:** | C T Corporation System, Dallas, TX |
| **DATE AND HOUR OF SERVICE:** | By Process Server on 03/07/2022 at 01:07 |
| **JURISDICTION SERVED :** | Texas |
| **APPEARANCE OR ANSWER DUE:** | None Specified |
| **ATTORNEY(S) / SENDER(S):** | None Specified |
| **ACTION ITEMS:** | CT will retain the current log |
| | Image SOP |
| | Email Notification,  KRISTEN ABERNATHY  kabernathy@loanpal.com |
| | Email Notification,  Jay Laifman  jlaifman@loanpal.com |
| | Email Notification,  David Dixon  ddixon@loanpal.com |
| **REGISTERED AGENT ADDRESS:** | C T Corporation System<br>1999 Bryan Street<br>Suite 900<br>Dallas, TX 75201<br>866-539-8692<br>CorporationTeam@wolterskluwer.com |

The information contained in this Transmittal is provided by CT for quick reference only. It does not constitute a legal opinion, and should not otherwise be relied on, as to the nature of action, the amount of damages, the answer date, or any other information contained in the included documents. The recipient(s) of this form is responsible for reviewing and interpreting the included documents and taking appropriate action, including consulting with its legal and other advisors as necessary. CT disclaims all liability for the information contained in this form, including for any omissions or inaccuracies that may be contained therein.



# PROCESS SERVER DELIVERY DETAILS

**Date:**          Mon, Mar 7, 2022

**Server Name:**          Tony Hitt

| Entity Served | PARAMOUNT EQUITY MORTGAGE LLC |
|---|---|
| Case Number | CC24097 |
| Jurisdiction | TX |



*TGH*
*PSC 11703*
*3-7-2R*

CITATION

CLERK OF THE COURT
Alex Archuleta
District Clerk
500 N. Loraine Street, Suite 300
Midland, Texas 79701

ATTORNEY REQUESTING SERVICE
J. BRANDON SCHUELKE
4920 SOUTH LOOP 289, SUITE 101
LUBBOCK, TEXAS 79414

THE STATE OF TEXAS

NOTICE TO PARAMOUNT EQUITY MORTGAGE LLC DBA LOANPAL:

"YOU HAVE BEEN SUED. YOU MAY EMPLOY AN ATTORNEY. IF YOU OR YOUR ATTORNEY
DO NOT FILE A WRITTEN ANSWER WITH THE CLERK WHO ISSUED THIS CITATION BY
10:00 A.M. ON THE MONDAY NEXT FOLLOWING THE EXPIRATION OF TWENTY (20) DAYS
AFTER YOU WERE SERVED THIS CITATION AND PETITION, A DEFAULT JUDGMENT MAY
BE TAKEN AGAINST YOU. IN ADDITION TO FILING A WRITTEN ANSWER WITH THE CLERK,
YOU MAY BE REQUIRED TO MAKE INITIAL DISCLOSURES TO THE OTHER PARTIES OF
THIS SUIT. THESE DISCLOSURES GENERALLY MUST BE MADE NO LATER THAN 30 DAYS
AFTER YOU FILE YOUR ANSWER WITH THE CLERK. FIND OUT MORE AT TexasLawHelp.org."

TO: PARAMOUNT EQUITY MORTGAGE LLC DBA LOANPAL

GREETINGS: You are commanded to appear by filing a written answer to the petition at or before
10:00 o'clock A.M. of the Monday next after the expiration of 20 days after the date of service hereof,
before the COUNTY COURT AT LAW NO. 2 of Midland County, Texas, at the Courthouse in
Midland, Texas.

Said petition was filed on: **March 2nd, 2022**

The file number of said suit being: **CC24097**

The style of the case is:

**SETH CUMMINGS**
**V.**
**ZENITH SOLAR LLC DBA DECA SOLA CAMACHO ELECTRIC LLC AND PARAMOUNT
EQUITY MORGAGE, LLC DBA LOANPAL**

A copy of **PLAINTIFF'S ORIGINAL PETITION AND REQUEST FOR DISCLOSURES**
accompanies this citation.

**ISSUED AND GIVEN UNDER MY HAND AND SEAL** OF SAID COURT, at office in
Midland, Texas, on March 3rd, 2022.

ALEX ARCHULETA
DISTRICT CLERK
MIDLAND COUNTY, TEXAS

By: _____ , Deputy

HONESTY GARZA

**OFFICER'S RETURN**

CC24097                    COUNTY COURT AT LAW NO. 2

SETH CUMMINGS
V.
ZENITH SOLAR LLC DBA DECA SOLA CAMACHO ELECTRIC LLC AND PARAMOUNT EQUITY
MORGAGE, LLC DBA LOANPAL

ADDRESS FOR SERVICE:
PARAMOUNT EQUITY MORTGAGE LLC DBA LOANPAL
BY SERVING ITS REGISTERED AGENT CT CORPORATION SYSTEM
1999 BRYAN ST., STE 900
DALLAS, TX 75201

Came to hand on the _____ day of _____, 20_____, at _____ o'clock ____.m., and
executed in _____ County, Texas by delivering to the within named defendant in person, a true
copy of this Citation together with the accompanying copy of the **PLAINTIFF'S ORIGINAL PETITION AND
REQUEST FOR DISCLOSURES**, with the date of delivery endorsed thereon, at the following time and places,
to-wit:
Name                          Date/Time              Place/Location
_____    _____    _____

NOT EXECUTED FOR THE FOLLOWING REASON: _____

The diligence used in finding said defendant being:_____

and the cause or failure to execute this process is: _____

And the information received as to the whereabouts of said defendant being:_____

                                                    _____, Sheriff

**FEES FOR SERVICE $**_____          _____, County, Texas
   (Of Citation)
                                             By: _____, Deputy

STATE OF TEXAS
COUNTY OF MIDLAND
                              **VERIFICATION**
BEFORE ME, A Notary Public, on this day personally appeared _____ known to be the
person whose name is subscribed to the foregoing document and being by me first duly sworn, declared that the statements
therein contained are true and correct. I am not a party to this lawsuit and have no interest in the outcome.

Given under my hand and seal of office this the _____ day of _____, 20_____.

                              _____
                              NOTARY PUBLIC, STATE OF TEXAS
**COMPLETE IF YOU ARE A PERSON OTHER THAN A SHERIFF, CONSTABLE, OR CLERK OF THE COURT.**
In accordance with Rule 107: The officer or authorized person who serves, or attempts to serve, a citation shall sign the
return. The return must either be verified or be signed under penalty of perjury. A return signed under penalty of perjury
must contain the statement below in substantially the following form:

"My name is _____, my date of birth is _____, and my address
                 (First, Middle, Last)
Is _____.
   (Street, City, Zip)
I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.
Executed in _____ County, State of _____, on the _____ day of _____ 20_____.

_____          _____
Declarant/Authorized Process Server               (Id # & expiration of certification)

Midland County  - District Clerk - County Court at Law Court

Filed 3/2/2022 1:29 PM
Alex Archuleta
District Clerk
Midland County, Texas
/s/ Angela Gardea

CAUSE NO. CC24097

| | | |
|---|---|---|
| SETH CUMMINGS | § | IN ~~THE~~ ~~DISTRICT COURT~~ |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| | § | |
| V. | § | ~~IN AND FOR~~ |
| | § | |
| ZENITH SOLAR, LLC, D/B/A/ | § | |
| DECA SOLAR, CAMACHO ELECTRIC, | § | |
| LLCAND PARAMOUNT EQUITY | § | |
| MORTGAGE, LLC, D/B/A LOANPAL | § | MIDLAND COUNTY, TEXAS |

## PLAINTIFF'S ORIGINAL PETITION AND REQUEST FOR DISCLOSURES

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, **Seth Cummings** ("Plaintiff"), by and through their respective counsel of record and files this Original Petition and Request for Disclosure against **Zenith Solar, LLC** ("Zenith") **d/b/a Deca Solar, Camacho Electric, LLC** ("Camacho") and **Paramount Equity Mortgage, LLC d/b/a Loanpal** ("loanpal") (collectively referred to as "Defendants"). In support of this Petition, Plaintiff alleges and shows this Court as follows:

### I.    DISCOVERY CONTROL PLAN

1.    Plaintiff requests discovery be conducted in this case under Level 2, pursuant to TEX. R. CIV. P. 190.3.

### II.    PARTIES

2.    Plaintiff is a resident of Midland County, Pursuant to TEX. CIV. PRAC. & REM. CODE § 30.0124, the last three digits of Plaintiff's Social Security Number is 341, the last three digits of Plaintiff Driver's Licenses are 349.

Defendant Zenith Solar, LLC d/b/a Deca Living is a Texas limited liability company with a local address at 7008 Four Sixes Ranch Rd., Odessa, TX 79765, and may be served with process through its registered agent, John Bankhead, 7008 Four Sixes Ranch Road, Odessa, TX 79765.

3.      Defendant Camacho Electric, LLC is a Texas limited liability company with a local address at 1402 Maberry St., Midland, TX 79701, and may be served through its registered agent, United States Corporation Agents, Inc., 9900 Spectrum Drive, Austin, Texas 78701.

1.      Defendant Paramount Equity Mortgage, LLC d/b/a Loanpal is a foreign limited liability company incorporated under the laws of California, with the address at 8781 Sierra College Blvd., Roseville, California, 95661 and may be served through its registered agent, CT Corporation System, 1999 Bryan St., Ste. 900, Dallas, TX 75201.

## III.    JURISDICTION, VENUE, AND RELIEF

3.      Jurisdiction of this case is proper because the amount in controversy exceeds this Court's minimum jurisdictional amount as prescribed by statute.  Venue of this case is proper because this is the county where a substantial amount of the acts or omissions giving rise to this suit occurred.

4.      In accordance with TEX. R. CIV. P. 47, Plaintiff is seeking monetary relief less than $250,000 excluding interest, statutory or punitive damages and penalties, and attorney's fees and costs.

4.      In compliance with TEX. CIV. PRAC. & REM. CODE, CH. 16, SEC. 16.001 *et seq.*, this Petition and all claims and allegations herein have been filed within the time allotted under all applicable statutes of limitations.

## IV.    FACTS

5.      Plaintiff incorporates by reference all of the allegations and statements as set forth above.

6.      Plaintiff entered into a Contract (the "Contract") for the purpose of purchasing and installing solar panels on the roof of his house on June 18, 2020.  The contract is attached hereto and incorporated by reference as Exhibit "A".

7.      The home is located at 4200 Downing Ave, Midland, Texas 79707.

8.      The purchase price Plaintiff and Defendant agreed to in the Contract is $48,996.23

9.      Plaintiff was told by Zenith Solar, LLC's representatives that his type of roof was appropriate for solar panels, and he would be entitled to tax benefits for having solar panels on his roof and indicated that Zenith had a permit to install solar on his house; however, that was not true. Plaintiff would not have entered into a contract to have solar panels installed on his roof if his type of roof would not have supported solar panels and if Zenith did not represent to him that Zenith had a permit to install solar panels.

10.     Moreover, the manufacturer in fact makes specific solar brackets for Plaintiff's style of roof . Additionally, there is nothing to indicate Zenith used the appropriate brackets for Plaintiff's specific type of roof.

11.     Zenith's workers have severely damaged Plaintiff property's roof due to their poor workmanship and the use of improper brackets.

13.     Plaintiff relied on the false representations and was induced into signing a contract which was carried out without care and illegally because of the inexistence of permits.  Due to the use of improper brackets and poor workmanship Defendants' caused substantial damage to the roof. A diagram of the damaged areas the roof sustained is being attached as Exhibit "B".

14.     Plaintiff was offered third party financing by Zenith to complete his end of the bargain, via Loanpal.

15.     Plaintiff signed and executed a loan agreement with Loanpal on June 18, 2020, for the full amount of the contract with Defendant Zenith. *See* Exhibit "C".

16.     According to the loan agreement the maturity date would be June 18, 2040, there would be a recurring payment every month with an initial monthly payment of $191.82 at a 2.99% anual rate.

17.     An important part of Defendants' process is selling their program by advertising the Federal Tax Credit customers would get by installing the solar panels. *See* Exhibit "D".

18.     However, in this case, Defendant Loanpal is soliciting Plaintiff to tender their "Tax Refund" as early payment otherwise Plaintiff's monthly payment will be increased.

19.     Zenith's customers would get a Federal Tax Credit when they start using solar energy, not a Tax refund, which are two completely different concepts.

20.     Nothing in the agreements with either Zenith or Loanpal includes anything regarding having to tender either a Tax credit or a Tax refund to any of the Defendants. As shown by Exhibit "C", the loan agreement shows a "Target Balance" which customers are supposed to reach by making "voluntary pre-payments". This inconspicuous language is what defendants are relying on to solicit their customer's "Tax Refunds" and if they choose not to comply, then, they will be charged a higher monthly payment different from what was agreed upon at the moment of inception of the contract.

21.     On the other hand, Zenith targets its sales campaign specifically to sell the tax incentives customers would get if they were to go into business with them. *See* Exhibit "D".

22.     Defendants were contacted by previous counsel hired by Plaintiff on November 25, 2020, via a DTPA demand letter, to which they never responded. See Exhibit "E".

23.     This representation followed up with a second demand letter dated November 9, 2020, but Defendants remain unresponsive to date. See Exhibit "F".

## V.     CAUSES OF ACTION

### COUNT 1—BREACH OF CONTRACT

24.     Plaintiff hereby and herein incorporates by reference the allegations and statements as set forth above.

25.     Plaintiff entered into a Contract (the "Contract") with Defendants for the purpose of purchasing and installing solar panels on the roof of his house on June 18, 2020 at a home located at 4200 Downing Ave, Midland, Texas 79707.

26.     Pursuant to that Agreement, Plaintiffs agreed to pay Defendants $48,996.23 for the panels and installation of the goods.

27.     Plaintiffs fully performed all conditions, covenants, and promises under the Contract for the purchase and installation of said panels.

28.     However, Defendants failed to comply with his obligations under the Contract.

29.     Defendants materially breached the Contract by failing to perform the installation in a good workmanlike manner.

30.     Plaintiff was offered third party financing by Zenith via Loanpal to take out a loan for the purchase price of the panels.

31.     Plaintiff signed and executed a loan agreement with Loanpal on March 02, 2021, for the full amount of the contract with Defendant Zenith. *See* Exhibit "B".

32.     According to the loan agreement the maturity date would be March 02, 2046, there would be a recurring payment every 2nd of each month with an initial monthly payment of $174.84 at a 2.99% annual rate.

33.     Plaintiff fully performed all conditions, covenants, and promises under the Contract for the purchase and installation of said panels.

34.     However, Defendants failed to comply with their obligations under the Contract.

35.     Defendants materially breached the Contract by coercing Plaintiff into paying his Tax Return towards the loan agreement.

37.     Customers are entitled to a Tax Credit for opting into the solar energy plan, once they begin using solar p.

38.     Nothing in the loan agreement stipulates such payment.

39.     Plaintiff was damaged by Defendant's breach in the amount of $198,401.73. Additionally, Plaintiffs are entitled to recovery of all costs of court plus interests, as well as attorney's fees pursuant to TEX. CIV. PRAC. & REM. CODE § 38.001 *et seq.*

## COUNT 2—NEGLIGENT MISREPRESENTATION

40.     Plaintiff hereby and herein incorporates by reference the allegations and statements as set forth above.

41.     Defendants represented they would perform the work in a good workmanlike manner.

42.     Defendants represented they had the knowledge and expertise to install the solar panels.

43.     Defendants represented they would abide by the terms of the loan agreement.

44.     Defendants represented the roof was appropriate for the solar panel installation.

45.     Defendants made these representations in the course of their business.

46.     Defendants can be held liable for negligent misrepresentation if it makes a representation in the course of its business. McCamish, Martin, Brown, & Loefler v. F.E. Appling Interests, 991 S.W.2d 787, 791 (Tex. 1999); First Interstate Bank v. S.B.F.I., Inc., 830 S.W.2d 239, 245 (Tex.App. – Dallas 1992, no writ).

47.     Information given in the course of Defendants' business, profession, or employment are sufficient to prove the Defendants had a pecuniary interest in the representation.

48.     Plaintiff actually and justifiably relied on Defendants' representations.

49.     Plaintiff was damaged by Defendants' breaches in the of amount of $198,401.73. Additionally, Plaintiffs are entitled to recovery of all costs of court plus interests, as well as attorney's fees pursuant to TEX. CIV. PRAC. & REM. CODE § 38.001 *et seq.*

## COUNT 3—COMMON-LAW FRAUD

48.     Plaintiff hereby and herein incorporates by reference the allegations and statements as set forth above.

49.     Defendants represented they would abide by the terms of the loan agreement.

50.     Defendants represented to Plaintiff they would perform and had the knowledge to do so.

51.     Defendants represented to Plaintiff they had the legal permits to perform the installation.

52.     Defendants' representation to Plaintiff was a false promise of performance.

53.     Defendants made the false representations knowing it was false.

54.     Plaintiff justifiably relied on Defendants' false representations when he entered into the Contracts with Defendants.

55.     Defendants' false representation directly and proximately caused injury to Plaintiff.

56.     Defendants' misrepresentations about their ability to complete the installation of the solar panels to Plaintiff's home directly caused Plaintiff's injuries.

57.     Defendants' misrepresentations about abiding by the terms of the agreements directly caused Plaintiff's injuries.

58.     Plaintiff is seeking $30,000 in exemplary damages due to Defendants' fraud, which induced the Plaintiff to enter into the Contracts with Defendants.

## COUNT 5—VIOLATIONS OF THE DECEPTIVE TRADE PRACTICES ACT

59.     Plaintiff hereby and herein incorporates by reference the allegations and statements as set forth above.

60.     Plaintiff is a consumer under the Deceptive Trade Practices Act ("DTPA") because Plaintiff is an individual contracting for services.

61.     Plaintiff sought services from Defendants to install solar panels on Plaintiff's home.

62.     Defendants are corporations that can be sued under the DTPA.

63      Defendants violated the DTPA when Defendants breached the implied warranty of good and workmanlike services.

64.     Defendants violated the DTPA when Defendants breached the loan agreement.

65.     Plaintiff was damaged by Defendants' violations of the DTPA by breaching the implied warranty of good and workmanlike services in the amount of $198,401.73 and is entitled to recovery of that amount plus interest, costs, and attorney's fees pursuant to TEX. CIV. PRAC. & REM. CODE § 38.001 *et seq.*

Plaintiff is also seeking $50,000.00 in mental anguish damages because Defendant acted knowingly and intentionally when it breached the implied warranty of good and workmanlike services.

66.     Plaintiff is also seeking treble damages for Defendants' knowing and intentional violation of the DTPA for both Plaintiff's actual damaged and mental anguish damages.

67.     Plaintiff gave Defendants notice as required by Texas Business & Commerce Code section 17.505(a). Attached as Exhibit "C" is a copy of the notice letter sent to Defendant, which is incorporated by reference.

## COUNT 6—BREACH OF IMPLIED WARRANTY OF GOOD & WORKMANLIKE SERVICES—REPAIR & MODIFICATION

68.     Plaintiff hereby and herein incorporates by reference the allegations and statements as set forth above.

69.     Defendants' sold services to Plaintiff for the installation of solar panels on Plaintiff's home.

70.     Defendants did not perform the services in a good and workmanlike manner because Defendants' services did not rise to the standard level of performance expected in the residential construction industry. In fact, Defendants wholly failed to perform the services contracted for under the Contract.

71.     Defendant's breach of warranty directly and proximately caused injury to Plaintiff, which resulted in damages.

72.     Plaintiff was damaged in the amount of $198,401.73 due to Defendants' breach of the implied warranty of good and workmanlike services.

73.     Plaintiff was damaged by Defendants' violations of the implied warranty of good and workmanlike services in the of $198,401.73, and is entitled to recovery of that amount plus interest, costs, and attorney's fees pursuant to TEX. CIV. PRAC. & REM. CODE § 38.001 *et seq*.

## COUNT 7—BREACH OF EXPRESS WARRANTY FOR SERVICES

74.     Plaintiff hereby and herein incorporates by reference the allegations and statements as set forth above.

75.     Defendants contracted for the performance of restoration and renovation services with Plaintiff.

75.     Defendants made arepresentations to Plaintiff about the quality and characteristics of the services that would be performed via the signed Contract.

76.     Defendants made the representations as an affirmation of fact.

77.    Defendants' representations were part of the basis of the agreement.

78.    The services provided by Defendants did not comply with Defendants' representations, which was a breach of Defendants' express warranty.

79.    Defendants' breach of warranty directly and proximately caused injury to Plaintiff, which resulted in damages in the amount of $198,401.73.

80.    Plaintiff was damaged by Defendants' violations of Defendants' express warranty for services in the economic amount of $198,401.73 and is entitled to recovery of that amount plus interest, costs, and attorney's fees pursuant to TEX. CIV. PRAC. & REM. CODE § 38.001 *et seq.*

## VI.    JURY DEMAND

81.    Plaintiffs request the right to a jury trial in this matter.

## VII.    REQUEST FOR DISCLOSURES

82.    ursuant to TEX. R. CIV. P. 194, you the Defendants are requested to disclose, within 30 days of service of this request, the information or material described within RULE 194.2.

## VIII.    PRAYER

83.    WHEREFORE, THE FOREGOING CONSIDERED, Plaintiff respectfully requests that he be granted judgment with respect to all causes of action asserted herein, and hereby requests that Defendants be cited to appear and answer and that on final trial Plaintiff receive and have:

A.    Judgment against Defendants in the amount of $198,401.73;

B.    Judgment against Defendants for past and future actual damages;

C.    Judgment against Defendants for past and future economic damages;

D.    Judgment against Defendants for exemplary damages;

E.    Judgment against Defendants for attorney's fees incurred in this matter;

F.    Judgment against Defendants for all costs of court; *and*

G.     Such other and further relief to which Plaintiff may show himself justly entitled.

Respectfully submitted,

**/s/ J. Brandon Schuelke**
J. Brandon Schuelke
State Bar No. 24120663
Kimberly W. Atwell
State Bar No. 18134300
**MOSTER CRAFT, P.C.**
4920 South Loop 289, Suite 101
Lubbock, TX 79414
brandon@themosterlawfirm.com
katwell@themosterlawfirm.com
Phone: (806) 778-6486
Facsimile: (866) 302-7046

*Counsel for Plaintiffs*

DocuSign Envelope ID: A455F32C-81D6-4747-A037-FD13049BEBD3



PLAINTIFF'S
EXHIBIT

**A**

# ZENITH

6010 Highway  191 Ste 245
Odessa TX 79762
432-248-9047
LIC:355067 TDLT:B18774

## Zenith Installation Agreement

Name: Seth Cummings                                  Phone: (228) 265-2301
Address: 4200 downing                Midland          TX 79707 Email: Sethcummings@hotmail.com
Total System Cost: 48996.23          Rebates and Incentives:
System Size: 12.480      KW          Estimated annual production year: 18894      KWH
Workmanship: 25-year limited warranty roof
Penetration: 25 year limited warranty product
Manufacture: Various manufacture warranties
Installation Timeline Approximate Start Date: 14-60 days from the date of the last amendment to
this Agreement Approximate Completion: 60-90 days from the date of the last amendment to this
agreement

## Solar Photovoltaic Installation Agreement

Name: Seth Cummings                                  Phone: (228) 265-2301
Address: 4200 downing          Midland          TX 79707  Representative: Derek Seethaler

This Solar Photovoltaic Installation Agreement (this "Agreement"), dated as of 6/18/2020 , ___ is
between Zenith Solar, LLC ("Zenith"), and you ("Customer") (Zenith and Customer hereby
sometimes referred to as "Parties") for the sale and installation of the Solar Photovoltaic System
described below (the "System") at your home (the "Property"). The Parties agree as follows:

### KEY TERMS AND CONDITIONS

1. **CONTRACT PRICE** The price for the System is $ 48996.23      ("Contract Price") is subject to
   final site survey and any amendments and change orders agreed to in writing by
   both parties.

2. **SYSTEM DESCRIPTION** As currently configured:

| SYSTE, Component | QTY | MAKE/MOEL |
|---|---|---|
| System Size KW DC | 12.480 | |
| SOLAR PV | 39 | MISSION |
| INVERTER | 39 | Enphase- IQ7 |
| ENERGY STORAGE. | | |
| ENERGY MONITORING | 1 | ENPHASE |
| THERMOSTATS | | |
| OTHER SERVICES | | |

DocuSign Envelope ID: A455F32C-81D6-4747-A037-FD130490DE0D3

### 3. PAYMENT OPTIONS

3. **Third Party Lending / Lease Option:** $ 48996.23 ___ Cash Payment Option / Down Payment: $_____ Customer agrees and acknowledges that this Agreement is separate and independent of any financing or loan agreement entered into with any third party lending company for the purchase or lease of the System equipment. Please refer to the separate loan/lease agreement for terms and conditions, payment terms and schedule.

4. **For a cash payment plan:** Amount due at signing of this Agreement (20%) or Down Payment amount $_____ Amount due before or at installation (70%) $_____ Amount due at activation (10%) $_____ Normal method of payment is via ACH or EFT transfers. Zenith will accept payment via check or credit card (3% convenience fee will apply for all credit card transactions).

### 4. WARRANTY

The Installed System comes with full and original manufacturer warranties. Additionally, Zenith provides a 25-year limited workmanship that the system is designed, engineered and installed according to applicable requirements for the System to operate without major defects. Furthermore, Zenith provides a 25-year limited warranty regarding roof penetration. (See Appendix, paragraphs 17 and 18 for additional details).

### 5. INSTALLATION TIMELINE:

**Approximate Start Date:** 14-90 days from the date of the last amendment to this Agreement **Approximate Completion Date:** 60-90 days from the date of the last amendment to this Agreement Zenith will start and complete install of the System within a reasonable amount of time after the date of this Agreement, typically within 14-90 days of execution of this Agreement; provided however, this performance timeline is an estimate and may be adjusted as provided in this Agreement or any subsequent amendments, including delays due to late payments, permitting, HOA approval, availability of parts and materials, weather, Acts of God, or unforeseen conditions beyond Zenith's control. When Zenith completes installation of the solar panels and the inverters(s), then substantial completion of the work to be performed under this Agreement shall be deemed to have occurred.

1. The pricing in this Agreement is valid for 30 days from the date set forth above. If Customer does not sign this Agreement and return it to Zenith on or before that date, Zenith reserves the right to reject this Agreement unless Customer agrees to Zenith's then-current pricing.

### 6. ACKNOWLEDGMENTS

_____ Customer understands that Zenith cannot give Customer tax advice regarding the federal solar investment tax credit, and that Customer should confirm eligibility for the tax credit with Customer's tax advisor. We do our best to ensure all projections we provide are as accurate as possible, and that any energy used above and beyond your solar production will need to be

purchased from your utility company

2.

Cummings - 0002

DocuSign Envelope ID: A455F32C-81D6-4747-A037-FD13049BEBD3

8. NOTICE OF RIGHT TO CANCEL

YOU MAY CANCEL THIS AGREEMENT AT ANY TIME PRIOR TO MIDNIGHT OF THE
THIRD BUSINESS DAY AFTER THE DATE YOU SIGN THIS AGREEMENT. SEE THE
ATTACHED NOTICE OF CANCELATION FORM FOR AN EXPLANATION OF THIS RIGHT.

9. ADDITIONAL RIGHTS TO CANCEL

IN ADDITION TO ANY RIGHTS YOU MAY HAVE TO CANCEL THIS AGREEMENT IN
SECTION 8 OF THE APPENDIX OF THE GENERAL TERMS AND CONDITIONS, YOU MAY
CANCEL THIS AGREEMENT, AT A COST TO REIMBURSE ZENITH FOR ACTUAL
INCURRED COSTS FOR PERMITS, DESIGN, ETC AT ANY TIME PRIOR TO
COMMENCEMENT OF CONSTRUCTION ON CUSTOMER'S HOME.

PLEASE SEE ADDITIONAL TERMS AND CONDITIONS ON PAGES FOLLOWING THIS SIGNATURE
PAGE. CUSTOMER ACKNOWLEDGES THAT THEY HAVE RECEIVED A COPY OF THIS AGREEMENT
AND READ AND UNDERSTOOD ALL TERMS AND CONDITIONS WHICH ARE INCORPORATED BY
REFERENCE HEREIN.

Customer's Name: Seth Cummings

Signature: _____
58CF70342SE1445

Date: 6/18/2020

Customer's Name: _____

Signature: _____

Date: _____

Zenith : Derek Seethaler

Signature: _____
2184C09008274F3

Date: 6/18/2020

You are entitled to a completed copy of this Agreement, signed by both you and Zenith, before any work
may be started.

DocuSign Envelope ID: A455F32C-81D6-4747-A037-FD13049BEBD3

## NOTICE OF CANCELLATION

You may CANCEL this transaction, without any Penalty or Obligation, within THREE BUSINESS DAYS from the above date.

If you cancel, any property traded in, any payments made by you under the contract or sale, and any negotiable instrument executed by you will be returned within TEN BUSINESS DAYS following receipt by the seller of your cancellation notice, and any security interest arising out of the transaction will be cancelled.

If you cancel, you must make available to the seller at your residence, in substantially as good condition as when received, any goods delivered to you under this contract or sale, or you may, if you wish, comply with the instructions of the seller regarding the return shipment of the goods at the seller's expense and risk.

If you do make the goods available to the seller and the seller does not pick them up within 20 days of the date of your Notice of Cancellation, you may retain or dispose of the goods without any further obligation. If you fail to make the goods available to the seller, or if you agree to return the goods to the seller and fail to do so, then you remain liable for performance of all obligations under the contract.

To cancel this transaction, mail or deliver a signed and dated copy of this Cancellation Notice or any other written notice, or send a telegram, to Zenith Security, LLC, at 6010 Highway 191 Suite #245, Odessa, TX 79762, NOT LATER THAN MIDNIGHT OF 06/23/2020

I HEREBY CANCEL THIS TRANSACTION.

DATE:_____

BUYER'S SIGNATURE_____

DocuSign Envelope ID: A455F32C-81D6-4747-A037-FD13049BEBD3

## APPENDIX – GENERAL TERMS AND CONDITIONS

**1. CHANGES, PERMITS, REBATES,INCENTIVES**   Zenith will use good faith reasonable efforts to provide reasonable figures in this Agreement. Following Zenith's site inspection, Zenith will amend this Agreement with revised figures. If the numbers provided materially differ from the prior estimates. Customer agrees that Zenith will not have any financial obligation to Customer regarding any difference between actual figures presented in any amendment to this Agreement and the estimated figures in the initial Agreement.   Any changes to the System will be documented in a written amendment to this Agreement signed by both Customer and Zenith. Customer authorizes Zenith to make corrections to the utility and incentive paperwork to conform to this Agreement or any amendments to this Agreement that the Parties both sign.   Customer acknowledges that the System equipment and materials Zenith will furnish and install are subject to cost increases. Zenith will hold the Contract Price for six (6) months after the date of the last signed amendment to this Agreement. After six (6) months, if the cost of any System equipment or material rises by any unusual amount because of circumstances beyond Zenith's control, including but not limited to market price fluctuations or a site audit that reveals the need for additional materials or labor, then Zenith shall have the right to present Customer with a change order for the System equipment with a new price. Customer will have the right to accept or reject this new price and get Customer's deposit, if any, back, If Customer does not accept the new price, Zenith shall have the right to terminate this Agreement and any amendments and issue Customer a full refund, upon which the Parties shall have no further obligations to one another.    Zenith will obtain any necessary permits. Zenith shall not be responsible for delays in work due to the actions of any permitting and regulatory agencies or their employees. Customer will pay to Zenith or the taxing party as applicable for any taxes or assessments required by federal, state or local governments or related regulatory agencies or utilities.
   Depending on the state and utility district in which you reside, Customer may be eligible for various state and local rebates and incentives. If applicable, the rebate and incentive calculations Zenith provides to Customer are only estimates. These estimates are based on certain assumptions that may not be applicable based on the circumstances specific to the System. However, actual rebates and incentives are variable as eligibility requirements, funding availability and rates may change. In an effort to assist Customer in capturing your rebate, Zenith will use good faith reasonable efforts to help Customer secure applicable rebates and incentives, but Zenith shall have no financial obligation to Customer regarding actual rebate and incentive amounts received. Customer agrees to pay the Contract Price in full regardless of the actual amount of rebates and/or incentives you receive. Customer also directs Zenith to apply any rebate or incentive, beyond those sold to Zenith under the any renewable energy credit set forth in an utility rebate form, which Zenith obtains on behalf of the Customer, toward paying down the outstanding balance owed Zenith.

**2, EXTRA WORK AND CHANGEORDERS** Note about Extra Work and Change Orders. Extra Work and Change Orders become part of the contract once the order is prepared in writing and signed by the Parties prior to commencement of any work covered by the new change order. The order must describe (i) the scope of the extra work or change; (ii) the cost to be added or subtracted from the contract; and (iii) the effect the order will have on the schedule of progress payments or the completion date. Notwithstanding this provision, the Zenith or its contractors shall have the right to

DocuSign Envelope ID: A455F32C-81D6-4747-A037-FD13049BEBD3

substitute System equipment without Customer's agreement, so long as that substitution adds no extra cost to the System and does not materially affect the System's performance. Zenith's failure to comply with the requirements of this paragraph does not preclude the recovery of compensation for work performed based on legal or equitable remedies designed to prevent unjust enrichment.   If the Agreement includes re-roof services at the Property, actual costs of the re-roof may differ from a previously provided estimate due to unforeseen conditions or problems which may require additional material and/or labor to complete the re-roof. Any changes to the cost or scope of the re-roof will be agreed upon by both Parties in writing before any further work is performed.

**3. PROPERTY CONDITIONS**   Customer will be responsible for the ongoing structural integrity of the location where the System is installed, including structural, roofing or electrical modifications necessary to prepare your Property for the System. Customer agrees that Zenith is not responsible for any known or unknown Property conditions.   Customer hereby acknowledges and agrees that any error or omission in the installation of the System must be brought to the attention of Zenith in writing within five (5) days after the completion of installation; otherwise, the installation shall be deemed accepted by and satisfactory to Customer.

**4. EXISTING CONDITIONS**   Zenith is not responsible and bears no liability for the performance of existing electrical equipment at the Property, including but not limited to the main electrical service panel, any major electrical devices, or any other fuses or similar devices.

**5. COST OR DELAY DUE TO UNFORESEEN CONDITIONS**   Zenith is not responsible for failures, delays or expenses related to unanticipated, unusual, or unforeseen conditions at the Property arising out of conditions beyond Zenith's reasonable control or as a result of unanticipated delays or changes in requirements by Customer's local electric utility (or any acts of God, acts of War, civil unrest, strikes, riots, insurrection, storms, fires, floods, earthquakes, natural disasters, power failures, or shortages of labor or materials (all of which together shall be considered "Force Majeure Events"). Performance times under this Agreement will be considered extended for a period of time equivalent to the time lost due to such Force Majeure Events. If Zenith discovers unforeseen conditions requiring additional cost, then Zenith shall present such costs to Customer and get Customer's written approval before beginning or continuing performance. **Failure to provide such approval may result in Zenith exercising its termination rights pursuant to Section 8 of this Agreement.**

**6. PROPERTY ACCESS**   Customer grants to Zenith and its employees, agents and contractors the right to reasonably access all of the Property as necessary for the purposes of (i) installing, constructing, operating, repairing, removing and replacing the System or making any additions to the System; (ii) installing, using and maintaining electric lines and inverters and meters, necessary to interconnect the System to Customer's electric system at the Property and/or to the utility's electric distribution system; or (iii) taking any other action reasonably necessary in connection with the construction, installation, operation, maintenance, removal or repair of the System.

**7. TITLE AND RISK OF LOSS** Title to they system shall transfer to Customer when we complete installation of the System. After delivery of the System equipment and materials to Customer's Property, other than damage directly resulting from Zenith's actions, Customer bears the risk of loss to the System, including all losses occurring after the warranty period. Zenith retains all Zenith - owned intellectual property rights on any of the equipment installed in the Customer's System including, but not limited to, patents, copyrights and trademarks. Customer hereby grants Zenith a perpetual, non-exclusive license to any data generated by any monitoring system installed as part of the System.

**8. TERMINATION AND DEFAULT** Zenith may terminate this Agreement, upon seven (7) days written notice, for any material or non-material breach, for any failure of Customer to agree to an appropriate change order, for any failure of Customer to pay Zenith any amount due, for any

DocuSign Envelope ID: A455F32C-81D6-4747-A037-FD13049BEBD3

bankruptcy or financial distress of Customer, or for any hindrance to Zenith in the performance process.

**9. REMEDIES UPON CUSTOMER BREACH** Without limiting any of Zenith's other rights and remedies, upon any breach by Customer, including any failure of Customer to pay Zenith any amount due, Zenith shall have the right to: (i) pursue a stop work order at the Property; (ii) prevent any more work from being done at the Property until the breach is cured and a bond is posted by the Customer for any amounts payable under this Agreement; (iii) repossess the System; (iv) recover all amounts due under this Agreement for services provided through the date of termination, including interest for any amounts due Zenith past due for thirty (30) days, subject to a one and one-half percent (1.5) interest charge for each month on the unpaid balance, this being equivalent to 18% per year, or subject to the maximum annualized interest rate allowed by applicable law, whichever is the lesser amount; (v) remove any System materials or equipment from the Property; (vi) submit to credit reporting agencies (credit bureaus) negative credit reports that would be reflected on Customer's credit record; (vii) recover all attorneys fees, court costs and other collection costs; and (viii) any other legal remedies including but not limited to mechanics' liens or similar remedies. In the event of a repossession of the System and resale thereof, Customer shall be responsible to Zenith for any deficiency remaining after Zenith applies the proceeds of such resale, first to all costs of repossession and resale, including, but not limited to, storage, repair, renovation, alteration, attorney's fees, collection costs and commissions, and then to the unpaid amount due hereunder.

**10. MECHANICS' LIEN** Customer acknowledges that Customer is aware that if Customer defaults in the performance of any of the terms or conditions of this Agreement, Zenith may have the right to record a Mechanic's Lien upon any property upon which Zenith has bestowed labor and/or furnished material or appliances or equipment, for the value of such labor done, or materials furnished, and/or for the value of the use of such appliances or equipment, whether done or furnished at the instance of the owner or any personal acting by or under the authority of the owner, or under the owner as a contractor or otherwise. Customer may be entitled to protect himself/herself/itself under applicable law again such claims either by filing with the court a "No Lien Agreement" or a payment bond, depending upon the law of the state where the Property is located. To the extent required by applicable law, upon satisfactory payment for any portion of the work performed, Zenith shall, furnish to Customer a full and unconditional release from any claim or mechanics' lien for that portion of the work for which payment has been made.

**11. ZENITHS' INSURANCE  Commercial General Liability Insurance (CGL).** Zenith carries commercial general liability insurance. with products and completed operations coverage with coverage amounts that meet or exceed those required by applicable law. **Workers' Compensation Insurance.** Zenith carries workers' compensation insurance, with employer's liability coverage, for all employees in compliance with applicable law.

**12. THIRD PARTY INDEMNIFICATION** When Customer in the ordinary course has the property of others in Customer's custody or other persons are on the Property, Customer agrees to and shall indemnify, defend and hold harmless Zenith and its employees and agents from and against all claims brought by parties other than the parties to brought by parties other than the parties to this Agreement. This provision shall apply to all claims, demands, or lawsuits, regardless of cause, including Zenith' performance or failure to perform any of the obligations herein, Zenith' negligence, or a failure of the System, whether these claims are based upon negligence, express or implied warranty, contribution, indemnification, strict liability, or product liability, on the part of Zenith or its employees or agents.

**13. SUBROGATION**   Customer hereby releases, discharges, and agrees to hold Zenith harmless from any and all claims, liabilities, damages, losses or expenses, arising from or caused by any hazard covered by insurance in, about or to the Property whether said claims are made by Customer, Customer's agents, or insurance company or other parties claiming under, or through Customer.

DocuSign Envelope ID: A455F32C-81D6-4747-A037-FD13049BEBD3

Customer agrees to indemnify Zenith against and defend and hold Zenith harmless from any action for subrogation which may be brought again Zenith by any insurer or insurance company or its agents or assigns including the payment of all damages, expenses, costs, and attorney's fees. Customer shall notify Customer's insurance carrier of the terms of this provision.

**14. GOVERNING LAW**   This Agreement shall be governed by and construed in accordance with the laws of the State of Texas, without regard to principles of conflicts of law thereof. By executing this Agreement, the parties agree to submit to the exclusive jurisdiction of and agree to the exclusive venue of the courts of the State of Texas, whether state courts or federal courts located in Odessa, Texas. The parties hereto agree not to bring an action in any court of law located outside the State of Texas.

**15. ENTIREAGREEMENT**   This Agreement contains the parties' entire agreement regarding the System. There are no other agreements regarding this Agreement, either written or spoken. Any change to this Agreement must be in writing and signed by all parties. Only an authorized employee of Zenith may execute any change to this Agreement on behalf of Zenith. If any portion of this Agreement is determined to be unenforceable or invalid, the remaining provisions shall be enforced in accordance with their terms or shall be interpreted or re-written so as to make them enforceable. Provisions that should reasonably be considered to survive termination of this Agreement shall survive. Zenith may assign or subcontract any of its rights or obligations under this Agreement to any successor, partner or purchaser, without providing notice to Customer.

**16. WAIVER**   Any delay or failure of a party to enforce any of the provisions of this Agreement, including but not limited to any remedies listed in this Agreement, or to require performance by the other party of any of the provisions of this Agreement, shall not be construed to (i) be a waiver of such provisions or a party's right to enforce those provisions; or (ii) affect the validity of this Agreement.

**17. PRIVACY/PUBLICITY**   Customer grants Zenith the right to publicly use, display, share, and advertise the photographic images, System details, price and any other non-personally identifying information of your System. Zenith shall not knowingly release any personally identifiable information about Customer or any data associating Customer with the Property. Customer may opt-out of these publicity rights by giving Zenith written notice and mailing it to: Zenith, 6010 Highway 191, #245, Odessa, TX 79762

**18. LIMITED WARRANTY**   System(s) installed receive the full and original manufacturer warranties. Additionally, Zenith acknowledges that implied warranties (workmanship and roof penetration) exist in almost every state and are governed as such. Zenith agrees to abide by and honor these implied warranties.  **Workmanship Warranty:** Zenith warrants that the System has been designed, engineered and constructed in accordance with applicable requirements and that it is capable of operating free of major defects in accordance with manufacturer specifications for 25 years from the installation of the System.   **Roof Penetration Warranty:** With respect to all roof penetrations, Zenith warrants that such roof penetrations shall be free from material defects in workmanship for 25 years from the installation of the System.   CUSTOMER UNDERSTANDS THAT THE SYSTEM IS WARRANTIED UNDER THE TERMS NOTED ABOVE, AND THAT THERE ARE NO OTHER REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, AS TO THE MERCHANTABILITY, FITNESS FOR ANY PURPOSE, CONDITION, DESIGN, CAPACITY, SUITABILITY OR PERFORMANCE OF THE SYSTEM OR ITS INSTALLATION. UPON RECEIPT OF PAYMENT IN FULL UNDER THIS AGREEMENT, ALL WARRANTIES THAT ARE PROVIDED BY MANUFACTURERS OF EQUIPMENT USED IN THE SYSTEM WILL BE TRANSFERRED DIRECTLY TO CUSTOMER. CUSTOMER UNDERSTANDS THAT ZENITH SOLAR, LLC HAS NO RESPONSIBILITY WITH RESPECT TO SUCH WARRANTIES OTHER THAN TO TRANSFER THEM TO CUSTOMER.

**19. LIMITATION OF LIABILITY. No Consequential Damages.** EACH PARTY'S LIABILITY TO THE

DocuSign Envelope ID: A455F32C-81D6-4747-A037-FD13049BEBD3

OTHER UNDER THIS AGREEMENT SHALL BE LIMITED TO ONLY, ACTUAL DAMAGES DIRECTLY RELATING TO THE INSTALLATION OF THE SYSTEM. BOTH PARTIES AGREE THAT IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER FOR CONSEQUENTIAL, INCIDENTAL, PUNITIVE, EXEMPLARY, SPECIAL OR INDIRECT DAMAGES. **Actual Damages.** Neither party's liability to the other will exceed the cost of the installed equipment or $15,000 whichever is less, including without limitation, damages to Customer's home or property during the performance of the System or resulting from the System. EXCEPTING THE OTHER PROVISIONS UNDER THIS HEADING, ZENITH DISCLAIMS AND CUSTOMER WAIVES ALL EXPRESS OR IMPLIED WARRANTIES INCLUDING (WITHOUT LIMITATION) ANY IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE. ZENITH SHALL NOT BE LIABLE TO CUSTOMER UNDER THIS WARRANTY IF AN ALLEGED DEFECT IN ANY WORK OR EQUIPMENT WAS CAUSED BY CUSTOMER'S OR ANY THIRD PERSON'S (FOR WHOM ZENITH IS NOT RESPONSIBLE AS PROVIDED HEREIN) MISUSE, NEGLECT, UNAUTHORIZED ATTEMPTS TO REPAIR, OR ANY OTHER CAUSE BEYOND THE RANGE OF THE INTENDED USE, OR BY ACCIDENT, FIRE, LIGHTNING, OR OTHER HAZARD.

**20. NOTICE REGARDING PERFORMANCE AND PAYMENT BONDS**  The owner or tenant in a home improvement contract has the right to require the contractor to have a performance and payment bond.

**21. SEVERABILITY**  If any provision of this Agreement is declared by a court of competent jurisdiction to be invalid, illegal, or unenforceable, such provision shall be severed from this Agreement and the other provisions shall remain in full force and effect.

**22. NOTICE OF PHOTO/VIDEO RELEASE**  Zenith may, during any point during the term of this agreement, take still photographs or video of the installation site for training, documentation, education or promotional purposes. Zenith will not release any personal information or personally identifiable images or video without written permission from the person/persons in the images or video. Acceptance of this Agreement will be considered a legal release by Customer to allow Zenith to engage in this activity. .

**23. CANCELLATION FEES** In the event you cancel this Contract, you agree to pay cancellation fees according to the following cancellation fee schedule: Number of Days from Effective Date 1-3 No Fee. 4-7 days (Pre-Job Phase) 3% of the Contract Price to cover loan processing fees and set up fees and $500 Site Survey Fee. 7-14 days (Engineering Phase) 3% of the Contract Price to cover loan processing fees and set up fees, $500 Site Survey Fee, $350 engineering Fee and $750 project management and origination fee. 14- 30 days (Engineering Phase) 3% of the Contract Price to cover loan processing fees and set up fees, $500 Site Survey Fee, $350 engineering Fee and $750 project management and origination fee 15% of material cost and Net Metering Fee (if applicable).


PLAINTIFF'S
EXHIBIT

B

## Residential Roof Report: 21885                    , 4200 Downing Ave, Midland, TX 79707, USA

Notes Diagram



DAMAGE

Field Notes

**6**

DocuSign Envelope ID: B47EDDA8-E73A-4FA2-A798-5F6FDA7A6AC8

Loan Agreement Cover Page



PLAINTIFF'S
EXHIBIT

**C**

# LOANPAL

## finance made friendly

# Loanpal Agreement

# FOR

Seth Cummings

DS
SC

DocuSign Envelope ID: B47EDDA8-E73A-4FA2-A798-5F6F0A7A6AC8



Congratulations!

Thank you for choosing Loanpal as your loan provider.

In this Package, you will be signing your loan agreement with the following terms:

## Key Loan Terms

| $45,817.43 | 20 YEARS | 2.99 % |
|---|---|---|
| Loan Amount | Loan Term | Interest Rate/APR |
| SC | SC | SC |

| $191.82 | Your initial Loanpal monthly payment for the first 18 months. SC |
|---|---|

| $261.75 | Your adjusted Loanpal monthly payment starting in month 19 until the end of your loan term if no voluntary payments are made in the first 18 months. |
|---|---|

Your loan is designed to re-amortize at the end of the 18th month. If you choose to make voluntary prepayments on your loan equal to 26% of your loan amount before the end of the 18th month, your loan payment will stay approximately the same as your initial monthly payment throughout the life of your loan. If you do not make a voluntary prepayment, your monthly loan payment will go up to the adjusted amount.

Borrower Initials  SC                  Co-Borrower Initials _____

Your loan start date is the date we fund the loan to your Contractor. Interest on your loan begins to accrue on the loan start date.

Your first payment date will be due approximately 60 days after your loan start date.  Your first payment date may be before your system has been granted Permission to Operate from your utility company.

Borrower  Seth Cummings                Co-Borrower: _____
          DocuSigned by:
          585E703425E1445

If you have any questions about your loan or your loan terms after reviewing this package, please call Loanpal at 1(844)910-0111.

Thank You,

The Loanpal Team

DocuSign Envelope ID: B47EDDA8-E73A-4FA2-A798-5F6FDA7A6AC8

**LOANPAL**
8781 Sierra College Blvd, Roseville, CA 95661  Phone: 1-877-290-9991

## Truth in Lending Disclosure Statement

Borrower: Seth Cummings
Co-Borrower:
Email: Sethcummings@hotmail.com
Phone:
Loan Agreement Number: 20-05-025003

Residence Address: 4200 downing
Midland, TX
79707

Date of the Agreement: 6/18/2020

| ANNUAL PERCENTAGE RATE The cost of your credit as a yearly rate | FINANCE CHARGE The dollar amount the credit will cost you | Amount Financed The amount of credit provided to you or on your behalf | Total of Payments The amount you will have paid after you have made all payments as scheduled |
|---|---|---|---|
| 2.99 % | $15,549.80 | $45,817.43 | $61,367.00 |

### Monthly Payment Schedule

| Number of Payments | Amount of Payments | When Payments Are Due |
|---|---|---|
| 1 | $191.82 | Monthly, beginning 2 months after the Loan Start Date (e) |
| 16 | $191.82 | Monthly, beginning 3 months after the Loan Start Date (e) |
| 221 | $261.75 | Monthly, beginning 19 months after the Loan Start Date (e) |
| 1 | $259.54 | 240 months after the Loan Start Date (e) |

"(e)" means an estimate

| | |
|---|---|
| Security: | You are giving a security interest in the personal property you are purchasing in this transaction and your rights under any related agreement. |
| Prepayment: | If you pay off your loan early, you will not have to pay a penalty. |
| Contract Reference: | See your Loan Agreement ("Agreement") for any additional information about nonpayment, default, and any required repayment in full before the scheduled date. |

### Itemization of Amount Financed

| Itemization of the amount financed: | $45,817.43 | |
|---|---|---|
| Amount given to you directly. | $0 | |
| Amount paid to others on your behalf: | $45,817.43 | to Zenith Security |

The "Loan Start Date" is the date we send funds to your contractor. This date must be within 180 days of the initial application date.

This loan is assumable upon the sale of the property to a new owner, if the new home owner qualifies under Loanpal's underwriting guidelines.

The Payment Schedule shown above assumes that you make no voluntary prepayments on your Loan. However, we have designed the Loan so that it will re-amortize at the end of the 18th month after your Loan Start Date. As a result, if you make all scheduled payments on time and also make sufficient voluntary prepayment(s) to reduce your total loan amount to the "Target Balance" by the "Target Balance Date" described in your Agreement, your payments from month 19 through the end of your term will be approximately equal to your initial monthly payment stated above.

By signing below, you acknowledge that you have read and received a complete copy of this disclosure to keep for future reference before you signed your Agreement.

Borrower: Seth Cummings
Date: 6/18/2020

Co-Borrower: _____
Date: _____

Loanpal: *Matt Dawson*
Matt Dawson, COO

Cummings - 00013

DocuSign Envelope ID: B47EDDA8-E73A-4FA2-A798-5F6FDA7A6AC8

**LOANPAL**

8781 Sierra College Blvd, Roseville, CA 95661   Phone: 1-877-290-9991

## Loan Agreement

Borrower: Seth Cummings
Co-Borrower:
Email: Sethcummings@hotmail.com
Phone:
Date of Agreement: 6/18/2020

Residence Address: 4200 downing
Midland, TX
79707

This document provides a Summary of the terms and conditions of your Loan.

### SUMMARY OF LOAN TERMS AND PAYMENTS

| 20 YEARS | $45,817.43 | $191.82 | 2.99 % | $32,676.77 | 02/17/2022 | $261.75 |
|---|---|---|---|---|---|---|
| LOAN TERM | TOTAL LOAN AMOUNT | INITIAL MONTHLY PAYMENT | FIXED INTEREST RATE / APR | TARGET BALANCE | TARGET BALANCE DATE | ADJUSTED MONTHLY PAYMENT* |

(e) means estimate
Adjusted monthly payment assumes that no prepayment was made and the Target Balance was not met by the Target Balance Date

### SYSTEM INFORMATION

Installation Contractor: Zenith Security

Purchased Goods under this Loan Agreement will be detailed in your Home Improvement Agreement with your Contractor. By initialing below, you confirm receipt of such Home Improvement Agreement.

Borrower's Initials: SC          Co-Borrower's Initials: _____

### LOAN INFORMATION

**Loan Start Date and First Payment Date**

The "Loan Start Date" and "First Payment Date" will be finalized in your Loan Closing Certificate (Exhibit A), an example of which is fully incorporated herein. This certificate will be sent to you following disbursement of the loan proceeds.

The "Loan Start Date" will be the date that we disburse loan proceeds to your Contractor.

The "First Payment Date" will be set by us as follows: If the Loan Start Date is on the 1st through 28th, it will be on the corresponding date two months later (i.e., if June 15th, then August 15th); if the Loan Start Date is on the 29th through 31st, it will be on the first day of the first month following 60 days after the Loan Start Date (i.e., if June 30th, then September 1st). You are obligated to make all loan payments starting on your First Payment Date, regardless of the utility company granting permission to operate.

Borrower's Initials: SC          Co-Borrower's Initials: _____

Interest will accrue on the loan amounts actually disbursed, with the first accrual starting on the first calendar day following the Loan Start Date. Thus, the longer your First Payment Date is from the Loan Start Date, the more interest you will pay. If you wish to reduce the amount of interest that accrues, you can begin making payments earlier, at any time you choose after the Loan Start Date. However, interest will continue to accrue until all amounts owed under this Agreement are paid in full.

Your loan application was approved for a period of 180 days from the initial credit report date. If the Loan Start Date does not occur within 180 days from the initial credit report date, we will request a new credit report from the credit bureaus, to make sure that you continue to qualify for the same loan terms. This may impact your credit score.

**Tax Credit**

You may be eligible for a federal solar investment tax credit. You acknowledge that eligibility for this tax credit is not guaranteed. In order to realize the benefits of the solar investment tax credit, you must have federal income liability that is at least equal to the value of the credit. We are not financially responsible for your receipt of any tax credits related to the Solar Equipment. We do not provide tax advice and nothing in this Loan Agreement is intended to be used as tax advice. To determine your eligibility for any federal solar investment tax credit, you should make an independent assessment or consult with your tax advisor.

**Target Balance Payments and Initial Monthly Payments**

You are not required to make prepayments. However, you acknowledge that in order to avoid an increase in your Initial Monthly Payment, you must make one or more voluntary prepayments equal to 26% of your Total Loan Amount by your Target Balance Date. If you pay more than 26% of your Total Loan Amount, your monthly payments will be adjusted to a lower amount than the Initial Monthly Payment. If you do not make any prepayments, or if your prepayments are less than 26% of your Total Loan Amount, your monthly payments will be adjusted to a higher amount than the Initial Monthly Payment. You also understand that your Initial Monthly Payment will not be fully amortizing, but your new Monthly Payment after the Target Balance Date will be fully amortizing.

Borrower's Initials: SC          Co-Borrower's Initials: _____

**Security Agreement**

You authorize us to file on your behalf any documentation, including but not limited to a copy of this Agreement, a UCC financing statement and/or a county fixture filing required to perfect our security interest in the Collateral to the extent required by applicable law, as outlined in Section 6 of this agreement.

**FOR MASSACHUSETTS BORROWERS ONLY: You, the buyer, may cancel this transaction at any time prior to midnight of the third business day after the date of this transaction. See the attached notice of cancellation form for an explanation of this right.**

### LOAN AGREEMENT

Cummings - 00014

DocuSign Envelope ID: B47EDDA8-E73A-4FA2-A798-5F6FDA7A6AC8

THIS AGREEMENT IS LEGALLY BINDING AS OF AND FOLLOWING THE DATE OF THIS AGREEMENT. IN THIS AGREEMENT, THE WORDS "YOU" AND "YOUR" REFER TO BORROWER, CO-BORROWER AND BORROWER'S AND/OR CO-BORROWER'S PERMITTED ASSIGNEES, AND THE WORDS "LENDER," "WE," "US" AND "OUR" REFER TO LOANPAL OR ITS ASSIGNEES. THIS AGREEMENT SUPERSEDES ANY PRIOR AGREEMENT BETWEEN YOU AND US CONCERNING THE SAME SUBJECT MATTER.

1.  **INTRODUCTION.** The parties (each, a "Party" and collectively, "Parties") to this Agreement are you and Loanpal, LLC ("Loanpal"). Your solar installation contractor ("Contractor") has provided us with a copy of a signed home improvement agreement between you and the Contractor (the "Home Improvement Agreement") under which the Contractor will install solar panels, inverters, racking systems, wiring, electrical and mechanical connections, metering, monitoring and/or other distributed generation interconnect equipment ("Solar Equipment") and may, in addition or instead, install new roofs and related roofing materials, battery storage equipment, electrical vehicle power charging equipment, and thermostat equipment, and provide landscaping services to accommodate the solar system (together with the Solar Equipment, "Purchased Goods") at your home ("Residence") located at the Residence Address listed above.

2.  **PROMISE TO PAY.** For value received, you promise to pay to Loanpal and/or its assignees, the principal sum of the Total Loan Amount, with interest as set forth in Section 3 ("Interest and Payments") and any fees assessed in Section 4 ("Fees") below.

3.  **INTEREST AND PAYMENTS.**

a.  Payment Timing. Your first Monthly Payment is due and payable on the First Payment Date (estimated on the Truth in Lending Disclosure and finalized on the Loan Closing Certificate).

b.  Payment Application. If you make a payment that satisfies all current and past due installments, any additional payment will be allocated as set forth in the following sentence, but that additional payment will not change the due date for any payment that comes due in the future. To the extent permitted by applicable law, all payments or prepayments will be applied first to accrued interest, then to unpaid principal in the inverse order of maturity (last to first), and then to fees or costs payable to us under this Agreement

c.  Accrual. Interest will accrue on the loan amounts actually disbursed, with the first accrual starting on the first calendar day following the Loan Start Date. Interest will continue to accrue until all amounts owed under this Agreement are paid in full. Unpaid interest will not be added to the principal balance. To the extent permitted by applicable law, interest on your loan will be calculated on a 30/360 basis. For any partial month, interest accrues based on the actual number of days your loan is outstanding for such partial month. If you make your loan payments late, more interest will accrue, and the total finance charge you pay over the life of your loan will be higher. If you make your loan payments early, less interest will accrue, and the total finance charge you pay over the life of your loan will be less. Interest accrues between the Loan Start Date and your First Payment Date, and the longer the period of time between the Loan Start Date and your First Payment Date, the more interest will accrue. If you wish to reduce the amount of interest that accrues before your First Payment Date, you can begin making loan payments any time after the Loan Start Date. The amount of your final loan payment will change based on when you pay your monthly loan payments and whether you make any voluntary prepayments.

d.  Interest Rate and Monthly Payment Amounts. Your interest rate is fixed (shown on Page 1) throughout the term of your loan. The monthly payments you must make, assuming you make all payments in full and on time, are set forth in your Loan Closing Certificate.

e.  Target Balance / Target Balance Date / Initial Monthly Payment / New Monthly Payment: After the Target Balance Date, your loan will re-amortize to reflect your outstanding principal balance on the Target Balance Date and your new Monthly Payments will be adjusted to an amount required to cause the full repayment of the Loan by the Maturity Date. You understand that your Initial Monthly Payments will not be fully amortizing, but your new Adjusted Monthly Payments after the Target Balance Date will be fully amortizing and will be calculated as follows:

(i)   If you do not make any voluntary prepayments before the Target Balance Date, then your new Monthly Payment will be the Adjusted Monthly Payment.

(ii)  If you make voluntary prepayments but such prepayments do not reduce your Total Loan Amount equal to or below the Target Balance by the Target Balance Date, then your new Monthly Payment will be an amount greater than your Initial Monthly Payment but less than the Adjusted Monthly Payment.

(iii) If you make voluntary prepayments and such prepayments reduce your Total Loan Amount equal to the Target Balance by the Target Balance Date, then your new Adjusted Monthly Payment will be approximately equal to your Initial Monthly Payment.

(iv)  If you make voluntary prepayments to reduce your unpaid Total Loan Amount to less than the Target Balance by the Target Balance Date, then your new Adjusted Monthly Payment will be less than the Initial Monthly Payment reflected in the Loan Summary above for the remainder of the Term.

f.  Maturity Date. Unless your loan is due earlier and payable as provided in this Agreement, your loan will mature on the Maturity Date. On the Maturity Date, you agree to pay in full any unpaid amounts payable under this Agreement.

g.  Payment Method. You may pay by ACH or check. To pay by ACH, complete the Automatic Payment Authorization Form (the "ACH Authorization"). To pay by check, include your Loan Agreement Number on your check and mail it to LOANPAL, PO BOX 4387, Portland, OR 97208. You may change your payment method by following the instructions in the ACH Authorization.

h.  Prepayment. You may prepay your loan at any time without penalty.

4.  **FEES.** We will also charge you the following fees to the extent permitted by applicable law.

a.  Insufficient Funds Fee. Unless prohibited by law, you will be charged a non-refundable fee of $15 for each failed electronic or check payment attempt. Your bank may assess its own fee in addition to the fee we assess.

b.  Fee for the Removal and Refiling of Our County Fixture Filing. See Section 6 below for further information.

c.  Transfer Fee. See Section 6 below for further information.

d.  Alternative Payment Convenience Fee. Where permitted by law, if you request that we accept a payment via an alternative source such as a debit card, you may be charged a convenience fee, in an amount that we will disclose prior to your election to pay by such alternative method.

5.  **ADDITIONAL OBLIGATIONS AND REPRESENTATIONS.**

a.  Collateral. To the extent permissible by law, you irrevocably grant us a limited power of attorney with full power of substitution and re-substitution, to sign any documents and perform any acts, in your name and on your behalf, for the exclusive purpose of exercising our rights with respect to the Collateral under this Agreement. You also agree not to pledge, mortgage, encumber or otherwise permit the Collateral at any time to be subject to any lien or encumbrance that is superior to our security interest. See Section 6 below for further information on what constitutes eligible Collateral under this Agreement.

b.  Ownership Confirmation. You represent and covenant that: (1) the Residence is your primary residential home dwelling or a second/vacation home and is not a rental property, or any business or commercial establishment or used as such; (2) you, or a trust controlled by you, are the fee simple owner of the Residence and the Collateral; (3) you are not, and will not, be in breach of your Home Improvement Agreement.

DocuSign Envelope ID: B47E0DA8-E73A-4FA2-A798-5F6FDA7A6AC8

c. **Collateral Access.** You agree to provide us or our designees after receiving reasonable notice, with access to the Residence for the purposes of (1) inspecting the Purchased Goods until this Agreement terminates or, (2) in the case of a foreclosure on the Collateral, removing the Collateral from the Residence.

d. **Personal Property.** You and we both expressly intend that no portion of the Collateralized Goods will constitute a "fixture" attached to any real property, and that the Collateralized Goods will be removable personal property. You also agree not to take any action that might cause the Collateralized Goods to be treated as real property or as fixtures to real property. You agree that we may make a fixture filing, if we choose, provided that you and we agree that we may enforce rights in the Collateralized Goods under the Uniform Commercial Code and not under state real estate or mortgage law.

e. **Installation and Maintenance.** You will take all steps necessary to enable the installation and proper functioning of the Purchased Goods to be completed in accordance with the Home Improvement Agreement and to be maintained in accordance with any Operations and Maintenance Agreement. You agree to keep the Purchased Goods in good working order and in compliance with manufacturing specifications, the operating and maintenance manuals, warranty requirements provided by your Installation Contractor and, if applicable, your Operations and Maintenance Contractor, and all applicable law, and not to remove or modify the Purchased Goods without our prior written consent. You agree to maintain at all times an internet connection sufficient to ensure that monitoring data for the Solar Equipment can be fully transmitted, and consent to Loanpal receiving such monitoring data, directly or through Contractor. You will be responsible for the structural integrity of the location where the Purchased Goods are installed, including structural or electrical modifications necessary to prepare your Residence for the Purchased Goods.

f. **Property Conditions.** You agree that Loanpal is not responsible for any known or unknown Residence conditions. Loanpal is not responsible and bears no liability for the malfunctioning of existing electrical equipment at the Residence, including but not limited to the main electrical service panel, any major electrical devices, or any other fuses or similar devices.

g. **Taxes.** You agree to pay, when due, your taxes, assessments, or other similar fees. If you do not pay these taxes or other fees when due, we may pay them on your behalf and add the amount we pay to the principal of our loan under this Agreement. In the event that we choose pay these taxes and/or other fees on your behalf, you agree to assist us in these efforts. Tax obligations that you may be required to pay may include: (1) the assessed value and the property tax assessments associated with the Purchased Goods calculated in the year this Agreement is signed; (2) transaction privilege taxes; and (3) any obligation to transfer tax credits or tax incentives of the Purchased Goods to any other person.

h. **Required Insurance.** To the extent permissible by law, you agree to maintain and pay any deductibles under a homeowners' insurance policy or equivalent insurance policy reasonably acceptable to us covering the Purchased Goods in an amount equal to the full replacement and installation cost of the Purchased Goods or the outstanding balance of the loan. If there is a payout under the property coverage for damage to the Purchased Goods, you agree to deliver those insurance proceeds to us, and we will apply those proceeds to the loan in the order of priority set forth in Section 3b. of this Agreement.

i. **Credit Inquiries.** You authorize us to obtain a credit report on you for any legal purpose in connection with this loan, including any update, extension of credit, review, or collection of this loan. Upon request, we will tell you the name and address of the credit bureau furnishing any report.

j. **Bankruptcy.** You represent that you are not contemplating bankruptcy and that you have not consulted with an attorney regarding bankruptcy in the past six months. Any communication with us required or permitted under the Federal Bankruptcy Code must be in writing, must include your loan number, and must be sent to us at the address for Loanpal.

**6.   GRANT OF SECURITY INTEREST IN COLLATERAL.** As consideration for the loan we are providing and to secure your obligations under this Agreement, you hereby grant to us a security interest in the following property (collectively "Collateral"):

a. all Purchased Goods excluding the roof and related roofing materials, if any (such Purchased Goods which excludes the roof and related roofing materials are referred to in this Agreement as "Collateralized Goods");

b. all accessions, attachments, accessories, tools, parts, supplies, replacements of and additions to the Collateralized Goods;

c. all proceeds from warranty claims related to the Collateralized Goods, the Home Improvement Agreement and any Operations and Maintenance Agreement;

d. all your rights, title, interests, and remedies under all agreements and other documentation relating to the Collateralized Goods (including, without limitation, the Home Improvement Agreement, and Operations and Maintenance Agreement);

e. all consideration received from the collection, sale or other disposition of the Collateralized Goods, including any payment received from any insurer arising from any loss, damage or destruction of any Collateralized Goods and any other payment received as a result of possessing any Collateralized Goods, or any other proceeds of Collateralized Goods.

You authorize us to file on your behalf any documentation, including but not limited to a copy of this Agreement, a UCC financing statement and a county fixture filing to perfect our security interest in the Collateralized Goods (in case a third party seeks to classify the panels as a fixture). If you are refinancing your home, upon request, we may agree to lift our county fixture filing, on the Solar Equipment for a limited period of time, provided we will be able to refile upon closing of the mortgage refinancing. A $200 fee will be assessed for the removal and refiling of our county fixture filing.   If you sell your home, your loan must be paid in full to remove the UCC financing statement and county fixture filing. The actual costs incurred, if any, of removing a UCC financing statement or country fixture filing will be added to your payoff amount if you elect to pay your loan in full before the end of the loan term. Alternatively, this loan agreement may be transferred to the new home owner if the new home owner qualifies for the loan product as outlined in Section 12. A $300 transfer fee will be assessed for any transferred loan agreements.

**7.   INDEMNIFICATION.** You agree to indemnify, defend and hold harmless us and our affiliates against any loss, liability, or damage that arises out of or relates to the transactions contemplated by this Agreement

**8.   DEFAULT. You will be in default under this Agreement if any of the following occurs:**

a. you fail to make any payment under this Agreement within fifteen (15) days of the date such payment is due;

b. you fail to perform any of your obligations under this Agreement and you fail to cure such failure to perform to our reasonable satisfaction within thirty (30) days after receiving notice from us of your failure to perform;

c. you terminate the Home Improvement Agreement without our consent after any loan proceeds have been disbursed;

d. you remove, modify, sell or otherwise transfer the Collateral without our approval;

e. any representation made by you on your loan application or this Agreement is false in any material respect when made;

f. any of the following occurs (each a "Bankruptcy Event"): (1) you make an application for the appointment of a receiver, trustee or custodian or a receiver, trustee or custodian is appointed for you or a majority of your assets; (2) you initiate or consent to any legal proceedings under the Bankruptcy Code, or equivalent law providing for the relief of debtors, (3) you make an assignment for the benefit of creditors, or (4) you have a petition in bankruptcy or similar relief of debtors filed against you, which is not withdrawn or discharged within thirty (30) days of being filed.

**9.   REMEDIES.** Our remedies if you default on this Agreement include the following (to the fullest extent permitted by law):

a. **General.** In the event that you are in default under this Agreement, we may:

DocuSign Envelope ID: B47EDDA8-E73A-4FA2-A798-5F6FDA7A6AC8

(1) **Accelerate your Loan:** We would declare our loan immediately due and payable. This requires you to pay in full the unpaid principal amount of the loan, all accrued interest, and any other amounts due under this agreement. Your loan will become immediately due and payable to us under a Bankruptcy Event, regardless of whether or not we take any action.

(2) **Provide a report to the credit bureaus** detailing any late payments, missed payments or other defaults: As required by law, you are hereby notified that a negative report reflecting on your credit record may be submitted to a credit reporting agency if you fail to fulfill the terms of this Agreement.

(3) **Disable / Foreclose on the Collateral:** (and exercise any other rights with respect to the Collateral that we have under this Agreement or applicable law). This includes disabling the Equipment remotely or by entering upon your property; and/or entering upon your property and removing and taking possession of the Collateral and then selling, leasing, or otherwise disposing of the property.

(4) **Pursue all remedies available under applicable law:** Including those of a secured creditor as permitted by applicable law.

(5) **Stop making credit extensions under your loan:** Including ceasing any funding that may be pending on your loan as permitted by applicable law

b. **Cost Reimbursement; Application of Proceeds.** Unless otherwise prohibited by state law, you are to promptly reimburse us, with interest, for all costs and expenses incurred in exercising our remedies related to this Agreement. If we choose to foreclose on the Collateral, we will apply any cash proceeds in the order of priority set forth in Section 3b. of this Agreement and then to you or as a court may otherwise direct.

c. **Deficiency Judgment.** To the fullest extent permitted by law we may require that you pay any amounts payable by you under this Agreement less any proceeds that we realize from our exercise of our remedies under this Agreement.

TO THE FULLEST EXTENT PERMITTED BY LAW, YOU ARE PERSONALLY LIABLE FOR ALL AMOUNTS PAYABLE UNDER THIS AGREEMENT. WE ARE NOT REQUIRED TO FORECLOSE ON THE COLLATERAL BEFORE INITIATING PROCEEDINGS AGAINST YOU AND YOUR ASSETS.

Our rights under this Agreement are cumulative and we may exercise these rights at any time if you default. In the event that we exercise any of our rights or remedies under this Agreement, you will continue to be in default until such time that you pay to us all amounts due and payable to us and you have cured any and all defaults. **OUR FAILURE TO TAKE ANY ACTION OR DELAY TAKING ANY ACTION RELATED TO YOUR DEFAULT, OR SIMILAR OR UNRELATED DEFAULT, DOES NOT WAIVE, OR IMPLY A WAIVER OF ANY OF OUR RIGHTS UNDER THIS AGREEMENT.**

**10. TERMINATION.** We may terminate this Agreement during any period in which a Force Majeure Event prevents, limits or otherwise impairs our ability to perform our obligations under this Agreement. A Force Majeure Event means any circumstance beyond the Parties' reasonable control, including but not limited to any act of nature, war, terrorism, rebellion, labor dispute, work stoppage, civil disorders, act of government, or any other similar major cause. This Agreement will terminate automatically if the final loan disbursement does not occur within one hundred eighty (180) days of the date you most recently received credit approval by us to enter into this Agreement. No delay in our exercise of the foregoing termination rights shall constitute a waiver of our continuing rights to terminate the Agreement. In addition, you may terminate this Agreement at any time prior to our disbursement of the loan proceeds, by sending advance written notice to us. The terms of this Agreement that would, by their express nature, survive the termination of this Agreement will survive and be enforceable under this Agreement. Upon termination of this Agreement, our security interest in the Collateral will terminate.

**11. NOTICES AND OTHER INFORMATION.** You agree to notify us if your name, email, or mailing address changes.

**12. ASSIGNMENT/REGISTERED FORM.** You may not assign or transfer your rights or obligations under this Agreement without our prior written consent, provided, that if you sell your home, you may transfer the loan obligations to the new home owner if (a) they meet our credit and underwriting criteria in place at that time by notifying us in writing at least thirty (30) days in advance using the contact information noted at the top of this Agreement, and (b) the warranties and operations and maintenance service obligations (if any) pertaining to the Purchased Goods are transferred to the new home owner. We reserve the right to not allow assignment of the loan in cases where you are in default under this Agreement. You agree that we may assign or transfer all or a portion of this Agreement and the related documents to any third party or affiliate. Loanpal or its agent, acting as a non-fiduciary agent of the Borrower, shall maintain, a register within the meaning of U.S. Treasury Regulations Sections 5(f).103-1(c) on which it will record the names and addresses of each owner and their rights to principle and stated interest. Any transfer of all or a portion of a beneficial interest hereunder shall be recorded on such register. All parties to this agreement or their agents may treat each person or entity whose name is recorded in such register pursuant to the terms hereof as the applicable participant for all purposes under this Agreement. The register shall be available for inspection from time to time by any party hereto upon reasonable prior notice to Loanpal or any of its agents. YOU AUTHORIZE US TO PROVIDE TO A THIRD PARTY OR AFFILIATE ANY INFORMATION THAT THEY MAY REQUEST IN CONSIDERING OR IMPLEMENTING A PURCHASE OF OUR RIGHTS UNDER THIS AGREEMENT.  Arizona borrowers only: we will notify you if the entity responsible for allowing the assignment of your loan changes.

**13.LIMITATION OF LIABILITY.** TO THE EXTENT PERMITTED BY APPLICABLE LAW, OUR LIABILITY TO YOU UNDER THIS AGREEMENT, IF ANY, SHALL BE LIMITED TO DIRECT, ACTUAL DAMAGES ONLY. YOU AGREE THAT IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER FOR CONSEQUENTIAL, INCIDENTAL, PUNITIVE, EXEMPLARY, SPECIAL OR INDIRECT DAMAGES.

**14. GOVERNING LAW AND MISCELLANEOUS.**

**NOTICE: ANY HOLDER OF THIS CONSUMER CREDIT CONTRACT IS SUBJECT TO ALL CLAIMS AND DEFENSES WHICH THE DEBTOR COULD ASSERT AGAINST THE SELLER OF GOODS OR SERVICES OBTAINED WITH THE PROCEEDS HEREOF. RECOVERY HEREUNDER BY THE DEBTOR SHALL NOT EXCEED AMOUNTS PAID BY THE DEBTOR HEREUNDER.**

Except for the Arbitration agreement below, this Agreement shall be governed by federal law and, to the extent state law applies, the substantive laws of the state where the Residence is located. If any provision of this Agreement cannot be enforced, the rest of this Agreement will stay in effect. No amendment of this Agreement will be valid unless in writing and signed by both Lender and you (the Loan Closing Certificate shall not be deemed an amendment of this Agreement and is fully incorporated into this Agreement). This Agreement represents the entire agreement between the Parties regarding your loan. Our rights under this Agreement shall inure to the benefit of our successors and assigns, and your obligations under this Agreement shall be binding upon your heirs, personal representatives and permitted assigns.

**15. ARBITRATION AGREEMENT.** All claims and disputes arising out of or relating to this Agreement (hereafter, "Dispute(s)") shall be resolved by binding arbitration on an individual basis. The arbitrator shall also decide any issues relating to the making, validity, enforcement, or scope of this arbitration agreement, arbitrability, defenses to arbitration including unconscionability, or the validity of the jury trial, class action or representative action waivers (collectively, "arbitrability" issues). YOU HEREBY WAIVE ANY CONSTITUTIONAL AND STATUTORY RIGHTS TO GO TO COURT AND HAVE A TRIAL IN FRONT OF A JURY.  FURTHER, UNLESS YOU OPT OUT OF ARBITRATION, YOU ALSO AGREE TO WAIVE ANY RIGHT TO BRING OR PARTICIPATE IN A CLASS OR REPRESENTATIVE ACTION IN COURT OR IN ARBITRATION. The arbitrator shall have the authority to award any relief, including injunctive relief, which is available under applicable law. Each party shall bear the expense of its own counsel, experts, witnesses and preparation and presentation of proofs. However, the arbitrator may award you reasonable attorney's fees and costs if this is expressly authorized by applicable law. Upon request, we will pay a portion of the fees and expenses of the arbitrator and the administrative fees and expenses of the arbitration. The arbitrator shall issue a written award describing the essential findings supporting the award. All hearings in the arbitration shall take place within the federal judicial district where the Residence is located; the arbitrator's award shall be final and judgment on the arbitrator's award may be entered by the federal District Court. The arbitration shall be administered by JAMS pursuant to its Streamlined Arbitration Rules (the "Rules"). A copy of the JAMS Streamlined

DocuSign Envelope ID: B47EDDA8-E73A-4FA2-A798-5F6FDA7A6AC8

Arbitration Rules can be obtained from JAMS at https://www.jamsadr.com/rules-streamlined-arbitration or (800) 352-5267. The arbitrator shall be selected from the JAMS panel of neutrals and shall be a retired federal judge, a retired state appellate judge, or a retired state trial judge (in that order of preference). You agree that this agreement to arbitrate may be enforced by us or our affiliates, subsidiaries, or parents, and (g) each of their officers, directors, employees, and agents. This arbitration agreement is made pursuant to a transaction involving interstate commerce. The Federal Arbitration Act (9 U.S.C. §§1-16) (the "FAA") shall govern this agreement to arbitrate including all arbitrability issues. No state law respecting arbitrability issues shall govern this agreement to arbitrate. Subject to and without limiting the foregoing, federal law shall apply to all other issues that arise under federal law and applicable state law as set forth in Section 14 above shall apply to all other issues that arise under state law (without reference to a state's choice of law rules). YOU MAY OPT OUT OF ARBITRATION BY SENDING US WRITTEN NOTICE WITHIN 15 DAYS OF SIGNING THE AGREEMENT STATING THAT YOU WISH TO "OPT OUT OF THE AGREEMENT TO ARBITRATE DISPUTES." THE OPT-OUT NOTICE SHOULD BE SENT TO THE FOLLOWING ADDRESS: LOANPAL, 8781 Sierra College Blvd., Roseville, CA 95661. If you do not opt out, but any part or parts of your agreement to arbitrate are unenforceable then Loanpal and you agree that such specific part or parts shall be of no force or effect and shall be severed, but the remainder of this agreement to arbitrate shall continue in full force and effect. If, however, the entire agreement to arbitrate or your waiver of the right to participate in class, representative or to arbitrate injunctive relief claims is unenforceable then the agreement to arbitrate shall be of no force or effect.

JUDICIAL REFERENCE FOR CALIFORNIA BORROWERS. IF THE RESIDENCE IS IN CALIFORNIA AND YOU OPT-OUT OF ARBITRATION, LOANPAL AND YOU AGREE THAT ANY DISPUTES WILL BE RESOLVED IN THE SUPERIOR COURT FOR THE COUNTY IN A GENERAL REFERENCE PURSUANT TO THE CALIFORNIA CODE OF CIVIL PROCEDURE ("CCP"), § 638(a). YOU ACKNOWLEDGE AND AGREE THAT IN A REFERENCE ACTION, ANY DISPUTE WILL BE HEARD BY A REFEREE AND NOT BY A SUPERIOR COURT JUDGE AND JURY AND HEREBY WAIVES HIS CONSTITUTIONAL AND STATUTORY RIGHTS TO HAVE A TRIAL IN FRONT OF A JUDGE AND JURY. The Referee shall be appointed pursuant to CCP § 640 in the absence of agreement on the selection. The Referee shall have the same qualifications as the arbitrator. Upon request, Loanpal will pay your portion of the fees and expenses of the Referee.

NOTWITHSTANDING ANYTHING TO THE CONTRARY HEREIN, IF THE RESIDENCE IS IN CALIFORNIA AND YOU DO NOT OPT-OUT OF ARBITRATION, YOU MAY SEEK PUBLIC INJUNCTIVE RELIEF IN ARBITRATION TO THE EXTENT PERMITTED BY APPLICABLE LAW. IF, HOWEVER, ARBITRATION IS UNENFORCEABLE, IN WHOLE OR IN PART, THEN LOANPAL AND YOU AGREE THAT SUCH DISPUTES WILL BE RESOLVED IN THE SUPERIOR COURT FOR THE COUNTY IN A GENERAL REFERENCE PURSUANT TO THE CALIFORNIA CODE OF CIVIL PROCEDURE ("CCP"), § 638(a). YOU ACKNOWLEDGE AND AGREE THAT IN A REFERENCE ACTION, ANY DISPUTE WILL BE HEARD BY A REFEREE AND NOT BY A SUPERIOR COURT JUDGE AND JURY AND HEREBY WAIVES HIS CONSTITUTIONAL AND STATUTORY RIGHTS TO HAVE A TRIAL IN FRONT OF A JUDGE AND JURY. The Referee shall be appointed pursuant to CCP § 640 in the absence of agreement on the selection. The Referee shall have the same qualifications as the arbitrator. Upon request, Loanpal will pay your portion of the fees and expenses of either the arbitrator or the Referee, as the case may be, any your portion of any administrative fee that the arbitrator, referee or JAMS may require.

Nothing in Section 15 shall prejudice the right of either party to: (a) seek and obtain such provisional relief or remedies as shall otherwise be available judicially pending appointment of the arbitrator or referee (b) bring their dispute in small claims court on an individual basis, (c) exercise such self-help remedies as are authorized by law or contract, or (d) pursue judicial foreclosure as set forth in Section 9.

BY PLACING YOUR INITIALS BELOW THIS NOTICE YOU CERTIFY THAT YOU HAVE READ AND AGREE TO SECTION 15 IN ITS ENTIRETY.

Borrower's Initials: **SC**          Co-Borrower's Initials: _____

**16.**     **ECOA NOTICE.** The Federal Equal Credit Opportunity Act prohibits creditors from discriminating against credit applicants on the basis of race, color, religion, national origin, sex, marital status, or age (providing that the applicant has the capacity to enter into a binding contract); because all or part of the applicant's income derives from any public assistance program; or because the applicant has in good faith exercised any right under the Consumer Credit Protection Act. The Federal Agency that administers compliance with this law concerning this creditor is:  The Federal Trade Commission, Consumer Response Center, Washington, DC 20580. Phone: 1-877-382-4357.

**17.**     **MILITARY ACT DISCLOSURE:** The Military Lending Act provides protections for certain members of the Armed Forces and their dependents ("Covered Borrowers"). The provisions of this section apply to Covered Borrowers under the Military Lending Act. If you would like more information about whether you are a Covered Borrower and whether this section applies to you, please contact us at 1-866-808-1933. Statement of MAPR. Federal law provides important protections to members of the Armed Forces and their dependents relating to extensions of consumer credit. In general, the cost of consumer credit to a member of the Armed Forces and his or her dependent may not exceed an Annual Percentage Rate of 36%. This rate must include, as applicable to the credit transaction or account: (1) the costs associated with credit insurance premiums; (2) fees for ancillary products sold in connection with the credit transaction; (3) any application fee charged (other than certain application fees for specified credit transactions or accounts); and (4) any participation fee charged (other than certain participation fees for a credit card account). Oral Disclosures. In order to hear important Military Act disclosures and payment information provided in this Note, please call 1-844-310-5091.

**18.**  This Agreement shall be interpreted to comply with the Military Lending Act and its implementing regulation, including its restrictions on permissible loan terms and limitations on interest and fees. For accounts opened on or after October 3, 2017, if you are a Covered Borrower (a) the Applicability of Jury Trial Waiver, Class Action Waiver, and Arbitration Provision sections of this Agreement do not apply to you; (b) any interest or fees in excess of the permitted limit under the Military Lending Act shall be reduced by the amount necessary to satisfy that limit and any amounts collected in excess of the permitted limit shall be refunded by crediting your Account or by making a direct payment to you; and (c) any other provision of this Agreement that is inconsistent with the Military Lending Act shall not apply to you.

**19.**  BUYER'S RIGHT TO CANCEL. YOU, THE BUYER, MAY CANCEL THIS TRANSACTION AT ANY TIME PRIOR TO MIDNIGHT OF THE THIRD  BUSINESS DAY  AFTER THE DATE OF THIS TRANSACTION. SEE THE ATTACHED NOTICE OF CANCELLATION FORM FOR AN  EXPLANATION OF THIS RIGHT.

**20. STATE-SPECIFIC DISCLOSURES:**

**IN-HOME SALE CUSTOMERS: ARIZONA, CONNECTICUT, NORTH DAKOTA AND RHODE ISLAND RESIDENTS:**
THIS INSTRUMENT IS BASED UPON A HOME/PERSONAL SOLICITATION SALE SUBJECT TO THE PROVISIONS OF TITLE 44, CHAPTER 15 OF THE ARIZONA REVISED STATUTES IN ARIZONA, THE HOME SOLICITATION SALES ACT IN CONNECTICUT, AND THE NORTH DAKOTA CENTURY CODE IN NORTH DAKOTA. THIS INSTRUMENT IS NOT NEGOTIABLE.

**ALABAMA BORROWERS:** ALABAMA RESIDENTS· CAUTION – IT IS IMPORTANT THAT YOU THOROUGHLY READ THIS NOTE AND LOAN AGREEMENT BEFORE YOU SIGN OR ACKNOWLEDGE IT.

**ARIZONA BORROWERS:** This instrument is based upon a home solicitation sale, which is subject to the provisions of title 44, chapter 15.1. This instrument is not negotiable.

DocuSign Envelope ID: B47EDDA8-E73A-4FA2-A798-5F6FDA7A6AC8

**NOTICE OF RIGHT TO FILE COMPLAINT:** The owner of the property subject to this contract has a right to file a written complaint with the Arizona Registrar of Contractors for an alleged violation of Ariz. Rev. Stat. § 32-1154(A) within two (2) years of completion of the specific project subject to this contract. The Arizona Registrar of Contractors may be reached through its website: https://roc.az.gov/; or by telephone: (602) 542-1525.

Notice: You may request that the initial disclosures prescribed in the truth in lending act (15 United States Code §§ 1601 through 1666j) be provided in Spanish before signing any loan documents.

Aviso: Usted puede solicitar que las divulgaciones iniciales prescritas en la Ley de veracidad en los préstamos (Código 15 de los Estados Unidos de América, artículos 1601-1666j) se provean en español antes de firmar cualquier documento del préstamo.

Note: There are additional disclosures for Arizona borrowers in a separate document.

**CALIFORNIA BORROWERS: This loan is made pursuant to the California Finance Lenders Law, Cal. Fin. Code § 22000 et seq. FOR INFORMATION CONTACT THE DEPARTMENT OF BUSINESS OVERSIGHT, STATE OF CALIFORNIA.**

**CONNECTICUT BORROWERS:** THIS INSTRUMENT IS BASED UPON A HOME SOLICITATION SALE, WHICH SALE IS SUBJECT TO THE PROVISIONS OF THE HOME SOLICITATION SALES ACT. THIS INSTRUMENT IS NOT NEGOTIABLE

**DISTRICT OF COLUMBIA BORROWERS: Buyer's Right to Cancel** – If this agreement was solicited at or near your residence and you do not want the goods or services, you may cancel this agreement by mailing a notice to the seller. The notice must say that you do not want the goods or services and it must be mailed before midnight of the third business day after you signed this agreement. The notice must be mailed to LOANPAL, 8781 Sierra College Blvd., Roseville, CA 95661.

**FLORIDA BORROWERS:** This is a home solicitation sale, and if you do not want the goods or services, you may cancel this agreement by providing written notice to the seller in person, by telegram, or by mail. This notice must indicate that you do not want the goods or services and must be delivered or postmarked before midnight of the third business day after you sign this agreement. If you cancel this agreement, the seller may not keep all or part of any cash down payment.

**For Loan Agreements executed in Florida:** Florida documentary stamp tax required by law in the amount of $0.35 per hundred has been paid or will be paid by Loanpal directly to the Department of Revenue.  Certificate of Registration #78-8017862271-5.

**ILLINOIS BORROWERS:** Prepayment in full on any installment date under this agreement will reduce insurance charges for the loan.

**IOWA BORROWERS:** NOTICE TO CONSUMER:

[1] Do not sign this paper before you read it.

[2] You are entitled to a copy of this paper.

[3] You may prepay the unpaid balance at any time without penalty and may be entitled to receive a refund of unearned charges in accordance with law

IMPORTANT: READ BEFORE SIGNING. The terms of this agreement should be read carefully because only those terms in writing are enforceable. No other terms or oral promises not contained in this written contract may be legally enforced. You may change the terms of this agreement only by another written agreement.

**KANSAS BORROWERS: NOTICE TO CONSUMER:**

(1) Do not sign this agreement before you read it.

(2) You are entitled to a copy of this agreement.

(3) You may prepay the unpaid balance at any time without penalty.

**LOUISIANA BORROWERS:**

CONSUMER'S RIGHT TO CANCEL: If this agreement was solicited at your residence and you do not want the goods or services, you may cancel this agreement by mailing a notice to the seller. The notice must say that you do not want the goods or services and must be mailed before midnight of the third business day after you sign this agreement. The notice must be mailed to: LOANPAL, 8781 Sierra College Blvd., Roseville, CA 95661. If you cancel, the seller must return all of your cash down payment.

Notwithstanding any other provision in this agreement, you will not be obligated to pay us for our attorney's fees more than twenty-five percent of the unpaid debt after default and referral to an attorney for collect.

**MASSACHUSETTS BORROWERS:** You may cancel this agreement if it has been signed by a party thereto at a place other than an address of the seller, which may be his main office or branch thereof, provided you notify the seller in writing at his main office or branch by ordinary mail posted, by telegram sent or by delivery, not later than midnight of the third business day following the signing of this agreement.  See the attached notice of cancellation form for an explanation of this right.

**MARYLAND BORROWERS:** This loan is made pursuant to the Credit Grantor Closed-end Credit Provisions of Title 12, Subtitle 10 of the Maryland Commercial Law Article (Md. Code Ann., Com. Law § 12-1001 et seq.).

Note: If you are a Maryland borrower who is 65 or older: **YOU, THE BUYER, MAY CANCEL THIS TRANSACTION AT ANY TIME PRIOR TO MIDNIGHT OF THE FIFTH BUSINESS DAY AFTER THE DATE OF THIS TRANSACTION. SEE THE ATTACHED NOTICE OF CANCELLATION FORM FOR AN EXPLANATION OF THIS RIGHT.**

Cummings - 00019

DocuSign Envelope ID: B47EDDA8-E73A-4FA2-A798-5F6FDA7A6AC8

**MICHIGAN BORROWERS: Notice to buyer:**

(1) Do not sign this contract before you read it.

(2) You are entitled to a completely filled-in copy of this contract.

(3) Under the law, you have the right to pay off in advance the full amount due and, under certain conditions, to obtain a partial refund of the finance charge.

(4) You may rescind or cancel this contract, not later than 5 p.m. on the business day following the date thereof by giving written notice of rescission to the contractor or his agent at his place of business given in the contract or by mailing the notice or cancellation to the contractor to his place of business given in the contract by depositing a properly addressed certified letter in a United States post office or mail box, but if you rescind after 5 p.m. on the business day following, you are still entitled to offer defenses in mitigation of damages and to pursue any rights of action or defenses that arise out of the transaction.

The seller is prohibited from having an independent courier service or other third party pick up your payment at your residence before the end of the 3-business-day period in which you can cancel the transaction.

**MISSOURI BORROWERS: NOTICE OF CANCELLATION**

If this agreement was solicited at your residence and you do not want the goods or services, you may cancel, without further obligation, this agreement by mailing a notice to the seller at the address as shown below, within 3 business days following the above date. You shall return the goods to seller in substantially the same condition as when you obtained them. Seller will then cancel all contracts and negotiable instruments executed by you and return any property given by you to seller within 10 days from date of transaction. If seller does not pick up the purchased goods within 20 days from date of your cancellation, you may retain or dispose of the goods without any further obligation.

The notice must be mailed to: LOANPAL; 8781 Sierra College Blvd, Roseville, CA 95661

Oral agreements or commitments to loan money, extend credit or to forbear from enforcing repayment of a debt including promises to extend or renew such debt are not enforceable. To protect me and you (Lender) from misunderstanding or disappointment; any agreements we reach covering such matters are contained in this writing, which is the complete and exclusive statement of the agreement between us, except as we may later agree in writing to modify it.

**NEBRASKA BORROWERS:** A credit agreement must be in writing to be enforceable under Nebraska law. To protect you and us from any misunderstandings or disappointments, any contract, promise, undertaking, or offer to forebear repayment of money or to make any other financial accommodation in connection with this loan of money or grant or extension of credit, or any amendment of, cancellation of, waiver of, or substitution for any or all of the terms or provisions of any instrument or document executed in connection with this loan of money or grant or extension of credit, must be in writing to be effective.

**NEW HAMPSHIRE BORROWERS:** You or your attorney may file a complaint with the New Hampshire Bank Commissioner.

**NEW JERSEY BORROWERS:**

RECEIPT: LOANPAL - 8781 Sierra College Blvd., Roseville, CA 95661, Residential Solar/Storage System    Loan Down Payment: $0

NOTICE TO RETAIL BUYER: YOU MAY RESCIND THIS SALE PROVIDED THAT YOU NOTIFY THE RETAIL SELLER OF YOUR INTENT TO DO SO BY CERTIFIED MAIL, RETURN RECEIPT REQUESTED, POSTMARKED NOT LATER THAN 5 P.M. OF THE THIRD BUSINESS DAY FOLLOWING THE SALE. FAILURE TO EXERCISE THIS OPTION, HOWEVER, WILL NOT INTERFERE WITH ANY OTHER REMEDIES AGAINST THE RETAIL SELLER YOU MAY POSSESS. IF YOU WISH, YOU MAY USE THIS PAGE AS NOTIFICATION BY WRITING 'I HEREBY RESCIND' AND ADDING YOUR NAME AND ADDRESS. A DUPLICATE OF THIS RECEIPT IS PROVIDED BY THE RETAIL SELLER FOR YOUR RECORDS.

The section headings of this Note are a table of contents and not contract terms.  Portions of this Note with references to actions taken to the extent of applicable law apply to acts or practices that New Jersey law permits or requires.  In this Note, acts or practices (i) by you which are or may be permitted by "applicable law" are permitted by New Jersey law, and (ii) that may or will be taken by you unless prohibited by "applicable law" are permitted by New Jersey law.

**NORTH DAKOTA BORROWERS:** This instrument is based upon a personal solicitation sale, which is subject to the provisions of the North Dakota Century Code. This instrument is not negotiable.

**OHIO BORROWERS: This loan is made pursuant to the provisions of Ohio Rev. Code Ann. §§ 1321.62-1321.702.**

**OKLAHOMA BORROWERS:** You should refer to the appropriate contract document for any information such document provides about nonpayment, default, the right to accelerate the maturity of the debt, and prepayment rebates and penalties.

BUYER'S RIGHT TO CANCEL If this agreement was solicited at your residence and you do not want the goods or services, you may cancel this agreement by mailing a notice to the seller. The notice must say that you do not want the goods or services and must be mailed before midnight of the third business day after you sign this agreement.

The notice must be mailed to: LOANPAL; 8781 Sierra College Blvd., Roseville, CA 95661.

If you cancel, the seller may keep all or part of your cash down payment not to exceed five percent (5%) of the cash price.

DocuSign Envelope ID: B47EDDA8-E73A-4FA2-A798-5F6FDA7A6AC8

**RHODE ISLAND BORROWERS: NOTICE OF CANCELLATION** – You may cancel this transaction, without any penalty or obligation, within three (3) business days from the above date. If you cancel, your cancellation notice must state that you do not wish to be bound by the agreement and mailed by registered or certified mail not later than midnight three (3) days following the buyer's signing the agreement, excluding Sunday and any holiday on which regular mail deliveries are not made. All cancellations must be mailed to: LOANPAL, 8781 Sierra College Blvd., Roseville, CA 95661.

**SOUTH CAROLINA AND IDAHO BORROWERS: BUYER'S RIGHT TO CANCEL** – If you decide you do not want the goods or services, you may cancel this agreement by mailing a notice to the seller. The notice must say that you do not want the goods or services and must be mailed before midnight of the third business day after you sign this agreement.

The notice must be mailed to: LOANPAL, 8781 Sierra College Blvd., Roseville, CA 95661.

**SOUTH DAKOTA BORROWERS:** Any improprieties in making the loan or in loan practices may be referred to the South Dakota Division of Banking at: 1601 N. Harrison Avenue, Suite 1, Pierre, SD 57501, Phone: 605.773.3421.

**UTAH BORROWERS: BUYER'S RIGHT TO CANCEL** – If this agreement was solicited at your residence or place of employment and you do not want the goods or services, you may cancel this agreement by mailing a notice to the seller. The notice must say that you do not want the goods or services and must be mailed before midnight on the third business day after you sign this agreement. The notice must be mailed to: LOANPAL, 8781 Sierra College Blvd., Roseville, CA 95661.

The written agreement is a final expression of the agreement between the creditor and debtor and the written agreement may not be contradicted by evidence of any alleged oral agreement.

**VIRGINIA BORROWERS:  BUYER'S RIGHT TO CANCEL** – If this agreement was solicited at a residence and you do not want the goods or services, you, the buyer, may cancel this transaction at any time prior to midnight of the third business day after the date of this transaction. See the attached notice of cancellation form for an explanation of this right.

**WISCONSIN RESIDENTS:** For married Wisconsin residents, my signature on this Promissory Note confirms that this loan obligation is being incurred in the interest of my marriage or family.  No provision of any marital property agreement (pre-marital agreement), unilateral statement under Section 766.59 or court decree under Section 766.70 adversely affects the interest of the Lender unless the Lender, prior to the time that the loan is approved, is furnished with a copy of the agreement, statement, or decree or has actual knowledge of the adverse provision when the obligation to the Lender is incurred. If the loan for which I am applying is granted, my spouse will also receive notification that credit has been extended to me.

**RHODE ISLAND BORROWERS: NOTICE TO BUYER**

(1) Do not sign this agreement if any of the spaces intended for the agreed terms of the extent of then available information are left blank.

(2) You are entitled to a copy of this agreement at the time you sign it.

(3) You may at any time pay off the full unpaid balance due under this agreement, and in so doing you may be entitled to receive a partial rebate of the finance and insurance charges.

(4) The seller has no right to enter unlawfully your premises or commit any breach of the peace to repossess goods purchased under this agreement.

(5) You may cancel this agreement if it has not been signed at the main office or a branch office of the seller, provided you notify the seller at his main office or branch office shown in the agreement by registered or certified mail, which shall be posted not later than midnight of the third calendar day after the day on which the buyer signs the agreement, excluding Sunday and any holiday on which regular mail deliveries are not made.  See the attached notice of cancellation form for an explanation of buyer's rights.

By signing below I/we confirm that I/we have read and agree to the terms in the Loan Agreement:

Borrower: Seth Cummings

—DocuSigned by:

—58CF703425E1445

Co-Borrower: _____

Date: 6/18/2020

Date: _____

Loanpal: *Matt Dawson*

**Matt Dawson, Co-Founder**

DocuSign Envelope ID: B47EDDA8-E73A-4FA2-A798-5F6FDA7A6AC8

EXHIBIT A: EXAMPLE OF LOAN CLOSING CERTIFICATE

## Loan Closing Certificate

Borrower:                                             Residence Address:
Co-Borrower:
Email:
Phone:
Loan Agreement Number:

### LOAN SUMMARY

| LOAN START DATE | FIRST PAYMENT DATE | RECURRING PAYMENT DAY | MATURITY DATE | TOTAL LOAN AMOUNT |
|---|---|---|---|---|
| | | | | |

### SUMMARY OF LOAN TERMS AND PAYMENTS

| LOAN TERM | TOTAL LOAN AMOUNT | INITIAL MONTHLY PAYMENT | FIXED INTEREST RATE / APR | TARGET BALANCE | TARGET BALANCE DATE | ADJUSTED MONTHLY PAYMENT* |
|---|---|---|---|---|---|---|
| | | | | | | |

Adjusted monthly payment assumes that no prepayment was made and the Target Balance was not met by the Target Balance Date

### SOLAR/STORAGE SYSTEM DESCRIPTION

Installation Contractor:                            *Home Improvement Agreement Number:

Purchased Goods under this Loan Agreement will be detailed in your Home Improvement Agreement

### PAYMENT TERMS

Term:                                         Target Balance Date:
Interest Rate / APR:                  Target Balance Amount:
Initial Monthly Payment:           Adjusted Monthly Payment:

### LOAN SUMMARY

Loan Start Date:                                 Maturity Date:
First Payment Date:                   Total Loan Amount:
Recurring Payment Day:

DocuSign Envelope ID: B47EDDA8-E73A-4FA2-A798-5F6FDA7A6AC8

FOR ALL BORROWERS:                                                                          6/18/2020

## NOTICE OF RIGHT TO CANCEL

YOU MAY CANCEL THIS TRANSACTION, WITHOUT ANY PENALTY OR OBLIGATION, WITHIN THREE BUSINESS DAYS FROM THE ABOVE DATE.

IF YOU CANCEL, ANY PROPERTY TRADED IN, ANY PAYMENT MADE BY YOU UNDER THE CONTRACT OR SALE, AND ANY NEGOTIABLE INSTRUMENT EXECUTED BY YOU WILL BE RETURNED WITHIN TEN BUSINESS DAYS FOLLOWING RECEIPT BY THE SELLER OF YOUR CANCELLATION NOTICE, AND ANY SECURITY INTEREST ARISING OUT OF THE TRANSACTION WILL BE CANCELLED.

IF YOU CANCEL YOU MUST MAKE AVAILABLE TO THE SELLER AT YOUR RESIDENCE, IN SUBSTANTIALLY AS GOOD CONDITION AS WHEN RECEIVED ANY GOODS DELIVERED TO YOU UNDER THIS CONTRACT OR SALE; OR YOU MAY, IF YOU WISH, COMPLY WITH THE INSTRUCTIONS OF THE SELLER REGARDING THE RETURN SHIPMENT OF THE GOODS AT THE SELLER'S EXPENSE AND RISK.

IF YOU DO MAKE THE GOODS AVAILABLE TO THE SELLER AND THE SELLER DOES NOT PICK THEM UP WITHIN TWENTY DAYS OF THE DATE OF YOUR NOTICE OF CANCELLATION, YOU MAY RETAIN OR DISPOSE OF THE GOODS WITHOUT ANY FURTHER OBLIGATION. IF YOU FAIL TO MAKE THE GOODS AVAILABLE TO THE SELLER, OR IF YOU AGREE TO RETURN THE GOODS TO THE SELLER AND FAIL TO DO SO, THEN YOU REMAIN LIABLE FOR PERFORMANCE OF ALL OBLIGATIONS UNDER THE CONTRACT.

TO CANCEL THIS TRANSACTION, MAIL OR DELIVER A SIGNED AND DATED COPY OF THIS CANCELLATION NOTICE OR ANY OTHER WRITTEN NOTICE, OR SEND A TELEGRAM TO LOANPAL, AT 8781 SIERRA COLLEGE BLVD., ROSEVILLE, CA 95746 NOT LATER THAN MIDNIGHT OF____6/22/2020___.

I HEREBY CANCEL THIS TRANSACTION.


_____            _____
Date                                             Borrower

Cummings - 00023

DocuSign Envelope ID: B47EDDA8-E73A-4FA2-A798-5F6F-0A7A6AC8

FOR ALL BORROWERS:                                                                                                6/18/2020

### NOTICE OF RIGHT TO CANCEL

YOU MAY CANCEL THIS TRANSACTION, WITHOUT ANY PENALTY OR OBLIGATION, WITHIN THREE BUSINESS DAYS FROM THE ABOVE DATE.

IF YOU CANCEL, ANY PROPERTY TRADED IN, ANY PAYMENT MADE BY YOU UNDER THE CONTRACT OR SALE, AND ANY NEGOTIABLE INSTRUMENT EXECUTED BY YOU WILL BE RETURNED WITHIN TEN BUSINESS DAYS FOLLOWING RECEIPT BY THE SELLER OF YOUR CANCELLATION NOTICE, AND ANY SECURITY INTEREST ARISING OUT OF THE TRANSACTION WILL BE CANCELLED.

IF YOU CANCEL YOU MUST MAKE AVAILABLE TO THE SELLER AT YOUR RESIDENCE, IN SUBSTANTIALLY AS GOOD CONDITION AS WHEN RECEIVED ANY GOODS DELIVERED TO YOU UNDER THIS CONTRACT OR SALE; OR YOU MAY, IF YOU WISH, COMPLY WITH THE INSTRUCTIONS OF THE SELLER REGARDING THE RETURN SHIPMENT OF THE GOODS AT THE SELLER'S EXPENSE AND RISK.

IF YOU DO MAKE THE GOODS AVAILABLE TO THE SELLER AND THE SELLER DOES NOT PICK THEM UP WITHIN TWENTY DAYS OF THE DATE OF YOUR NOTICE OF CANCELLATION, YOU MAY RETAIN OR DISPOSE OF THE GOODS WITHOUT ANY FURTHER OBLIGATION. IF YOU FAIL TO MAKE THE GOODS AVAILABLE TO THE SELLER, OR IF YOU AGREE TO RETURN THE GOODS TO THE SELLER AND FAIL TO DO SO, THEN YOU REMAIN LIABLE FOR PERFORMANCE OF ALL OBLIGATIONS UNDER THE CONTRACT.

TO CANCEL THIS TRANSACTION, MAIL OR DELIVER A SIGNED AND DATED COPY OF THIS CANCELLATION NOTICE OR ANY OTHER WRITTEN NOTICE, OR SEND A TELEGRAM TO LOANPAL, AT 8781 SIERRA COLLEGE BLVD., ROSEVILLE, CA 95746 NOT LATER THAN MIDNIGHT OF ___6/22/2020___ .

I HEREBY CANCEL THIS TRANSACTION.

_____          _____

Cummings - 00024

DocuSign Envelope ID: B47EDDA8-E73A-4FA2-A76B-5FBFD47A6ACB

## PRIVACY POLICY AND INFORMATION SHARING NOTICE

**Privacy Policy:** We take our responsibility to protect the privacy and confidentiality of customer information seriously. We maintain safeguards that comply with federal standards to secure and protect your information. This policy applies to consumers who are current or former customers of Loanpal, LLC ("Loanpal"). We gather information from your application, when you make a payment, consumer credit reporting agencies, public sources, and other data sources. We may only disclose this data as permitted by law. We may provide your information without your consent to regulatory or law enforcement agencies as permitted by law. **Information Sharing and Opt-Out:** Financial companies choose how they share your personal information. Federal law gives you the right to limit some, but not all sharing. Federal law also requires us to tell you how we collect, share, and protect your personal information. Please read this notice carefully to understand what we do. For additional information visit: http://www.loanpal.com/privacy.html.

The types of personal information we collect and share include, but aren't limited to:

- Account Balances and Payment History
- Bank Account Information
- Social Security Number and Income
- Credit History and Scores
- Address
- Phone Numbers

All financial companies need to share customers' personal information to conduct their everyday business. In the section below, we list the reasons companies can share their customers' information; the reason we share this information; and whether you can limit this sharing. If you have any questions please call (877) 290-9991.

| Reasons we share your information | Do we share this information? | Can you limit this sharing? |
|---|---|---|
| For our everyday business purposes such as to process your transactions, maintain your account, respond to court orders and legal investigations, or report to the credit bureaus | YES | NO |
| For our own marketing purposes to offer products and services to you | YES | NO |
| For joint marketing with other financial companies – to offer other services to you | YES | NO |
| For our affiliates everyday business purposes – information about your transactions and experiences | NO | NA |
| For our affiliates everyday business purposes – information about your creditworthiness | NO | NA |
| For our affiliates to market to you | NO | NA |
| For non-affiliates to market to you | NO | NA |

| | |
|---|---|
| How does Loanpal protect my personal information? | To protect your information from unauthorized access and use, we use security measures that comply with federal law. These include computer safeguards and secured files and buildings. |
| How does Loanpal collect my personal information? | When you apply for a loan or make a payment. We also collect information from other data providers such as credit bureaus. |
| Why can't I limit all sharing? | Federal law gives you the right to limit only:<br>- Sharing for affiliates' business purposes – info about your creditworthiness<br>- Affiliates from using your information to market to you<br>- Sharing with non-affiliates to market to you |
| Affiliates | Companies related by common ownership |
| Non-Affiliates | Companies not related by ownership or control. Non-affiliates we can share with include other financial services companies or non-financial services companies. |
| Joint Marketing | A formal agreement between non-affiliated companies to market to you. |

For CA and VT residents only: Under California and Vermont law we will not share information we collect about you with companies outside of Loanpal unless the law allows.

## EXPRESS WRITTEN CONSENT TO COMMUNICATE OR CALL VIA CELL PHONE OR OTHER MEANS

We take your privacy seriously. By signing this document, you are providing express written consent for Loanpal, LLC ("Loanpal") or companies working on our behalf to call you (including through automated means: e.g. autodialing, text, and pre-recorded messaging) via telephone, mobile device or cell phone (including SMS and MMS) and/or via email, even if your telephone number is currently listed on any state, judicial, or national Do-Not-Call (DNC) list.

Consent is not required to conduct business with Loanpal and this consent can be withdrawn at any time by calling (877) 290-9991 or requesting by mail at Loanpal: 8781 Sierra College Blvd, Roseville, CA 95661. If you withdraw your consent you will be put on Loanpal's internal Do-Not-Call list.

For NV residents only: We are providing this notice under state law. You may be placed on our internal Do-Not-Call list by calling (877) 290-9991. Nevada asks us to provide their contact information. Office Bureau of Consumer Protection, Office of the Nevada Attorney General, 555 E. Washington St. Suite 3900, Las Vegas, NV 89101. Phone: (702) 486-3132; Email: bcinfo@ag.state.nv.us.

| Seth Cummings | 6/18/2020 | | |
|---|---|---|---|
| Borrower | Date | Co-Borrower | Date |

DocuSign Envelope ID: B47EDDA8-E73A-4FA2-A798-5F6F DA7A6AC8

## MEMBERSHIP APPLICATION AND AGREEMENTS

Loanpal partners with various financial institutions and credit unions who may purchase loans originated by Loanpal. When a credit union purchases your loan you may be enrolled as a member of that credit union and will receive the added benefits of that membership. There is no obligation to agree to the membership and your membership may be cancelled any time after enrollment at your request.

By initialing below, I understand that if I am applying for a PenFed Credit Union Membership, I have read and reviewed the following disclosures. If you do not wish to apply for a membership with PenFed please do not sign the PenFed Membership Agreement.

https://www.penfed.org/forms/penfed-membership-disclosures
https://www.penfed.org/privacy-policy
https://www.penfed.org/current-service-fees
https://www.penfed.org/accounts/regular-savings-account

Borrower Initials: **SC**

### PENFED MEMBERSHIP AGREEMENT

The words "I", "me", "my", "myself" mean each person signing the Membership Application/Signature Card including anyone who has access to the account(s).

1.    I understand this account shall be governed by the Code of Virginia, federal laws, National Credit Union Administration (NCUA) Rules and Regulations, and the bylaws and policies and procedures of the credit union and amendments thereto. This account shall be subject to other terms and conditions which are subject to change upon notice to me.

2.    I agree PenFed has the right pursuant to its statutory lien, and I give my express consent to enable PenFed to charge against a balance in my PenFed accounts, including accounts on which I am a joint owner, to include otherwise statutorily protected funds that may not otherwise be available by legal process, to liquidate PenFed indebtedness owed by me or a person who is listed as a joint owner on my accounts with PenFed, including a deceased joint owner. This provision does not include my IRA account or other accounts for which this provision is not permitted under Internal Revenue Code. PenFed may take such action without further notice to me or a joint owner. In regard to those funds having a statutory protection, I understand I may withdraw my express consent for PenFed to apply such funds to pay such indebtedness by notifying PenFed in writing. If my consent is withdrawn, PenFed may, in its sole discretion, terminate services I have with the credit union.

3.    I expressly authorize PenFed to procure upon its request from a person, partnership, credit reporting agency, association, firm, or corporation a credit report, and for such person to furnish PenFed with said credit report concerning financial services I may request or obtain from PenFed as well as subsequent re-evaluation of such financial services.

4    If I have caused PenFed to incur a loss due to my activities, or if accounts at PenFed are maintained by me in a manner PenFed, in its sole discretion, deems contrary to sound financial practice, I agree PenFed may terminate all accounts or services which I may receive from PenFed with the exception of my Regular Share Account.

5.    I understand if all my shares in PenFed are withdrawn, my membership in PenFed may be terminated. Funds in my accounts will be subject to collection through normal banking channels and PenFed's hold policy.

6.    I agree my share accounts are not transferable except on the records of PenFed.

7.    I agree payment of money in the account on the written instructions of an authorized person excuses PenFed of further legal obligation regarding the proceeds of the transaction. I agree to indemnify and hold PenFed harmless from suits or liability, directly or indirectly, resulting from the handling of the account consistent with the written instructions of an authorized person. PenFed may refuse to honor my instruction if it is unclear or the signature appears not to be authentic.

8.    Financial services provided by PenFed may be used for any transaction permitted by law. I agree illegal use of financial services will be deemed an action of default and/or breach of contract and such service and/or other related services may be terminated in PenFed's discretion. I further agree, should illegal use occur, to waive rights to sue PenFed for such illegal use or activity directly or indirectly related to it. I agree to indemnify and hold PenFed harmless from suits or other legal action or liability, directly or indirectly, resulting from such illegal use.

9.    JOINT SHARE ACCOUNT AGREEMENT:
If my accounts, either now or in the future, are established as a joint account, PenFed is authorized to recognize all of the joint owner signatures for the payment of funds or for transactions from this account. The joint owners of this account agree with each other and with PenFed that all funds deposited into the account shall be owned jointly by all joint owners. The funds on deposit will be subject to the withdrawal or receipt of all joint owners. In the event of death of an owner and according to the type of joint share account selected, withdrawal or payment may also be made to the survivor(s) or the estate(s) of the deceased owners(s). Each joint owner will discharge PenFed from liability for the payment or withdrawal. A joint owner who is a PenFed member may pledge all or part of the shares in this account as collateral security for a loan or loans, and PenFed is authorized to charge against this account indebtedness owing to it by each of the joint owners.

Please note: Joint ownership does not constitute membership.

This account shall be governed by the Code of Virginia, federal laws, rules and regulations, and the bylaws of PenFed and amendments thereto.

PenFed is federally insured by the National Credit Union Administration (NCUA). The information in this form is current as of May 2019 and is subject to change. To determine if changes have occurred since printing, call 800-247-5626. Our address, in accordance with NY Law, is 7940 Jones Branch Drive, Tysons, VA 22102.

I/we have read the attached Membership and Joint Account Agreement and, if accepted, I/we agree to comply with these terms and any amendments thereto, and to subscribe to at least one share. I/we authorize PenFed to obtain a credit report to determine my/our eligibility for this account or other financial services, I/we may request. Under penalties of perjury, I/we certify: 1) the number shown on the form is my/our correct taxpayer identification number; and 2) I/we am/are not subject to backup withholding because (a) I/we am/are exempt from backup withholding, or (b) I/we have not been notified by the Internal Revenue Service (IRS) that I/we am/are subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me/us I/we am/are no longer subject to backup withholding (cross out this section if you are subject to withholding); and 3) I/we are a U.S. person (including a U.S. resident alien). The Internal Revenue Service does not require your consent to any provision of this document other than the certifications required to avoid backup withholding.

PenFed Credit Union may purchase loans originated by Loanpal. By reading and signing this document, I/we agree to the terms of this agreement and to become a member of PenFed if my/our loan is purchased by PenFed. Becoming a member of PenFed is optional. If you do not want to become a member of PenFed please do not sign this form. Also, if you sign this form and PenFed does not purchase your loan you will not become a member of PenFed.

| Seth Cummings | 6/18/2020 | SC |
|---|---|---|
| Borrower | Date | Initials |

Cummings - 00026

DocuSign Envelope ID: B47EDDA8-E73A-4FA2-A798-5F6FDA7A6AC8

### MONTHLY PAYMENT AUTHORIZATION DOCUMENT

Loanpal is providing this document to you to select your loan payment method.  Please select one of the options below.

[ x ] **Payment by Autopay:** Loanpal offers Autopay as a service to our clients.  By paying with Autopay, you authorize Loanpal and its agents, service providers, and successors or assignees to initiate preauthorized electronic fund transfers ("Autopay") on or after the Payment Due Dates specified in the Loan Agreement from your account described below or from any updated bank account that you subsequently supply to us (the "Account"). If the Autopay is not made on the Payment Due Date for whatever reason, Loanpal will deduct the payment on the next day that Loanpal processes such payments, or as soon thereafter as practicable. The Autopay amount will be equal to the Scheduled Monthly Payment as shown in your Loan Agreement (or any modified amounts we may later agree to) and will continue until your loan is paid in full or you cancel this authorization.  If the amount of your payment changes from this amount, we will provide notice at least ten (10) days before the scheduled date of the payment. You certify that you are the owner or joint owner of the Account.  We are not responsible for bank charges you may incur due to dishonored Autopay. We may reinitiate any Autopay from the Account that is unsuccessful up to two times, until it is successful. You further authorize us to correct any erroneous transactions with credits or debits to your Account, if necessary.

**Information for Autopay:**

| Bank/Credit Union Name | |
|---|---|
| Navy Federal Credit Union | |
| Routing / ABA Number | Bank Account Number |
| 256074974 | 7003769523 |



Routing/ABA Number      Account Number

Please know that you may terminate this authorization at any time by either (1) paying the remaining balance due, (2) sending written notice to us at **8781 Sierra College Blvd, Roseville, CA 95661,** or (3) calling **1-800-345-9372.** It may take three business days for the change to take effect.  Cancelling Autopay does not terminate or relieve you of making all your payments on time each month.

[  ] **Payment by Alternative Method:** If this box is checked, you elect NOT to make your scheduled monthly payments by Autopay.  Instead each month, you must mail a check to us or arrange for payments to be made in some other manner acceptable to Loanpal.  **There may be additional payment processing fees when electing alternative payment methods, such as debit card payment charges, where allowed by law.**

PLEASE KEEP A COPY OF THIS DOCUMENT FOR YOUR RECORDS.

DocuSigned by:

**Seth Cummings**                          6/18/2020

Borrower                                    Date

Cummings - 00027

DocuSign Envelope ID: B47EDDA8-E73A-4FA2-A798-5F6FDA7A6AC8



# Thank you for choosing Loanpal as your solar loan provider.

## The Loanpal Team

### (844) 910-0111

Borrower Initials SC

Co-Borrower Initials _____





# Law Office of Katherine Britton

1800 Main Street, 1802 | Dallas, Texas 75201
(214) 475-2810 | kbritton@protonmail.com



November 25, 2020

<u>Via Certified Mail (70182290000124754417)</u>
<u>Return Receipt Requested (95909402339008060353647)</u>
John Bankhead
Zenith Solar
7008 Four Sixes Ranch Rd.
Odessa, TX 79765-79765

Re: Demand Under the Texas Deceptive Trade Practices Act

Dear Mr. Bankhead,

Please be advised that Seth Cummings has retained me to represent him in prosecuting his claims under the Texas Deceptive Trade Practices—Consumer Protection Act (DTPA) against you. I am reaching out to discuss settlement.

My client's claims arise out of the following transaction in which, on or about June 16, 2020, he sought to purchase goods and services from you: solar panels and installations of solar panels at 4200 Downing Ave, Midland, TX 79707.

According to information provided by my client, Mr. Cummings was told by Zenith Solar representatives that while his type of roof was appropriate for solar panels, that he would be entitled to tax benefits for having solar panels on his roof and indicated that Zenith had a permit to install solar on his house. This was not true and Mr. Cummings would not have entered into a contract to have solar panels installed on his roof if his type of roof would not have supported solar panels and if Zenith did not have a permit to install solar panels. The manufacturer does make specific solar brackets for the style of roof that Mr. Cummings has and there is nothing that indicates that Zenith used the appropriate brackets. The Zenith workers have severely damaged my client's roof due to their poor workmanship and lack of communication.

These acts and omissions constitute violations of the following provisions of the Deceptive Trade Practice Act ("DTPA"):

a. Tex. Bus. & Com. Code Ann. § 17.46(b)(5) which prohibits representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has sponsorship, approval, status, affiliation, or connection which he does not;

1

b. Tex. Bus. & Com. Code Ann. § 17.46(b)(7) which prohibits representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;

c. Tex. Bus. & Com. Code Ann. § 17.46(b)(9) which prohibits advertising goods or services with intent not to sell them as advertised;

d. Tex. Bus. & Com. Code Ann. § 17.46(b)(24) which prohibits not disclosing information concerning goods or services which was known at the time of the transaction if such failure to disclose such information was intended to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed;

Additionally, according to the contract entered into between Mr. Cummings and Zenith, Zenith was bound by workmanship and roof penetration warrantees. The solar panels were appropriate for Mr. Cummings's type using particular solar brackets, they were not installed appropriately which has caused damage to the roof. Zenith's employees or agents who recommended and installed the solar panels stated that they knew of the unique challenges that Mr. Cummings's roof presented and they assured Mr. Cummings that they accounted for those challenges in recommending solar panels for his roof. The workers who installed the solar panels were not adequately trained or competent in installing the solar panels correctly. There was a complete lack of communication that might have prevented the damage. As a result, Mr. Cummings's roof is damaged. These acts and omissions constitute violations of Tex. Bus. & Com. Code Ann. § 17.50(a)(2), breach of an express or implied warranty.

Zenith solicited Ms. Cummings's business by coming to his house and claiming that they have installed solar panels in the area, that they had the needed permits to install solar panels, and that solar panels would be appropriate for Mr. Cummings's roof as a cost-saving measure that would entitle him to tax credits. These statements were made with conviction by individuals who claimed to be knowledgeable about what was possible without having done any due diligence and without having the appropriate permits. These actions violate Tex. Bus. & Com. Code Ann. § 17.50(a)(3), which allows a consumer to recover for any unconscionable action or course of action taken by any person. An "unconscionable action or course of action" is defined by Tex. Bus. & Com. Code Ann. § 17.45(5) as an act or practice which, to a consumer's detriment, takes advantage of the lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree.

Mr. Cummings has obtained a quote to repair just a portion of the damage and replace the roof. A copy of the quote is enclosed to this letter. According to the enclosed quote, it will cost $99,274.30 to remediate the damage done to the roof. The pay-off value of Mr. Cummings's loan for Zenith's services is $49,127.43.

Therefore, please be advised that my client's damages currently include the following:

| | |
|---|---|
| Economic damages | $ 148,401.73 |
| Mental anguish damages | $ 50,000 |

2

| | |
|---|---|
| Expenses, including attorney's fees | $ 1,332 |
| TOTAL | $199,733.73 |

According to information provided by my client, your acts were knowing under the DTPA and caused mental anguish to my client. The amount necessary to compensate him for this injury is $50,000 for past mental anguish and future mental anguish.

To pursue their claim against you, my client was required to engage my services as an attorney and have agreed to pay reasonable fees for my services on his behalf. The reasonable costs of our services to the date of this letter are $1,332.

You have 60 days from the date you receive this letter in which to satisfactorily resolve this matter. Otherwise, I will advise my client to commence litigation against you. In such litigation, we will seek to recover the damages available under Tex. Bus. & Com. Code Ann. § 17.50; which may be an amount of damages for mental anguish, up to three times the amount of economic damages. I look forward to hearing from you.

Sincerely,


Katherine Britton


CC: Oscar Luna
Seth Cummings

Office of the Texas Attorney General
Consumer Protection Division
P.O. Box 12548
Austin, Texas 78711-2548

3





MOSTER CRAFT PC
ATTORNEYS AT LAW

(432) 203-6961
CONTACT@MOSTERCRAFT.COM

December 7, 2021

PLAINTIFF'S
EXHIBIT

F

**Via Certified Mail – RRR – 7020 0350- 0000 6961 7917 and Regular Mail**
John Bankhead
Zenith Solar
7008 Four Sixes Ranch Rd.
Odessa, Texas 79765

**Via Certified Mail – RRR – 7020 0350 0002 2409 2902 - and Regular Mail**
Joe Camacho
Camacho Electric, LLC
1402 Maberry St.
Midland, Texas 79701

        Re:     Seth Cummings
                4200 Downing Ave, Midland, Texas 79707

Gentlemen:

        My name is Charles Moster. I am the owner and attorney practicing with Moster Craft, P.C. Our firm has been retained by Mr. Cummings regarding unprofessional work done by you on Mr. Cummings' property located at 4200 Downing Ave, Midland, Texas 79707.
        You are directed not to contact my client regarding this matter, including via phone call, email, text message, and/or by fax. All communication with Mr. Cummings henceforth will be conducted through this law firm.

        A review of our records indicates Mr. Bankhead has already received a demand letter dated November 25, 2021, from a previous counsel retained by Mr. Cummings which to date, he has failed to acknowledge. See Exhibit "A" attached hereto.

        As stated in the previous demand letter, you represented to our client that the type of roof on his property was appropriate for solar panels, and you already had the permits to proceed with the installation. This simply was not true. Our client relied on your false representations and was induced into signing a contract. The poor workmanship performed on our client's roof caused substantial damage to his roof. Attached hereto as Exhibit "B" is a diagram showing the damages to the roof. Also, as a direct consequence of your misrepresentations, our client obtained third party financing to pay you for the installation of the solar panels.

        We are in position to file suit against you, this includes: fraud actions; DTPA actions which allow us to pursue treble damages, mental anguish damages, and recovery of attorney's fees.

Page Two
December 7, 2021

Based upon the foregoing, my client has valid claims against you. By this letter we are formally informing you that you have seven (7) days to comply with the following demands: (1) remove the solar panels; (2) replace the roof on the property; (3) return the money that was tendered to you by the third-party financing company; and (4) pay all the attorneys' fees and expenses our client has incurred since you damaged his roof.

Because of your fraud, you are personally responsible for the damages caused to my client. We can, and will, come after your personal assets to satisfy the full cost of damages you caused my client. Your exposure and liability to my client are considerable. Not to mention the payment of his attorney's fees in seeking restitution for your willful damages against him.

You are hereby directed not to sell, trade, exchange, or hide any personal or real property that may be used to satisfy a judgment against you. We can investigate your assets and can block any transfer of property, real or personal, if you try to transfer any of your property.

This letter serves as a demand for the immediate correction of all the problems caused by your installation of the solar panels.

Should you choose not to comply with the demands we will continue to seek all claims against you for restitution and mitigation of damages by seeking out a more professional and qualified contractor than you to complete this work.

You have seven (7) days from the receipt of this letter to comply with my client's demands or we will take further immediate legal action against you for the full amount of damages to my client. This includes seeking monetary damages, punitive damages, all attorneys' fees and costs incurred seeking all claims against you. While we certainly hope this is not necessary, we are prepared to pursue whatever avenues are necessary on behalf of our clients to recover the damages caused by your breach of contract, negligent misrepresentation, fraud, and clear violations of the DTPA.

Respectfully,

MOSTER CRAFT PC

/s/ Charles A. Moster
Charles A. Moster

CAM

Enclosures

## RETURN OF SERVICE

State of                                                                                    County of

Case Number: .

Plaintiff:

vs.

Defendant:



BBW2021012768

Received by Annabel Martinez on the 8th day of December, 2021 at 2:17 pm to be served on JOE
CAMACHO CAMACHO ELECTRIC, LLC, 1402 MABERRY ST, MIDLAND, TX 79701.

I, Annabel Martinez, do hereby affirm that on the **13th day of December, 2021 at 10:55 am, I:**

**INDIVIDUALLY/PERSONALLY** delivered by delivering a true copy of the **LETTER DELIVERY/ EXHIBIT
A/ EXHIBIT B** with the date of service endorsed thereon by me, to: **JOE CAMACHO CAMACHO
ELECTRIC, LLC** at the address of: 1402 MABERRY ST, MIDLAND, TX 79701, and informed said person
of the contents therein, in compliance with state statutes.

"My name is  Annabel Martinez  my date of birth is 2/28/1961  and my address is P. O. Box 52214,
MIDLAND, TX 79710.  I declare under penalty of perjury that the foregoing is true and correct.  Executed
in Midland County, State of Texas on the   13th    Day of December, 2021, Annabel Martinez
declarant."

_____

Annabel Martinez
PSC-2816 Exp 6/30/2023

Pronto Process
1406 W Salinas
San Antonio, TX 78207
(210) 226-7192

Our Job Serial Number: BBW-2021012768

Copyright © 1992-2021 Database Services, Inc. - Process Server's Toolbox V8.2d

## RETURN OF SERVICE

State of                                                                                    County of

Case Number: .

Plaintiff:

vs.

Defendant:

BBW2021012764

Received by Annabel Martinez on the 8th day of December, 2021 at 2:17 pm to be served on **JOHN BANKHEAD, 7008 FOUR SIXES RANCH RD, ODESSA, TX 79765.**

I, Annabel Martinez, do hereby affirm that on the **13th day of December, 2021** at **8:22 am, I:**

**INDIVIDUALLY/PERSONALLY** delivered by delivering a true copy of the **LETTER DELIVERY/ EXHIBIT A/ EXHIBIT B** with the date of service endorsed thereon by me, to: **JOHN BANKHEAD** at the address of: **7008 FOUR SIXES RANCH RD, ODESSA, TX 79765,** and informed said person of the contents therein, in compliance with state statutes.

"My name is  Annabel Martinez  my date of birth is 2/28/1961  and my address is P. O. Box 52214, MIDLAND, TX 79710.  I declare under penalty of perjury that the foregoing is true and correct.  Executed in Midland County, State of Texas on the 13th  Day of December, 2021, Annabel Martinez declarant."

**Annabel Martinez**
PSC-2816 Exp 6/30/2023

**Pronto Process**
**1406 W Salinas**
**San Antonio, TX 78207**
**(210) 226-7192**

Our Job Serial Number: BBW-2021012764

Copyright © 1992-2021 Database Services, Inc. - Process Server's Toolbox V8.2d

Cummings - 00037

## Automated Certificate of eService

This automated certificate of service was created by the efiling system.
The filer served this document via email generated by the efiling system
on the date and to the persons listed below. The rules governing
certificates of service have not changed. Filers must still provide a
certificate of service that complies with all applicable rules.

Miguel Gomez on behalf of Joseph Schuelke
Bar No. 24120663
mgomez@themosterlawfirm.com
Envelope ID: 62227190
Status as of 3/2/2022 3:59 PM CST

Associated Case Party: Seth  Cummings

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Shari Sellers | | ssellers@themosterlawfirm.com | 3/2/2022 1:29:15 PM | SENT |
| J. BrandonSchuelke | | brandon@themosterlawfirm.com | 3/2/2022 1:29:15 PM | SENT |
| Miguel Gomez | | mgomez@themosterlawfirm.com | 3/2/2022 1:29:15 PM | SENT |

# EXHIBIT B

DocuSign Envelope ID: E7C11912-A298-4B99-B6F4-737543E2F6C3

**LOANPAL SOLAR / STORAGE FINANCING PROGRAM AGREEMENT**

dated as of

7/7/2020

_____

by and between

**LOANPAL**

and

**INSTALLER:**

**Zenith Security**

DocuSign Envelope ID: E7C11912-A298-4B99-B6F4-737543E2F6C3

**LOANPAL SOLAR / STORAGE FINANCING PROGRAM AGREEMENT**

**Preliminary Statement**

This SOLAR / STORAGE FINANCING PROGRAM AGREEMENT (this "**Agreement**") is made as of July 7, 2020 (the "**Effective Date**"), by and between Loanpal, LLC, a California limited liability company ("**Loanpal**") and Zenith Security, a Idaho Limited Liability Company ("**Installer**" and together with Loanpal, collectively, the "**Parties**" and each individually, a "**Party**"). Any capitalized terms not otherwise defined in this Agreement have the meaning set forth in Section 1.1

**Recitals**

A.      Installer is in the business of identifying consumers interested in purchasing from Installer, and having Installer install, residential Solar Systems.

B.      Loanpal is in the business of originating and providing loans to consumers that are used for the purchase and installation of Solar Systems pursuant to Loanpal's credit and collections policies.

C.      Loanpal and Installer are entering into this Agreement to allow Installer to sell, to consumers whom Installer identifies, and install at such consumers' properties, residential Solar Systems, where the consumers will have the option to finance the installation price of such systems using loan products provided by Loanpal.

**Agreement**

NOW, THEREFORE, in consideration of the foregoing premises, the mutual promises and agreements of the Parties expressed herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

**ARTICLE 1.**
**DEFINITIONS**

**1.1      Definitions**. Except as otherwise expressly provided herein, capitalized terms not otherwise defined in this Agreement have the meanings set forth below.

"**Add-on**" means work in addition to the installation of a Solar or Storage System, subject to the limitations on such work in the applicable Program Specification.

"**Affiliate**" means, as to an entity, any other entity that, directly or indirectly, owns or controls, is owned or controlled by or is under common ownership or control with such entity.

"**Agreement**" has the meaning set forth in the Preliminary Statement.

"**Amount Financed**" means an amount equal to the total costs for the Project as reflected on the Home Improvement Contract

"**Applicable Law**" means any applicable federal, state or local act, law, statute, ordinance, code, rule, regulation, mandatory Utility tariff, Permit, order, judgment, consent or approval of any Governmental Authority, and the provisions of any incentive or rebate offer of any Governmental Authority promoted by Installer to a Consumer, as such may be in effect at any relevant times.

"**Arbitration Rules**" has the meaning set forth in Section 9.2.

"**Bankruptcy Code**" has the meaning set forth in the definition of "**Event of Bankruptcy**."

"**Business Day**" means any day other than (a) a Saturday or Sunday or (b) any day national commercial banks are permitted or required to close in the States of California, New York or Texas.

1

DocuSign Envelope ID: E7C11912-A298-4B99-B6F4-737543E2F6C3

"**Closing Call**" means a call between a Consumer and Loanpal whose intent is to obtain Consumer feedback regarding the Program, Installer and Installer's participation in the Program, and to confirm such Consumer's understanding of the Program as it relates to such Consumer.

"**Confidential Information**" has the meaning set forth in Section 9.12.

"**Consumer**" means (a) the homeowner on behalf of all of the homeowners; (b) all homeowners; (c) trustee (if home is owned by a trust); or (d) Attorney-in-fact or agent authorized under a general or limited power of attorney for any of the foregoing who either own (or in the case of the Attorney-in-fact or authorized agent, acting on behalf of those who own) the property on or about the dwelling where a Project will be installed and who has either submitted, or on whose behalf, Installer has submitted, a Consumer Application or entered into a Loan Agreement.  Notwithstanding the foregoing, a Consumer shall not be any person who is employed by Installer and who is involved in the sale of the Solar System for a Project.

"**Consumer Acceptance**" has the meaning set forth in Section 3.3 .1.

"**Consumer Application**" means an application for a Consumer to receive credit approval for a Loan Agreement.

"**Consumer Credit Offer**" means, with respect to a Consumer, an offer by Loanpal, as applicable, to extend credit to such Consumer.

"**Consumer Complaint**" means a verbal or written statement by or on behalf of a Consumer indicating dissatisfaction with such Consumer's loan, Project, the Installer, Loanpal, or the obligations of either Party to the Consumer, provided, that the oral expressions of dissatisfaction or grievance that are resolved promptly upon explanation of the facts to the satisfaction of the Consumer and without the need for any substantive redress are not considered Consumer Complaints for the purpose of this Agreement.

"**Consumer Disclosures**" means the Consumer Credit Offer and other disclosures and documents required to be delivered to each Consumer by Applicable Law.

"**Delinquent Loan Agreement**" means, with respect to any given Project, thirty days past due on any scheduled monthly payment.

"**Distributor**" means, an equipment distributor that the Installer purchases the Project equipment from.

"**Effective Date**" has the meaning set forth in the Preliminary Statement.

"**Electronic Device**" means a computer, laptop, tablet or similar electronic device with internet connectivity used for accessing email and/or the Software.

"**Energy Storage System**" means a unit that receives energy from a Solar Energy System with the objective of storing it electrically, chemically, electrochemically, mechanically or thermally and of making it available again for use at a later time, which may consist of inverter(s), monitoring equipment, and other related equipment and wiring installed at a premises owned by the related Borrower at the time of installation.

"**Event of Bankruptcy**" means with regard to an entity, that (a) the entity (i) institutes a voluntary case seeking liquidation or reorganization under any chapter of Title 11 of the United States Bankruptcy Code, as now constituted or hereafter amended (the "**Bankruptcy Code**"), or consents to the institution of an involuntary case thereunder against it, (ii) files a petition or consents or otherwise institutes any similar proceeding under any other applicable federal or state bankruptcy law, (iii) applies for, or suffers the appointment of, a receiver, liquidator, sequestrator, trustee or other officer with similar powers, (iv) makes a general assignment for the benefit of creditors, or (v) admits in writing its inability to pay its debts generally as they become due; or (b) an involuntary case is commenced seeking the liquidation or reorganization of such entity under the Bankruptcy Code or any similar proceeding shall be commenced against such entity under any other Applicable Law and such proceeding is not dismissed within 60 days; or (c) any other similar relief is granted against the

DocuSign Envelope ID: E7C11912-A298-4B99-B6F4-737543E2F6C3

entity under any Applicable Law.

"**Force Majeure Event**" means any event or circumstance that wholly or partly prevents or delays performance of any obligations arising under this Agreement, but only if and to the extent such event or circumstance is beyond the reasonable control of, and not the result of the negligence of, the Party seeking to have its performance obligation excused thereby, which event or circumstance, by the exercise of due diligence, such Party has been unable to prevent or overcome.

"**GAAP**" means generally accepted accounting principles as in effect from time to time in the United States.

"**Governing Documents**" means any charter or similar document adopted or filed in connection with the creation, formation or organization of a particular entity, all equity holders' agreements, voting agreements, voting trust agreements, joint venture agreements, registration rights agreements or other agreements or documents relating to the organization, management or operation of such entity, or relating to the rights, duties and obligations of the equity holders of such entity; and any amendment or supplement to any of the foregoing.

"**Governmental Authority**" means any federal, state, local or other governmental, regulatory or judicial agency, authority, or other entity having legal jurisdiction over the Parties, any Job Site or Installation or the ownership or operation of any Project, including any Utility. For the purposes of this Agreement, homeowners' or property owners' associations are considered entities having legal jurisdiction over the applicable Job Site or Installation.

"**Hazardous Material**" means any hazardous or toxic substance, waste or material, or any other substance, pollutant or condition that poses a risk to human health or the environment.

"**Home Improvement Contract**" means a contract substantially in one of the forms attached hereto as Exhibit D or in another form as a result of changes to such forms in accordance with Section 4.10 to be signed by Installer and/or Installer's Affiliate for the Project.

"**Indemnified Person**" has the meaning set forth in Section 7.4.

"**Indemnitor**" has the meaning set forth in Section 7.4.

"**Installation**" means, with respect to a given Project, the design, engineering, equipment procurement, supervision, provision of labor, materials, equipment, tools, construction equipment and machinery, utilities, transportation and procurement of all Permits as set forth in the Home Improvement Contract and Project Specifications applicable to such Project.

"**Installer**" has the meaning set forth in the Preliminary Statement.

"**Installer Account**" has the meaning set forth in Section 3.5.3.

"**Installer Default**" has the meaning set forth in Section 6.1.1.

"**Installer Indemnified Person**" or "**Installer Indemnified Persons**" has the meaning set forth in Section 7.2.

"**Installer Qualifying Information**" means the financial, credit, licensing and other information regarding Installer as requested by Loanpal from time to time pursuant to this Agreement

"**Installer Price**" means, with respect to a given Project, the Loan Amount less the Program Fee.

"**Job Site**" means the rooftop(s) or other property on or about the dwellings owned by a Consumer where the applicable Project will be installed and any other areas on such Consumer's property that such Consumer allows Installer to use, occupy or disturb in connection with performance of the applicable Installation, including for ingress and egress, laydown and temporary storage purposes.

DocuSign Envelope ID: E7C11912-A298-4B99-B6F4-737543E2F6C3

"**Knowledge**" means, with respect to a particular fact or other matter after due inquiry, an individual is or should have become aware of such fact or other matter. A Person (other than an individual) shall be deemed to have "Knowledge" of a particular fact or other matter if any individual who is serving, or who has at any time served, as a supervisor, manager, director, officer, partner, executor or trustee of such Person (or in any similar capacity) has, or at any time had, Knowledge of such fact or other matter.

"**Loan Agreement**" means a contract currently in substantially one of the forms attached hereto as Exhibit E, which Loanpal may change from time to time.

"**Loan Amount**" means the amount equal to the price paid by a Consumer for a Project pursuant to a Home Improvement Contract, including any Add-on or adjustments for change orders.

"**Loan Funding Date**" means, with respect to a given Project, the date on which Loanpal has funded the Installer Price, in its entirety.

"**Loan Repurchase Price**" means, with respect to a given Project, the Installer Price plus any due and unpaid interest and fees under the Loan Agreement.

"**Loan Termination**" has the meaning set forth in Section 6.1.3.

"**Loanpal**" has the meaning set forth in the Preliminary Statement.

"**Loanpal Default**" has the meaning set forth in Section 6.3.

"**Loanpal Indemnified Person**" or "**Loanpal Indemnified Persons**" has the meaning set forth in Section 7.1.

"**Losses**" means any and all liabilities (including, without limitations, liabilities arising out of the application of the doctrine of strict liability), obligations, losses, damages, penalties, fines, claims, penalties, actions, suits, judgments, costs, expenses and disbursements (including reasonable legal fees and expenses and reasonable costs of investigation).

"**Milestone**" has the meaning set forth in Section 3.5.2.

"**Milestone Approval**" has the meaning set forth in Section 3.5.2.

"**Milestone Rejection**" has the meaning set forth in Section 3.5.2.

"**Milestone Submission**" has the meaning set forth in Section 3.5.2.

"**Non-Warranty Repairs**" means with respect to a Solar System, any necessary repairs to a Solar System not covered by the Workmanship Warranty or Principal System Component manufacturer warranty.

"**NPI**" has the meaning set forth in Section 9.13.1.

"**Parties**" has the meaning set forth in the Preliminary Statement.

"**Permit**" means each and every national, regional and local license, authorization, certification, filing, recording, permit or other approval with or of any Governmental Authority, including each and every environmental, land use, construction or operating permit and any agreement, consent or approval from or with any Governmental Authority that is required by any Applicable Law or that is otherwise necessary for the performance of an Installation or for operation, maintenance and use of a Project.

"**Person**" means an individual, partnership, corporation, business trust, limited liability company, limited liability partnership, joint stock company, trust, unincorporated association, joint venture or other entity, or a Governmental Authority.

DocuSign Envelope ID: E7C11912-A298-4B99-B6F4-737543E2F6C3

"**Pricing Specifications**" has the meaning set forth in Section 3.1.

"**Pricing Variables**" means variable terms (such as length of repayment periods and APR) that are included by Loanpal in the applicable Pricing Specifications.

"**Principal System Components**" means photovoltaic modules, inverters and/or batteries included in the Solar/Storage System.

"**Program**" has the meaning set forth in Section 2.1.

"**Program Fee**" means the program fee percentage set forth in the applicable Pricing Specification multiplied by the Loan Amount.

"**Program Specification**" has the meaning set forth in Section 3.1.2.

"**Project**" means the Solar System, plus any Add-Ons.

"**Project Specifications**" means the specifications for a Project, excluding Add-ons, and certain other terms and conditions for Loanpal's obligation to purchase or fund under a Loan Agreement, as applicable, and identified (a) generally as such on the Program Specification, and (b) specifically for a particular Solar System (i) as set forth in the Home Improvement Contract and (ii) submitted to Loanpal by Installer through the Software or other process approved by Loanpal. Project Specifications shall include at minimum the Principal System Components for the Solar System (manufacturer, quantity, nameplate capacity of modules, inverters and meters); the applicable Utility, the Solar System size, and the Amount Financed.

"**Representatives**" has the meaning set forth in Section 9.12.

"**Responsible Officer**" means the chief executive officer, chief financial officer or any other duly appointed officer of Installer.

"**Software**" means the Loanpal Software, the proprietary electronic application and funding platform and portal owned by Loanpal, and to be used by Installer and Loanpal in connection with this Agreement, to generate and exchange documentation and notices regarding the Program, including Consumer Applications, Project Specifications, Consumer Credit Offers, Loan Agreements and Consumer Disclosures.

"**Solar System**" means a photovoltaic energy generating system, that can consist of solar panels or modules, inverter(s), electricity storage system, energy efficient monitoring equipment and related equipment and wiring installed at a premise owned by the Borrower at the time of installation identified in the applicable Project Specifications.

"**Sub-Installer**" means (a) any party, not an employee, with whom Installer enters into an arrangement for the performance of any of Installer's obligation under this Agreement, whether that be some or all of the performance of the Installation of a Project or for the supply of labor or services to Installer in connection with the Installation of any Project, or Installer's other obligations, and (b) any party, not an employee, at any tier with whom any Sub-Installer has further subcontracted any part of any Installation or other of Installer's obligations hereunder.

"**Term**" means the term of this Agreement set forth in Section 2.2.

"**Territory**" means the states, utility service territories or other geographic areas where a Loan Agreement is available as indicated in the Software.  References to multiple "Territories," "any Territory" or "each Territory" are to the Territories identified in an active Program Specification for Installer on the Software from time to time.

"**Utility**" means the local public electric utility to which a Solar System will be interconnected.

"**Workmanship Warranty**" means the warranty provided by the Installer and/or Installer's Affiliate under the applicable

DocuSign Envelope ID: E7C11912-A298-4B99-B6F4-737543E2F6C3

Home Improvement Contract.

## ARTICLE 2.

### OVERVIEW AND TERM

**2.1**     **Overview**. This Agreement sets forth the terms and conditions pursuant to which Installer will identify potential Consumers and proposed Projects Installer has sold to such Consumers on credit under a Program Specification; and in connection with such Consumers and proposed Projects, Loanpal shall have the opportunity to enter into Loan Agreements directly with such Consumers, in each case at the applicable Loan Amount (collectively, the "**Program**").

**2.2**     **Term.** The term of this Agreement commences as of the Effective Date and continues until terminated by either Party pursuant to Article 6 (the "**Term**").

## ARTICLE 3.

### PROGRAM OPERATIONS

**3.1**     **Pricing and Program Specifications**.

3.1.1     Pricing Specifications. Upon signing this Agreement, Loanpal and the Installer agree to the Pricing Specifications that describe the Program Fee and the range of Pricing Variables under which Loanpal is willing to offer to consumers Loan Agreements (as applicable) in substantially the form attached to Exhibit A ("**Pricing Specifications**"). These Pricing Specifications may change from time to time as outlined in Section 3.1.3.

3.1.2     Program Specification. Upon signing this Agreement, Loanpal and the Installer agree to the Program Specifications, in substantially the form attached to Exhibit B. The Program Specifications will (a) provide general terms and requirements for loans that will be offered to consumers for the Projects completed by the Installer, (b) define the conditions for Installer achieving each applicable Milestone, (c) set the deadlines for Installer achieving each applicable Milestone and completing Installation of Projects, (d) set forth the required Project Specifications, and (e) describe any other applicable terms. These Program Specifications may change from time to time as outlined in Section 3.1.3.

3.1.3     Right to Adjust Pricing and Program Specifications.

(a)     Loanpal may from time to time, in its sole discretion, replace or change any existing Program Specifications or existing Pricing Specifications. Loanpal will provide written notice via e-mail (as provided in Section 9.1) to the Installer of any change of either the Program Specifications or Pricing Specifications, which revisions will be deemed to amend and replace  Exhibit A and/or Exhibit B.

(b)     Such revised Program Specifications or Pricing Specifications shall apply to each Project for which the date of the Consumer Credit Offer occurs on or after the date Loanpal provides in the written notice in subparagraph (a) above.

**3.2**     **Underwriting**.

3.2.1     Consumer Application Submission and Review.

(a)     Consumer Application Submission. With respect to each Consumer Application, Consumer shall (i) provide the required Consumer information, and that information should be entered into the Loanpal Software either directly, via API, or other means mutually agreed upon by the Parties (ii) ensure all information is complete and accurate (iii) submit such Consumer Application through the Software or by other method agreed to by Loanpal and the Installer.

6

DocuSign Envelope ID: E7C11912-A298-4B99-B6F4-737543E2F6C3

(b)     Consumer Authorizations. When submitting a Consumer Application, which may be done only in compliance with Loanpal's rules and procedures, and with Loanpal's prior approval, if the Installer collects and transmits to Loanpal any Consumer NPI, the Installer shall obtain and maintain, as required by Section 4.2.2, each Consumer's confirmed or recorded authorization for Loanpal to use NPI related to such Consumer to order a Consumer's credit report and evaluate such Consumer's credit and otherwise in connection with the Program.

3.2.2    Consumer Application Review.

(a)     Loanpal shall respond to each Consumer Application in one of the following ways: (1) "Approved," (2) "Approved with Stipulations," (3) "Pending" or (4) "Declined" in accordance with the timeframes set forth below:

(i)     Loanpal shall, upon confirming that such Consumer Application is complete, review and respond to Installer and the applicable Consumer within 60 seconds (subject to normal electronic and Internet connectivity conditions).

(ii)    If Loanpal responds to a Consumer Application with "Approved with Stipulations," Loanpal shall request additional information and documentation required from the Consumer or Installer in order for Loanpal to further consider such Consumer Application. Loanpal shall then make a determination as to the status of such Consumer Application within two (2) Business Days after Loanpal's receipt of such requested additional information and documentation.

3.2.3    Consumer Application Approval. If a Consumer Application is classified by Loanpal as "Approved" or "Approved with Stipulations":

(a)     Loanpal shall provide to the Consumer the Consumer Credit Offer, any additional information or documentation needed from the Consumer in the case of "Approved with Stipulations", and applicable Consumer Disclosures that the applicable Consumer qualifies for based on the Pricing Variables.

(b)     Installer agrees and acknowledges that each Consumer Credit Offer shall be (i) for an amount not to exceed the maximum amount specified therein; and (ii) valid, along with the associated Project Specifications, for the time period set forth in the applicable Program Specification, subject to expiration provided in Section 3.3.2.

**3.3    Consumer Acceptance.**

3.3.1    Consumer Credit Offer.

(a)     If a Consumer communicates to Installer its decision to purchase a Solar System from the Installer and accept the applicable Consumer Credit Offer from Loanpal:

(i)     Installer shall (a) notify Loanpal of the Consumer's desire to accept the applicable Consumer Credit Offer and (b) provide the details contained in the Home Improvement Contract including but not limited to the final Loan Amount for such Consumer's Project;

(ii)    Loanpal shall (a) generate the Loan Agreement, including other related documents and all required Consumer Disclosures, (b) send directly to Consumer via secured E-Mail, and (c) initiate and facilitate the Consumer's execution of such Loan Agreement.

(b)     The date that Loanpal receives a completed and fully executed Loan Agreement electronically executed by the applicable Consumer, associated with a Consumer Credit Offer, and any applicable statutory rescission period associated with such Loan Agreement has passed, and any other requirements as set forth in the Program Specification have been met, shall be the "**Consumer Acceptance**" for such Consumer Credit Offer.

(c)     Upon the occurrence of Consumer Acceptance for a Loan Agreement, subject to Section 3.3.2:

DocuSign Envelope ID: E7C11912-A298-4B99-B6F4-737543E2F6C3

(i)       Loanpal shall notify Installer that the Consumer has executed the Loan Agreement; and

(ii)      Loanpal shall be obligated to fund such Loan Agreement with the applicable Consumer; in each case, on the terms set forth in this Agreement, the applicable Program Specification, pursuant to the applicable Project Specifications, and subject to Section 3.3.2.

3.3.2    Expiration of Consumer Credit Offer. Any Consumer Credit Offer and the corresponding Loan Agreement shall automatically expire (i) as provided in the applicable Program Specification, or (ii) if any Milestone completion deadline (as set forth in the Program Specification) is not met. Upon request by Installer to Loanpal, Loanpal may in its sole discretion extend a Consumer Credit Offer and Loan Agreement as set forth in such Program Specification. Installer may reinitiate the Consumer Application process for a Consumer, with Consumer consent, if the associated Consumer Credit Offer has expired and not been extended.

3.3.3    Consumer / Solar System UCC Filings. Installer acknowledges and agrees that Loanpal may file or cause to be filed financing statements and fixture filings in the name of Loanpal with respect to a Solar System associated with a Consumer Application, at any time after the applicable Loan Funding Date.

**3.4      Installer Installation of Projects.**

3.4.1    Installation. Installer shall be solely responsible for the Installation for each Project. The Installation includes all facilities, items and services, even if not specifically identified herein, that are necessary to complete such Project in accordance with the Home Improvement Contract and/or other requirements of this Agreement.

3.4.2    Change Orders. Installer shall provide notice of any change orders to a Home Improvement Contract promptly to Loanpal through the Software, or by other process approved by the Parties. In the event of a change to the Home Improvement Contract that results in a change to the Amount Financed set forth in a Loan Agreement, Installer shall be required to submit a request to cancel the Loan Agreement, and after cancellation (if approved by Loanpal), shall repeat the steps outlined in Section 3.3.1 above in order to generate and submit a new Loan Agreement reflecting such terms.

3.4.3    Force Majeure Events. Notwithstanding the foregoing, any Milestone associated with the Installation schedule for a Project may be extended up to an additional 90 days (or longer, if approved by Loanpal in its reasonable discretion), due to the occurrence and continuance of a Force Majeure Event affecting such Project. Installer shall give notice to Loanpal of the occurrence and continuance of a Force Majeure Event promptly upon receiving any notice, or having any Knowledge thereof, and shall keep Loanpal advised on a current basis of the expected impact of such Force Majeure Event upon its schedule for performance. Installer shall use all commercially reasonable efforts to promptly alleviate such Force Majeure Event and its impact.

3.4.4    Job Site Supervision and Personnel. Installer shall be solely responsible for supervising and directing each Installation, and shall be solely responsible for and have exclusive control over the means, methods, techniques, sequences and procedures employed. Installer shall ensure that all persons performing each Installation are skilled in the tasks assigned to them and have active appropriate licenses and posted license bonds, if applicable.

3.4.5    Sub-Installers.

(a)       Consent Not Required for Installation Sub-Installers. Subject to Section 3.4.5(b), Installer may use and engage Sub-Installers (including engineers or the supply of labor or services or Affiliates) to perform some or all of the Installation without Loanpal's approval; and

(b)       Installer shall be solely responsible for the performance of all obligations under this Agreement, and for paying each Sub-Installer amounts due to such Sub-Installer, and nothing contained herein shall obligate Loanpal to pay any Sub-Installer for any of the obligations performed by such Sub-Installer or taxes or withholdings related to such obligations performed by any such Sub-Installer. No Sub-Installer is intended to be, nor shall any such Sub-Installer be

8

DocuSign Envelope ID: E7C11912-A298-4B99-B6F4-737543E2F6C3

deemed to be, a third-party beneficiary of this Agreement or an agent, employee, Installer, joint venture or partner of Loanpal. Installer shall cause all Sub-Installers to comply with the terms of and standards of performance set forth in this Agreement applicable to Installer. Installer shall ensure that all Sub-Installers are in compliance with all license and bonding requirements applicable to the obligations of Installer to be performed by them in accordance with Applicable Law. Installer agrees to cause all Sub-Installers to maintain, and comply with, the same insurance requirements as Installer. Installer shall ensure that its use of, compensation of and activities by all of its Sub-Installers are in compliance with Applicable Law, including but not limited to all fair housing and fair lending laws as it relates to any aspect of the activities contemplated by this Agreement. Installer shall be solely responsible for the employment, control, actions, liability and conduct of its Sub-Installers, including the compliance with the terms of this Agreement.

3.4.6    <u>Quality Assurance of Project</u>. Each Project shall be subject to commercially reasonable quality assurance review by Loanpal or any third party appointed by Loanpal, as determined by Loanpal from time to time.  Loanpal may request within 10 business days after the end of each month and the Installer shall provide Loanpal with all sales proposals, install photos, Permits, Final System Designs, and PTO documentation, if applicable, for all loans funded the previous month.  If Installer does not deliver the requested information within five (5) business days after Loanpal's request then Loanpal shall have the right to, among other things, suspend the Installer until said time as Installer complies with Loanpal's request.

**3.5**    **Payments for Loan Agreements**.

3.5.1    <u>Determining Payment Amounts</u>. The Installer Price shall be calculated by applying the fees, rates and information set forth in the applicable Program Specification, Pricing Specification and Project Specifications, to the Amount Financed.

3.5.2    <u>Milestones</u>.

(a)    Each Program Specification shall set forth milestones for completion of each Installation and Project (each, a "**Milestone**").

(b)    Installer shall notify Loanpal via the Software upon completing each Milestone for a Project as provided in this <u>Section 3.5.2</u> (a "**Milestone Submission**") (except that Consumer Acceptance shall be as provided in <u>Section 3.3.1</u>).

(c)    As of the date of each Milestone Submission to Loanpal, Installer shall be deemed to certify to Loanpal that each of the representations and warranties in <u>Article 5</u> is true and correct, including with respect to the applicable Project. Within one (1) Business Day of receipt of a Milestone Submission, Loanpal shall review and notify Installer via the Software whether such Milestone, as described in the Program Specification, has been met ("**Milestone Approval**") or is deficient (each, a "**Milestone Rejection**").

(d)    In the event of a Milestone Rejection, Installer may resubmit the Milestone Submission upon curing any deficiency, so long as such resubmission is made within the applicable Milestone completion deadline.

(e)    If Milestone Approval does not occur by the applicable deadline set forth in the Program Specification for a Project (other than due to Loanpal's failure to comply with its obligations under the Agreement), Loanpal may exercise its remedies set forth in <u>Article 6;</u> and/or the Consumer Credit Offer shall expire.

3.5.3    <u>Loanpal Payments</u>. Within two (2) Business Day after Loanpal has issued a Milestone Approval for a Project pursuant to <u>Section 3.5.2</u> that is associated with a payment, Loanpal shall pay or fund (as applicable) the Installer Price, in immediately available funds.  These funds may be payable according to Exhibit C and F.

3.5.4    <u>Effect of Payments</u>.

9

DocuSign Envelope ID: E7C11912-A298-4B99-B6F4-737543E2F6C3

(a)    <u>Loan Agreements</u>. Any complete funding of a Loan to Installer shall, regardless of any fees or setoff retained by Loanpal as permitted under this Agreement, be deemed a full funding of the Amount Financed for such Loan to the applicable Consumer and such Consumer's payment of such amount to Installer in full satisfaction of the applicable Project as set forth in the applicable Home Improvement Contract.

3.5.5    <u>Right to Setoff</u>. Loanpal shall have the right to set off amounts due and owing by Installer, including without limitation amounts for removal of liens, against any amounts owed by Loanpal to Installer under this Agreement, regardless of whether such amounts relate to the same or different Projects or Loan Agreements.

**3.6**    **Closing Call.** Loanpal hereby reserves the right to perform a Closing Call following the Loan Funding Date for any such Consumer. If any material Consumer Complaint is brought forth by the Consumer as part of the Closing Call, Loanpal shall promptly notify Installer. Installer will use commercially reasonable efforts to promptly remedy such Consumer Complaint.

**3.7**    **Production Data**. Installer agrees to provide to Loanpal with a standard quarterly operating report containing system level production data as specified in the Program Agreement within ten (10) business days of the end of every quarter.  In addition, within five (5) business days of Loanpal's request, Installer will provide Loanpal with system-level production data regarding specific Consumers with Delinquent Loan Agreements.


## ARTICLE 4.

## <u>INSTALLER COVENANTS</u>

**4.1**    **Notice of Relevant Events**.

4.1.1    <u>Litigation</u>. Each party shall promptly inform the other party of any litigation, action, investigation, material Consumer Complaint, event or proceeding that is pending or has been threatened, in either case of which it has Knowledge, that: (a) arises under or relates to this Agreement, any of the transactions under this Agreement or any of Installer's, any Sub-Installer's, or Loanpal's licenses or Permits required for performance under this Agreement, (b) if adversely resolved, would (i) have a material adverse effect on any Loan Agreement, Home Improvement Contract, or related Project; (ii) have a material adverse effect on the ability of Loanpal, Installer, or Sub-Installers or any of their Affiliates to perform their respective obligations under this Agreement; (iii) have a material adverse effect on Installer or Loanpal; or (iv) constitute or result, if true, in a material breach of any representation, warranty, covenant or agreement set forth in this Agreement. Any information provided by Installer pursuant to this <u>Section 4.1.1</u> shall be deemed Installer Qualifying Information.

4.1.2    <u>Change in Circumstances</u>. Each party shall promptly inform the other Party upon receiving any notice of, or having any Knowledge of (a) any failure by such Party to comply with its obligations hereunder, or (b) any material misrepresentation, falsity or deficiency in any documentation or materials submitted by such Party to a Consumer hereunder (including any subsequent events that have caused a Loan Agreement or other document hereunder to become incorrect, false, or deficient) or (c) any material change in Installer Qualifying Information that Installer previously provided to Loanpal. Any information provided by Installer pursuant to this <u>Section 4.1.2</u> shall be deemed Installer Qualifying Information.

4.1.3    <u>Licenses and Registrations</u>. Installer shall identify to Loanpal all licenses and registrations, including the license and registration number if applicable, required for the performance of Installer's obligations for each Installation. Upon Loanpal's request, from time to time, Installer shall deliver evidence satisfactory to Loanpal from the applicable state licensing board that Installer is in good standing and is not subject to any liens, litigation, or material complaints before such licensing board. Any information provided by Installer pursuant to this <u>Section 4.1.3</u> shall be deemed Installer Qualifying Information.

4.1.4    <u>Breach of Reps and Warranties</u>.  Installer shall notify LoanPal within five (5) business days after becoming aware of any representations or warranties in Article 5 not being true or correct when made.

**4.2**     **Compliance With Applicable Law; Performance in English and Spanish.**

4.2.1     Each Party shall perform all activities in connection with this Agreement and the Program, including all advertising and promotion activities, (a) in compliance with each Home Improvement Contract, each Loan Agreement, and Applicable Law, (b) making no unreasonable or deceptive claims, and (c) only in English or Spanish languages, unless otherwise approved by Loanpal. Installer shall ensure that each Home Improvement Contract is in clear and understandable terms and contains a full, complete and accurate description of the Project and Installation in compliance with Applicable Law. Without limiting the generality of its obligations hereunder, Installer shall not discriminate against any Consumer on any basis prohibited by Applicable Law and Installer shall not use or disclose any information relating to Consumers in violation of Applicable Law.

4.2.2     Each party shall provide the other Party with all records and information requested by such party in order to investigate or address any material Consumer Complaint related to the other Party. Each party shall maintain paper copies (when used) or copies of electronic images of its submissions and invoices and other records pertaining to any transaction covered by this Agreement for such time and in such manner as Loanpal or any Applicable Law may require, but in no event less than (x) two years from the date of submittal of any Consumer Applications with respect to any Consumers that do not receive a Consumer Credit Offer or (y) seven years from the date of submittal of any Consumer Applications or invoices with respect to any Consumers that receive a Consumer Credit Offer.

4.2.3     Installer shall not advertise or promote any Loanpal product or service without prior written approval of Loanpal.  Subsequent to Loanpal's initial review and approval of any advertisements or promotions of Loanpal's product or service, Loanpal will need to review any of the Installer's advertisements or promotions that are materially different than the initial advertisements or promotions of Loanpal's product or service that Loanpal has already reviewed and approved.

4.2.4     If Contractor is working with a Consumer who negotiates primarily in Spanish or whose English skills cannot be described as "proficient", then Contractor shall utilize the Home Improvement Contract in the Spanish language. Other approved non-English language contracts may be provided in accordance with Section 4.2.1 above.  A failure of Contractor to use the appropriate non-English language Home Improvement Contract for Consumers with non-proficient English skills shall be deemed a material breach and default of this Agreement.

**4.3**     **Agency**. Installer shall not, and shall not permit any Sub-Installer to, represent that it is an agent or employee of Loanpal.  Loanpal shall not represent that it is an agent or employee of Installer.

**4.4**     **Representations to Consumers Regarding Projects**. Installer (a) shall not, and shall not permit any Sub-Installer to, (i) make any misrepresentations regarding the performance of the Projects; or (ii) make any representations regarding the performance of the Projects, including energy savings, that are not provided by or reasonably related to and consistent with those provided by the equipment manufacturer(s); and (b) shall in all cases ensure that all representations it or any Sub-Installer makes are in accordance with good solar industry practice. Installer shall not, and shall not permit any Sub-Installer to, provide any Consumer with any warranty that is not expressly set forth in the applicable Home Improvement Contract. Installer shall not allow any of its employees or representatives, or the employees or representatives of its Sub-Installers, to make any verbal representations concerning these matters that go beyond the applicable written materials and representations provided to Consumers.  If Installer breaches the representations set forth in this Section 4.4, then Loanpal may, among other things, reject the funding of any given Project.

**4.5**     **No Exclusivity**. Installer shall not, and shall cause each Sub-Installer not to, represent that it is the exclusive provider of services under the Program.  Loanpal shall not represent that it is the exclusive provider of loan products to customers of Installer.

**4.6**     **Monitoring and Ownership Support Services.**

4.6.1     Monitoring. Installer shall ensure that each Solar System meets the performance and production monitoring requirements set forth on the Program Specification.

DocuSign Envelope ID: E7C11912-A298-4B99-B6F4-737543E2F6C3

4.6.2   <u>Ownership Support Services</u>. During the term of the Workmanship Warranty, Installer shall provide the following ownership support services to the Consumer, at no additional cost to such Consumer or Loanpal.

(a)   <u>*Consumer Warranty Claim Assistance*</u>: Remotely diagnose, investigate on site and resolve, as applicable, any Consumer concern (including but not limited to system performance) that may result in a Workmanship Warranty claim or Principal Solar System Component manufacturer warranty claim.

(b)   <u>*Warranty Claim Response Times*</u>: Respond to Consumer requests for Solar System claims where the Solar System is not functioning (critical claims) within five (5) Business Days.

(c)   <u>*Non-Warranty Repairs*</u>. Identify to Consumer any Non-Warranty Repairs. This may include providing to the Consumer a quotation for performance of such repairs by Installer (if applicable and appropriate in the circumstances), or advice as to the type of repairs necessary, the likely cost to the Consumer, and possible service providers. Prior to performing Non-Warranty Repairs, obtain written consent (in accordance with Applicable Law) from the Consumer as to the scope of work and associated cost to the Consumer. Installer is solely responsible for collecting any payments from the applicable Consumer for any Non-Warranty Repairs.

(d)   <u>*Other*</u>. Provide any other warranty or support services as set forth in the Program Specification.

**4.7**   **<u>Warranties</u>**.

4.7.1   <u>Workmanship Warranty</u>.  Installer shall:

(a)   Warrant to the Consumer that each Solar System has been installed in accordance with the warranties specified in the Home Improvement Contract, which shall not be less than the following minimum warranty standards:

(i)   Workmanship Warranty = 10 years

(ii)   Roof Penetration Warranty = 5 years

(b)   Warrant to the Consumer that the components of the Solar System shall have no less than the following minimum manufactures warranty standards, which such warranties shall be transferred to the Consumer:

(i)   Inverter Product Warranty = 10 years

(ii)   Module Product Warranty = 10 years

(iii)   Module Performance Warranty = 25 years

(iv)   Battery Product Warranty = 10 years

(c)   Cause the Workmanship Warranty in each Home Improvement Contract to:

(i)   With respect to the Solar System:

(1)   Provide that all goods, services, equipment, parts and materials used in connection with the installation of the applicable Solar System (i) are free from any defects in design, materials, workmanship and manufacturing, except with respect to Principal System Components and (ii) are new, unused and undamaged at the time of Installation.

(2)   Provide that the Installation (i) conforms to all Applicable Laws, (ii) has been performed in accordance with the terms and conditions set forth in the applicable manufacturer's warranties for Principal System Components and (iii) is free from any defects in construction, installation and workmanship.

DocuSign Envelope ID: E7C11912-A298-4B99-B6F4-737543E2F6C3

      (ii)      With respect to the Add-ons: contain commercially reasonable and market terms.

4.7.2    <u>Support for Manufacturer's Warranties</u>.

    (a)    During the term of the applicable Workmanship Warranty for each Home Improvement Contract, Installer shall use commercially reasonable efforts to support the enforcement of manufacturer's warranties for Principal System Components by any Consumer or carry out enforcement of such warranties on behalf of such Consumer, if requested and at Consumer's expense to the extent not covered by such manufacturer's warranty.

    (i)    Installer shall promptly notify Loanpal in regards to any manufacturer that is not honoring the warranty of any Principal System Components ever used by Installer on any Project.

    (b)    For the avoidance of doubt, nothing in this <u>Section</u> obligates Installer to assume any obligations under a manufacturer's warranty for Principal System Components; however, Installer shall bear the cost of removal and replacement of Principal System Components covered by manufacturer warranty where required by Applicable Law, Utility tariff or Rebate Program.

4.7.3    <u>Consumer Project Performance Inquiry</u>. During the term of the applicable Workmanship Warranty, Installer shall respond to all Consumer inquiries regarding the Project and specifically Solar System performance, with prompt attention given to those that may result in a Workmanship Warranty claim or manufacturer's warranty claim. Without limiting Installer's obligations under the Workmanship Warranty, Installer shall assist in the diagnosis of all Solar System performance issues, and should Installer determine that the problem requires an on-site assessment, Installer will promptly do so. Installer will provide the applicable Consumer with the assessment of the cause of the performance issue and options available to such Consumer (including those that may require such Consumer to pay for any part, or all of the repair cost) to return such Solar System to its expected operating condition.

4.7.4    <u>Installer Failure to Perform</u>. If Installer fails to comply with its Workmanship Warranty obligations owed to a Consumer, Loanpal shall have the right, without limiting any other remedies Loanpal may have at law or equity arising from Installer's failure, to perform such obligations and Installer shall reimburse Loanpal for the costs of such performance.

**4.8**    **Maintenance of Insurance**. During the Term of this Agreement and thereafter for so long as Installer has any obligations to Loanpal, Installer shall maintain at its expense general liability insurance and workers' compensation insurance in such amounts and in such forms as are commercially reasonable for a business of Installer's nature. If requested by Loanpal, Loanpal and other parties identified by Loanpal, shall be named as an additional insured under each policy. If requested by Loanpal, Installer shall provide Loanpal with a certificate of insurance evidencing such insurance coverage and renewals thereof. Installer shall notify Loanpal in writing if any required insurance policy is not renewed within 15 days of the renewal deadline. Any insurance certificates or information provided by Installer pursuant to this <u>Section</u> shall be deemed Installer Qualifying Information.

**4.9**    **Installer Financial Statements**. Installer shall deliver to Loanpal, if not publicly available, (a) as soon as available after the current fiscal year, and each subsequent fiscal year, and (b) upon request by Loanpal after the end of a fiscal quarter, a balance sheet and related statements of operations, cash flows and owners' equity, in each case (x) showing the financial position of Installer as of the close of such fiscal year or quarter, as applicable, and the results of its operations during such year or quarter, as applicable, (y) with respect to a fiscal year, audited or reviewed by a certified public accountant, and (z) fairly presenting, in all material respects, the financial position and results of operations of Installer at the dates indicated in conformity with GAAP. Any information provided by Installer pursuant to this <u>Section</u> shall be deemed Installer Qualifying Information.

**4.10**    **Home Improvement Contracts**. Installer shall have any form of home improvement contract it intends to use for the Program (including, for the avoidance of doubt, any revision or modification to a home improvement contract previously used in the Program) certified by a Responsible Officer as having been reviewed by Installer's counsel and determined to comply with all Applicable Laws (including laws requiring filing with or approval by any Governmental Authority) for each Territory, the Warranty and ownership support services requirements of this Agreement, and the

DocuSign Envelope ID: E7C11912-A298-4B99-B6F4-737543E2F6C3

requirements of the Program Specification (each such contract or revision, a "<u>Home Improvement Contract</u>"). Furthermore, Installer shall provide each such Home Improvement Contract to Loanpal and Loanpal may review such Home Improvement Contract and, at its reasonable discretion, determine that such Home Improvement Contract is ineligible to be used in the Program. Installer shall ensure that each Home Improvement Contract executed by a Consumer is identical to the applicable form Home Improvement Contract submitted to Loanpal pursuant to the foregoing process. Nothing in this section shall satisfy or limit Installer's obligations under Section 4.1.1.  Notwithstanding anything to the contrary contained herein, each Home Improvement Contract must include, at a minimum, the following info:

(a)     The construction license number for the applicable State if required by that State;

(b)     Warranty Information for the Solar System;

(c)     A minimum of a 3-day Right to Cancel, or such longer period of time as required and in accordance with the applicable State or federal law.

(d)     The Project Description for the Solar System

**4.11     Review of Installer Qualifications.**  Installer shall, from time to time, provide information and documentation reasonably requested by Loanpal to confirm Installer's eligibility to continue in the Program, including, but not limited to, copies of then current licenses, registrations and insurance certificates, sale and marketing material, and any financial statements provided pursuant to <u>Section 4.9</u>.

**4.12     Qualifications and Training of Sales and Installation Employees**. Installer's sales and Installation employees are duly qualified, registered and licensed, and have received training for their respective positions commensurate with customary industry practice.  Installer shall ensure that each of its sales and Installation employees, and those of its Sub-Installers involved in the sales process, shall receive relevant compliance training as reasonably required or provided by Loanpal from time to time, and provide confirmation of the same as reasonably requested by Loanpal.  Loanpal's sales and underwriting employees are duly qualified, registered and licensed (where applicable), and have received training for their respective positions commensurate with customary industry practice.

**4.13     Liens and Encumbrances:**  Installer shall not permit to exist any lien, charge or encumbrance on, either (a) any Project financed by a Loan Agreement or (b) all other fixtures, maintenance supplies, tools, equipment and the like that are appurtenant to, or used in the operation of, such Project, so that the applicable Consumer will own such Project, fixtures, maintenance supplies and equipment free and clear of any mortgages, liens, charges, encumbrances or mechanics' liens arising or that might arise by, through or under Installer or Sub-Installers. Notwithstanding the foregoing, if the applicable Program Specification provides for any interim Milestones, the foregoing shall not apply to liens arising in respect of work on the Project that has not been completed as of the achievement of any such interim Milestone, which liens shall be released upon achievement of the final Milestone.

**ARTICLE 5.**

**REPRESENTATIONS AND WARRANTIES**

**5.1     Both Parties Representations and Warranties**. Both Parties represent and warrant to the other as follows, as of (a) the Effective Date, (b) the date of any Consumer Application; and (c) the date on which Installer achieves any Milestone:

5.1.1     <u>Organization and Qualification</u>. It is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization and is authorized to do business and in good standing in the Territory in which the applicable Project is located and has the lawful power to engage in the business it presently conducts and contemplates conducting.

5.1.2     <u>Power and Authority</u>. It has the power to make and carry out this Agreement and to perform its obligations

DocuSign Envelope ID: E7C11912-A298-4B99-B6F4-737543E2F6C3

hereunder and all such actions have been duly authorized by all necessary proceedings on its part.

5.1.3     Licenses. It is duly licensed, as required by Applicable Law, to perform its obligations under this Agreement.

5.1.4     No Conflicts. The execution, delivery and performance of this Agreement will not conflict with, result in the breach of, constitute a default under or accelerate performance required by any of the terms of its Governing Documents or any Applicable Law or any covenant, agreement, understanding, decree or order to which Installer is a party or by which it or any of its properties or assets is bound or affected.

5.1.5     Enforceability; Validity; and Binding Effect. This Agreement constitutes the valid and binding obligation of the parties, enforceable against each party in accordance with its terms.

5.1.6     Bankruptcy. No Event of Bankruptcy has occurred with respect to either party or any of its Affiliates.

5.1.7     Compliance with Laws. Each Party is and will continue to be in compliance with all applicable lending, consumer finance, consumer protection and other applicable laws relating to the activities it is obligated to perform pursuant to this Agreement (including related marketing activities) and that is possesses any licenses or authorizations needed to engage in the activities contemplated by this Agreement.

**5.2     Representations and Warranties Respecting Each Loan Agreement and Project**. With regard to each Customer Application and/or project, Installer represents and warrants to Loanpal as follows, as of (a) the date on which Installer submits the Consumer Application (b) the date on which Installer achieves any Milestone for that project, including, without limitation, the notice of permission to operate; or (c) such other date to which a given representation and warranty refers, as applicable:

5.2.1     Accuracy of Installer Submitted Information. To the best of Installer's Knowledge, (a) as of the date of the applicable Consumer Application to Loanpal, the information provided by Installer with respect to such Consumer Application is true, correct and complete in all material respects and (b) as of the date of the applicable Milestone submission, Installer has no reason to believe the information provided in the applicable Consumer Application is or has become incorrect, false, or deficient.

5.2.2     No Defaults. Installer is not in default under and has no Knowledge of any default by any other party under the applicable Home Improvement Contract.

5.2.3     Applicable Contracts. Each of the applicable Home Improvement Contract is in compliance with Section 4.10, is in full force and effect and Installer has no Knowledge of any breach, default or event of default thereunder.

5.2.4     No Defenses to Payment. Installer is not aware of and has no Knowledge of any defenses to payment by the Consumer under the applicable Loan Agreement (other than the proper completion of the applicable Installation with respect to the applicable Milestone).

5.2.5     Cash Prices Are Market Prices. The purchase price for each Project associated with a Loan Agreement represents a fair retail price for the design, procurement and installation of the applicable Project, including any Add-ons, and is no higher than the price that Installer would charge for an equivalent project sold for cash or sold on credit outside of the Program.

5.2.6     Conditions Precedent to Each Milestone. All of the conditions to the applicable Milestone set forth in the applicable Program Specification have been satisfied.

5.2.7     No Litigation or Consumer Complaint. There is no litigation or unresolved Consumer Complaints associated with the Project

5.2.8     No Other Financing Arrangements. To Installer's Knowledge, the applicable Loan Agreement is the sole

DocuSign Envelope ID: E7C11912-A298-4B99-B6F4-737543E2F6C3

source of financing for the purchase of the applicable Project.

5.2.9    Disclosure to Loanpal and Consumers. No financial or other information provided by Installer to Loanpal or the applicable Consumer in connection with the Project, the Loan Agreement, the Home Improvement Contract or any other document related to such Project, including statements regarding energy savings, cost savings and eligibility for rebates or tax benefits, as of the date such information was provided, contained any untrue statement of a material fact or omitted a material fact necessary to make the information provided not misleading in light of all the circumstances existing at the date the information was provided. Installer has no Knowledge of any circumstances that would cause such information to be materially misleading.

5.2.10    Assistance with Delinquent Loan Agreements: Within the first six (6) months after Installation, Installer shall, within ten (10) business days, use commercially reasonable efforts to assist Loanpal in making current any Delinquent Loan Agreements, including but not limited to, turning off the Solar System when Loanpal deems in its sole discretion such action is necessary. When possible and when supported by the technology and components of the Solar System, Installer shall remotely turn off the Solar System of such Delinquent Loan Agreement within a reasonable amount of time after receiving notification from Loanpal to turn the system off.  In the event that the technology of the given Solar System is not capable of being turned off remotely, Installer shall provide an estimate of the cost to physically roll a truck to the Consumer's address on which the Solar System has been installed. Loanpal, in its sole discretion, will decide whether to contract Installer to roll a truck and physically disconnect such Solar System, and will reimburse Installer at cost for such action. Installer shall disconnect such Solar System within a reasonable amount of time after Loanpal's notification of its decision to have Installer roll out a truck to disconnect the Solar System.

5.2.11    No Adverse Selection: No selection procedures reasonably believed by the Installer to be adverse to Loanpal were utilized in selecting any Consumer in respect of such Project, and each Project sold to Loanpal has not been selected in a manner that would be more adverse to the Loanpal than to any such other entity and its creditors.

5.2.12    No Second Pass at Credit Approval: Such Consumer has not been rejected, refused or otherwise declined by Installer or any of Installer's financing partners for a substantially similar product.

5.2.13    Warranty and Workmanship Obligations:   During the term of the Loan Agreement, the Installer will continue to honor all warranty and workmanship obligations as outlined in Section 4.7.

5.2.14    Insurance:   Installer's General Liability Insurance is in effect as outlined in Section 4.8.

5.2.15    Related Person:   A Consumer shall not be a related Person of Installer or any of Installer's contractors, sub-contractors, or Affiliates.

5.2.16    Relocation of Solar System:   Installer agrees not to remove or relocate a Solar System while a Loan is outstanding with Loanpal.


**ARTICLE 6.**

**DEFAULT, SUSPENSION AND TERMINATION**

**6.1    Default by Installer**.

6.1.1    General. It shall be an event of default by Installer (each, an "**Installer Default**") if: (a) Installer fails to make or cause to be made any undisputed payment due and payable to Loanpal and such failure continues for ten (10) Business Days after notice by Loanpal to Installer of such failure; (b) an Event of Bankruptcy has occurred with respect to Installer or Installer has stated in writing that it is no longer able to meet its financial obligations in due course; or (c) any of Installer's representations or warranties in Article 5 were not true and correct when made, and are not true and correct as updated, or (d) Installer breaches any covenants in this Agreement including, without limitation, the Installer covenants in Article 4;

16

DocuSign Envelope ID: E7C11912-A298-4B99-B6F4-737543E2F6C3

or (e) Installer fails to cause all items financed to be completed and installed pursuant to the time periods required set forth in **Exhibit B**.

6.1.2   Loanpal Remedies Upon Default. Without limiting any other remedies Loanpal may have under this Agreement or under Applicable Law, with notice to Installer, Loanpal may terminate this Agreement immediately upon the occurrence and during the continuance of an Installer Default referenced in Section 6.1.1. Upon any termination by Loanpal pursuant to this Section 6.1.2, Loanpal shall have the option, but not the obligation to: (x) fund any existing Loan Agreements for which the payment for the final Milestone has not been made to Installer, (y) enter into and fund any Loan Agreements relating to outstanding Consumer Credit Offers that were issued prior to the date of such termination, or (z) fund any loan directly to the Consumer or to another installer designated by the Consumer.  Effective immediately upon receipt of any notice of termination hereunder, Installer shall not initiate any new Consumer Applications, and Loanpal shall not review any new Consumer Applications or issue any new Consumer Credit Offers. Any Loan Agreements funded and Projects installed after the effective date of a termination as provided in this Section 6.1.2 shall continue to be subject to this Agreement to the extent the provisions of this Agreement survive termination as provided in Section 9.11.

6.1.3   Termination of Loan Agreements. If (i) Loanpal has terminated this Agreement pursuant to Section 6.1.2 and Loanpal elects not to fund an existing Loan Agreement that has not already reached a Loan Funding Date or (ii) Installer fails to achieve a substantial completion of Installation per the Program Specifications; Loanpal will no longer be obligated to fund the terminated Project and shall provide notice of such termination to Installer (a "Loan Termination").

6.1.4   Loanpal's election to Loan Termination pursuant to this section shall not operate as a waiver of any of its rights to pursue Installer for any other remedy that may be available to Loanpal under this Agreement or under Applicable Law.

**6.2   Repurchase of Funded Loans.**

6.2.1   In the event that any of the Installer's representations or warranties in Article 5 were not true and correct when made, the Installer shall be required to repurchase any and all funded loans that fall under the purview of said breach in representation or warranty at the applicable Loan Repurchase Price, with respect to such funded loans. The Loan Repurchase Price shall be due and payable within ten (10) business days after receipt of an invoice from Loanpal.  If Installer fails to deliver the Loan Repurchase Price, Loanpal has the right to offset such amount per the terms of Section 3.5.5 of this Agreement.

6.2.2   In the event that the Utility does not grant Permission to Operate within the deadline specified in the Program Specification, the Installer shall be required to repurchase such funded loan at the applicable Loan Repurchase Price.  In the event that the Installer repurchases a loan under this situation and later the project receives PTO and the Customer is current on their loan payments, the Installer can re-request funding for that loan. Loanpal in its sole an absolute discretion may agree to find an investor for the loan and if Installer agrees to any and all changes to the purchase price or terms, coordinate the sale of the loan to the investor.

6.2.3   Upon receipt of funds from the Installer in respect of the Loan Repurchase Price paid in full, LoanPal shall authorize the release of the related loan File and shall transfer its interest in such repurchased loan to Installer on an "AS-IS," "WHERE-IS" basis, without any representations or warranties, other than that LoanPal has is selling such loan to the Installer free and clear of any Liens created by or through LoanPal.  Any repurchase by Installer pursuant to Section 6.2 shall be made by wire transfer to the bank account designated by LoanPal unless set off per Section 3.5.5.

6.2.4   It is solely the responsibility of the Installer to pay the full Repurchase Price for any repurchased loan to Loanpal regardless of the amount funded to another party if applicable.

**6.3   Default by Loanpal**. It shall be an event of default by Loanpal (each, a "**Loanpal Default**") if: (a) Loanpal fails to make or cause to be made any undisputed payment due and payable to Installer and such failure continues for ten (10) Business Days after notice by Installer to Loanpal of such failure; (b) an Event of Bankruptcy has occurred with respect to

DocuSign Envelope ID: E7C11912-A298-4B99-B6F4-737543E2F6C3

Loanpal or Loanpal has stated in writing that it is no longer able to meet its financial obligations in due course; (c) any of Loanpal's representations or warranties in <u>Article 5</u> were not true and correct when made in any material respect, and failure is not remedied within fifteen (15) days of notice of its failure from Installer, or (d) Loanpal breaches any covenants in this Agreement and fails to cure its breach within fifteen (15) days of receiving notice of its breach from Installer. Without limiting any other remedies Loanpal may have under this Agreement or under Applicable Law, with notice to Loanpal, Installer may terminate this Agreement immediately upon the occurrence and during the continuance of a Loanpal Default in this <u>Section 6.3</u>. Upon any such termination by Installer, then-outstanding Consumer Credit Offers and Loan Agreements shall be addressed as provided in <u>Section 6.5</u>.

**6.4**     <u>**Termination for Convenience**</u>. Either Party may terminate this Agreement upon 90 days' prior notice to the other Party. Upon any such termination, neither Party shall have any further obligation to the other hereunder, except as otherwise provided in <u>Section 9.11</u> and <u>Section 6.5</u>. Upon any such termination, then-outstanding Consumer Credit Offers and Loan Agreements shall be addressed as provided in <u>Section 6.5</u>.

**6.5**     <u>**Effect of Termination on Pending Projects**</u>. In the event that either Party terminates this Agreement pursuant to <u>Sections 6.3</u> or <u>6.4</u>, Loanpal shall remain obligated to: (a) fund any existing Loan Agreements that have achieved Consumer Acceptance but have not already been funded, or (b) enter into any Loan Agreements relating to outstanding Consumer Credit Offers that were issued prior to the date of such termination. Effective immediately upon receipt of any notice of termination pursuant to <u>Sections 6.3</u> or <u>6.4</u>, Installer shall not initiate any new Consumer Applications, and Loanpal shall not review any new Consumer Applications or issue any new Consumer Credit Offers. Any Loan Agreements funded and Projects installed after the effective date of a termination as provided in this <u>Section 6.5</u> shall continue to be subject to this Agreement to the extent the provisions of this Agreement survive termination as provided in <u>Section 9.11</u>.

**6.6**     <u>**Suspension of Installer**</u>. If, at any time, Loanpal, based on its review of the Installer's key performance indicators, including, without limitation, (a) evidence of changes or potential issues with Installer's covenants set forth in Article 4; (b) changes to Installer's Qualifying Information or (c) Installer's failure to provide requested or required updated Installer Qualifying Information, reasonably determines that Installer no longer meets Loanpal's qualifications for Installer to participate in the Program, or Loanpal otherwise believes that Installer may be in breach of this Agreement, Loanpal may, at its option, upon notice to Installer (and without limiting any of Loanpal's other rights under this <u>Article 6 or elsewhere in the Agreement</u>), suspend any pending Consumer Applications, suspend Installer's right to request that Loanpal make determinations regarding Consumer Applications, move the Closing Call to prior to Loan Funding Date; or suspend any pending funding requests. Such suspension will cease when Loanpal determines, in its sole discretion, that Installer currently meets Loanpal's qualifications for Installer to participate in the Program or is not in breach of this Agreement.

**ARTICLE 7.**

**INDEMNIFICATION**

**7.1**     <u>**Installer Indemnity.**</u> To the fullest extent permitted by Applicable Law, Installer shall defend, indemnify and hold harmless Loanpal and Loanpal's Affiliates, officers, members, directors, employees and agents (each, an "<u>**Loanpal Indemnified Person**</u>", and collectively, the "<u>**Loanpal Indemnified Persons**</u>") from and against any Losses caused by: (a) any breach of a representation, warranty or covenant or other Installer Default under this Agreement; (b) any property damage, bodily injury or death arising from the Installation or Installer's personnel's operation of Projects; (c) any breach of a representation, warranty or covenant or default by Installer under any Home Improvement Contract; (d) any failure by Installer to achieve a completion deadline set forth in the applicable Program Specification for a Project; (e) Loanpal's termination of any Loan Agreement pursuant to <u>Section 6.1</u>; or (f) (i) the uncovering or unveiling, or any release by Installer or its Sub-Installers or agents of any Hazardous Materials; (ii) any enforcement or compliance proceeding commenced by or in the name of any Governmental Authority because of an alleged, threatened or actual violation of any Applicable Law by Installer or its Sub-Installers or agents because of the presence on the applicable Job Site of any Hazardous Materials; or (iii) any action reasonably necessary to abate, remediate or prevent a violation or threatened violation of any Applicable Law by Installer or its Sub-Installers or agents with respect to any Hazardous Materials.

DocuSign Envelope ID: E7C11912-A298-4B99-B6F4-737543E2F6C3

**7.2**     **Loanpal Indemnity**. To the fullest extent permitted by Applicable Law, Loanpal shall defend, indemnify and hold harmless Installer and Installer's Affiliates, officers, members, directors, employees and agents (each, a "**Installer Indemnified Person**", and collectively, the "**Installer Indemnified Persons**") from and against any Losses caused by any breach of a representation, warranty or covenant or other Loanpal Default under this Agreement.

**7.3**     **Comparative Fault**. It is the intent of the Parties that where fault is determined to have been joint or contributory, principles of comparative fault will be followed and each indemnifying Party shall bear the proportionate cost of any Losses attributable to such indemnifying Party's fault.

**7.4**     **Notice of First Party Claims and Indemnification Procedures**. Any Installer Indemnified Person or Loanpal Indemnified Person with a claim to indemnification under this Article 7 (each, an "**Indemnified Person**," and collectively "**Indemnified Persons**") for Losses other than Losses arising from third-party claims addressed in Section 7.5 shall promptly notify the applicable indemnifying Party (each, an "**Indemnitor**") in writing of such claim, which notice shall specify with particularity and to the extent practicable the basis on which indemnification is sought and the amount of Losses. Upon receipt of such notice, the Indemnitor shall have 30 days to object to the claim set forth in such notice by delivery of a written objection to the Indemnified Person specifying in reasonable detail the basis for such objection. Failure to timely deliver an objection shall constitute the Indemnitor's final and binding acceptance of the Indemnified Party's claim. If the Indemnitor timely delivers an objection pursuant to this Section 7.4, the Parties shall in good faith seek to resolve any dispute within the 30-day period following delivery of such objection. If the Parties have not resolved their dispute within such period, such dispute shall be resolved by arbitration in accordance with the dispute resolution procedures set forth in Section 9.2.

**7.5**     **Third Party Claims**. Whenever any Indemnified Person shall learn of a claim made by a Person other than one of the Parties that, if allowed (whether voluntarily or by a judicial or quasi-judicial tribunal or agency), would entitle such Indemnified Person to indemnification under this Article 7, before paying the same or agreeing thereto the Indemnified Person shall forward the claim to the Indemnitor within ten days of receipt thereof if such claim is in writing and shall otherwise notify the Indemnitor in writing within ten days of receipt of such claim; provided, however, that the Indemnified Person's right to indemnification shall be diminished by the failure to give prompt notice only to the extent that the Indemnified Person's failure to give such notice was prejudicial to the interests of the Indemnitor. Unless the Indemnitor gives written notice to the Indemnified Person within 15 days disputing Indemnitor's indemnity obligations hereunder with respect to such claim, the Indemnitor shall have the right to control the defense of the claim, at the Indemnitor's cost, with counsel selected by the Indemnitor but acceptable to the Indemnified Person in its reasonable discretion. The Indemnitor's election to control the defense of the claim shall be deemed acceptance by the Indemnitor of its indemnity obligations hereunder to the extent such claim results in Losses to the Indemnified Person. The Indemnitor's control over the claim shall include the right to lead any investigation, negotiation, settlement, litigation or other contest of the claim. Notwithstanding the foregoing, the Indemnitor shall have no right to enter into any settlement without the Indemnified Person's consent if the settlement would involve any foreclosure, injunctive or other equitable relief or an admission of wrongdoing on the part of the Indemnified Person or involve a payment that would exceed the limitation of liability in Article 8. The Indemnified Person shall participate in any such investigation, negotiation, settlement, litigation or other contest, as reasonably requested by the Indemnitor and at the Indemnitor's cost. The Indemnitor shall keep the Indemnified Person apprised of important developments related to the claim, shall promptly respond to questions the Indemnified Person may direct to the Indemnitor with respect to the claim and shall generally cooperate with the Indemnified Person in connection with the claim. If any suit or proceeding involves the potential imposition of criminal liability upon the Indemnified Person or a potential or actual conflict of interest between the Indemnified Person and the Indemnitor, or if the Indemnitor does not elect to control the defense of such claim within the 15-day period provided above, the Indemnified Person may, in its reasonable discretion, either defend such suit or proceeding or settle the claim that is the basis thereof, without the consent of the Indemnitor, and the Indemnitor shall nevertheless pay the Indemnified Person's Losses. The Indemnified Person shall not be required to refrain from paying any claim that has matured by a court judgment or decree, unless an appeal is duly taken therefrom and execution thereof has been stayed, nor shall it be required to refrain from paying any claim where the delay to pay such claim would result in the foreclosure of a lien upon any of the property of the Indemnified Person, or where any delay in payment would cause the Indemnified Person an incremental economic loss, unless the Indemnitor shall have agreed to compensate the Indemnified Person for such loss.

DocuSign Envelope ID: E7C11912-A298-4B99-B6F4-737543E2F6C3

**7.6** __Indemnification Expenses__. To the extent that an Indemnitor has not elected to assume the defense of a claim under Section 7.5, the Indemnitor shall reimburse the Indemnified Person for all reasonable and documented out of pocket costs and expenses as and when incurred by such Indemnified Person (including reasonable legal fees and costs) in connection with defending, settling or investigating an actual or threatened action or proceeding in advance of the final disposition of such action or proceeding, provided that such Indemnified Person shall repay such reimbursement payments if it is ultimately determined by a court of competent jurisdiction or an arbitrator that such Indemnified Person is not entitled to indemnification under this Article 7. Amounts payable by an Indemnitor under this Section shall be due and payable promptly upon receipt by such Indemnitor of an invoice detailing such reimbursable costs and expenses.

**7.7** __Breach of Indemnity Obligations__. In the event that the Indemnitor breaches its obligations hereunder, the Indemnitor shall be liable for: (a) the fees and costs incurred by the Indemnified Person in enforcing its indemnity rights; and (b) simple interest on any monetary obligation of Indemnitor from the time such monetary obligation matured until the time paid in full at an annual rate of 12% or the highest rate permitted by Applicable Law, whichever is less.

## ARTICLE 8.

## LIMITATION OF LIABILITY

**8.1** __No Consequential or Punitive Damages__. In no event shall either Loanpal or Installer or their Affiliates be liable to the other Party, nor shall Loanpal be liable to any Sub-Installer or vendor of Installer, either individually or jointly, for special, indirect, consequential, punitive or exemplary damages of any nature whatsoever, including losses or damages caused by reason of loss of use, loss of production, loss of profits or revenue, loss of contracts, inventory or use charges, interest charges or cost of capital or claims of Loanpal's customers; and Loanpal hereby releases Installer and its Sub-Installers and vendors therefrom, and Installer hereby releases Loanpal therefrom; provided, however, the limitation of liability in this Section shall not apply to (a) Installer's liability under this Agreement for indemnification for Losses arising as a result of claims, actions and suits by third parties, (b) damages arising from fraud or willful misconduct or (c) damages arising as a result of a breach of Section 9.12 or Section 9.13.

## ARTICLE 9.

## GENERAL PROVISIONS

(e) __Rules of Interpretation__. (a) The singular number includes the plural number and vice versa; (b) references to "Articles," "Sections," or "Annexes" shall be to articles, sections or annexes of this Agreement; (c) references to "days" shall mean calendar days, unless otherwise indicated; (d) reference to any Person includes such Person's successors and assigns but, if applicable, only if such successors or assigns are not prohibited by this Agreement and reference to a Person in a particular capacity excludes such Person in any other capacity; (e) reference to any gender includes each other gender; (f) reference to any agreement, document or instrument means such agreement, document or instrument as amended or modified and in effect from time to time in accordance with the terms thereof; (g) reference to any Applicable Law means such Applicable Law as amended, modified, codified, replaced or reenacted, in whole or in part, and in effect from time to time, including rules and regulations promulgated thereunder and reference to any section or other provision of any Applicable Law means that provision of such Applicable Law from time to time in effect and constituting the substantive amendment, modification, codification, replacement or reenactment of such section or other provision; (h) the words "herein," "hereof" and "hereunder" and words of similar import shall refer to this Agreement as a whole and not to any particular section or subsection of this Agreement; the words "include," "includes" or "including" shall mean "including, but not limited to;" (i) references to documents, instruments or agreements shall be deemed to refer as well to all addenda, exhibits, schedules or amendments thereto.

**9.1** __Notices__. All notices, consents, claims, demands and other communications between the Parties must be in writing and shall be deemed given (a) in the case of email or submissions through the Software, when the status of the document indicates that such document has been sent or uploaded (provided that such transmission is completed prior to 5:00 p.m., local time at the location of the recipient, on a Business Day; otherwise, such transmission shall be deemed to have been received on the next Business Day); (b) in the case of delivery by a standard overnight carrier, upon the date of delivery

DocuSign Envelope ID: E7C11912-A298-4B99-B6F4-737543E2F6C3

indicated in the records of such carrier; or (c) in the case of delivery by hand, when delivered by hand addressed to Loanpal at the address below, or to Installer at the address set forth on Exhibit C hereto (or another address provided by notice under this <u>Section</u>). Any documents or other deliverables that are required to be delivered under this Agreement, but are not transmittable through the Software shall be delivered to the other Party by email transmission, delivery by a standard overnight carrier or delivery by hand and deemed given as provided in this <u>Section</u>. Notwithstanding the foregoing, Installer expressly agrees and acknowledges that Replacement Program Specifications and Replacement Pricing Specifications shall be sent to Installer by email to Installer to the specific "Email Address(es) for Program and Pricing Specifications" set forth on Exhibit C, pursuant to <u>Section 3.2.3</u>.

| Loanpal Address for Written Notice: | With a copy to: Zenith Security |
|---|---|
| 8781 Sierra College Blvd, Roseville, CA 95661 | 9175 W. State Street, Boise, ID 83714 |
| Attn: General Counsel | Attn: Oscar Luna |
| Email: jlaifman@loanpal.com | Email: info@getzenithsolar.com |

**9.2     Dispute Resolution**. Except as otherwise provided in this Agreement, in the event of any dispute, claim or controversy arising from this Agreement, or the breach hereof or thereof the Parties will confer and attempt to resolve the dispute informally. If such dispute cannot be resolved in this manner within 15 days after notice of the dispute is given to the other Party, then either Party may elect to initiate arbitration of the dispute in a binding arbitration administered by JAMS under its arbitration rules ("**Arbitration Rules**"), subject to the following.

9.2.1   <u>Arbitrator</u>.  The arbitration shall be conducted by a single arbitrator.  The Parties will first attempt to agree on a mutually acceptable arbitrator, and if they are unable to reach agreement within ten days after the initial demand for arbitration, the arbitrator shall be selected in accordance with the Arbitration Rules.

9.2.2   <u>Jurisdiction</u>. The site of the arbitration shall be in San Francisco, California. Each Party hereby consents to the jurisdiction of the federal and state courts within whose district the site of arbitration is located for purposes of enforcement of this arbitration provision, for provisional relief in aid of arbitration, and for enforcement of any award issued by the arbitrator.

9.2.3   <u>Attendees</u>. The only Persons entitled to attend any arbitration hearing are the arbitrator, the parties to the arbitration, their respective counsel and witnesses. Any documents or other materials produced in or generated in connection with the arbitration proceedings will not be disclosed to any Persons other than the foregoing.

9.2.4   <u>Enforcement</u>. Any award, order or judgment pursuant to the arbitration is final and may be entered and enforced in any court of competent jurisdiction.

9.2.5   <u>Applicable Law</u>. The foregoing arbitration provisions shall be construed and enforced in accordance with the Federal Arbitration Act, notwithstanding the provisions of this Agreement specifying the application of California state law.

**9.3     Waiver and Remedies Cumulative**. Except as may be expressly provided in this Agreement, the rights and remedies of the Parties to this Agreement are cumulative and not alternative. Neither any failure nor any delay by any Party in exercising any right, power or privilege under this Agreement or any of the documents referred to herein shall operate as a waiver of such right, power or privilege, and no single or partial exercise of any such right, power or privilege shall preclude any other or further exercise of such right, power or privilege or the exercise of any other right, power or privilege. To the maximum extent permitted by Applicable Law, (a) no claim or right arising out of this Agreement can be discharged by one Party, in whole or in part, by a waiver or renunciation of the claim or right unless in writing signed by the other Party; (b) no waiver that may be given by a Party shall be applicable except in the specific instance for which it is given; and (c) no notice to or demand on one Party shall be deemed to be a waiver of any obligation of that Party or of the right of the Party giving such notice or demand to take further action without notice or demand as provided in this Agreement.

DocuSign Envelope ID: E7C11912-A298-4B99-B6F4-737543E2F6C3

**9.4     Assignments; Successors; and No Third-Party Rights.**

9.4.1    Assignment. Except as set forth expressly herein, Installer may not assign any of its rights or delegate any of its obligations under this Agreement without the prior consent of Loanpal. Loanpal may assign any of its rights under this Agreement without the prior consent of Installer. In the event that Loanpal enters into agreements with third-party financial institutions to provide financing in connection with the Program, such financial institutions shall be third party beneficiaries of the obligations of Installer hereunder and shall have the benefit of such obligations and the right to enforce (but not to the exclusion of Loanpal for its own account) such obligations with respect to any Loan Agreements owned by such financial institution.

9.4.2    Binding on Successors. Subject to this Section, this Agreement shall apply to, be binding in all respects upon and inure to the benefit of the successors and permitted assigns of the Parties. Nothing expressed or referred to in this Agreement shall be construed to give any Person other than the Parties to this Agreement any legal or equitable right, remedy or claim under or with respect to this Agreement or any provision of this Agreement, except such rights as shall inure to a successor or permitted assignee pursuant to this Section  or to Indemnified Persons covered by Article 7.

**9.5     Severability**. If any court of competent jurisdiction holds invalid or unenforceable any provision of this Agreement, the other provisions of this Agreement shall remain in full force and effect. Any provision of this Agreement held invalid or unenforceable only in part or degree shall remain in full force and effect to the extent not held invalid or unenforceable.

**9.6     Governing Law**. The laws of the state of California shall govern the relationship between the Parties and disputes, differences, controversies or claims directly or indirectly based on this Agreement, including those relating to the formation, validity, interpretation, construction, performance, breach, enforceability or termination of this Agreement and duties based on tort, contract or statutory concepts.

**9.7     Independent Installer**. Installer and its Sub-Installers, vendors, employees and agents shall be independent Installers with respect to any Installation, irrespective of whether approved by Loanpal, and neither Installer nor its Sub-Installers, vendors, employees or agents shall be deemed to be the Installers, servants, employees, or agents of Loanpal in any respect for any purpose whatsoever and none shall have any authority to create or assume any obligation, express or implied, in the name of or on behalf of Loanpal or to bind Loanpal in any manner whatsoever. Nothing in this Agreement shall be construed to imply that the Parties are partners, joint ventures, co-owners, debtor-creditor or otherwise as participants in a joint or common undertaking.

**9.8     Execution of Agreement**. This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original copy of this Agreement and all of which, when taken together, shall be deemed to constitute one and the same agreement. The exchange of copies of this Agreement and of signature pages by facsimile or email shall constitute effective execution and delivery of this Agreement as to the Parties and may be used in lieu of the original Agreement for all purposes. Signatures of the Parties transmitted by facsimile or email shall be deemed to be their original signatures for all purposes.  The Parties consent to the use of digital signatures.

**9.9     Advice From Independent Counsel**. The Parties understand that this Agreement is a legally binding agreement that may affect their rights. Each Party represents to the other that it has received legal advice from counsel of its choice regarding the meaning and legal significance of this Agreement and that it is satisfied with its legal counsel and the advice received from its legal counsel. Any rule of construction or interpretation otherwise requiring this Agreement to be construed or interpreted against any Party shall not apply to any construction or interpretation hereof.

**9.10    Further Assurances**. The Parties agree (a) to furnish upon request to each other such further information, (b) to execute and deliver to each other such other documents and (c) to do such other acts and things, all as the other Party may reasonably request for the purpose of carrying out the intent of this Agreement.

**9.11    Survival**. The Parties' rights and obligations under Sections 4.2, 4.7, 4.8 (to the extent provided therein), 6.1.2, 6.2, 6.5 and 9.13, and Article 7 and Article 8 and any outstanding payment obligations under this Agreement accrued prior to termination of this Agreement will survive any termination or expiration of this Agreement.

DocuSign Envelope ID: E7C11912-A298-4B99-B6F4-737543E2F6C3

**9.12** **Confidentiality**. For the Term of this Agreement and for a period of five years after the termination of this Agreement, each Party (a) shall maintain the confidential nature of, and shall not use or disclose, any non-public terms of this Agreement, any financial information or other information with respect to Loanpal, Installer or any Consumer provided pursuant to the transactions contemplated hereunder that are identified as confidential or that should reasonably be understood to be confidential given the nature of such information or the circumstances surrounding the disclosure of such information (collectively, "**Confidential Information**"), (b) shall not, directly or indirectly, disclose or permit the disclosure of any Confidential Information, and (c) other than in connection with the performance of its obligations under this Agreement, shall not make any use of or permit the use of Confidential Information for the benefit of itself or others; provided, however, that Confidential Information shall not include information that (i) becomes generally available to the public other than as a result of a disclosure by the non-disclosing Party, any of its Affiliates or any of their directors, officers, agents, or other representatives, (ii) becomes available to the non-disclosing Party or any of its directors, officers, agents, or other representatives on a non-confidential basis from a source other than the disclosing Party or its directors, officers, agents, or other representatives or any other party who is under an obligation of confidentiality with respect to such information or (iii) is required or requested to be disclosed by the non-disclosing Party as a result of any applicable legal or regulatory requirement or rule or regulation of any stock exchange, or other regulatory authority having jurisdiction over such non-disclosing Party; provided, that in the case of clause (iii), if a Party becomes legally compelled to disclose such information, such Party shall, to the extent legally permissible, promptly notify the other Party and, if requested by the other Party, use commercially reasonable efforts to assist the other Party in seeking a protective order or other appropriate remedy to preserve the confidentiality of all Confidential Information to the maximum extent possible under the circumstances.  Notwithstanding the foregoing, either Party may disclose Confidential Information received by it to its Affiliates and such Party's and its Affiliates' employees, consultants, legal counsel, accountants, actual or potential lenders, actual or potential equity investors, rating agencies, actual or potential purchasers of Loan Agreements (including reasonable disclosures made in connection with any offering memoranda) or other agents or advisors who have a need to know such Confidential Information and have agreed, or are otherwise bound, to maintain the confidentiality of same on terms and conditions substantially similar to those contained in this Agreement (collectively, "**Representatives**"). Such Representatives shall preserve the confidential nature of all Confidential Information, and the recipient of such Confidential Information shall be liable for any Representative's failure to maintain the confidentiality of Confidential Information disclosed hereunder. The Parties shall be entitled to all remedies available under Applicable Law or in equity to enforce, or seek relief in connection with, this confidentiality obligation.  Upon termination or expiration of this Agreement, each Party will promptly return or certify the destruction of, if so requested by the other Party, any Confidential Information provided to it and will use commercially reasonable efforts to return any copies thereof that may have been provided to others in accordance with this Section.

**9.13** **Security of Nonpublic Personal Information.**

      9.13.1  Installer and Loanpal each shall not disclose and shall take all reasonable measures to protect any data that Loanpal obtains from any credit bureau and/or conveys to Installer for firm offers of credit and any other nonpublic personal information (as defined in the Gramm-Leach Bliley Act of 1999, title V, its implementing regulations, and other similar laws and regulations) obtained by either Party (collectively, "**NPI**") to (a) any third party or (b) any employee, officer, partner or director of Installer who is not engaged in the implementation and execution of the Program and having a need to know such information for Installer to perform its obligations under this Agreement. Neither Party shall retain, in any format, electronic or otherwise, any NPI beyond what is required pursuant to this Agreement and in compliance with Applicable Law. Without by implication limiting the foregoing, if either Party allows individuals to submit personal identifying information via the Internet, such Party shall adopt and maintain a comprehensive privacy policy with respect to its handling of such personal information.

      9.13.2  Each Party agrees that it has developed, implemented and will maintain at all relevant times contemplated by this Agreement effective information security policies and procedures that include administrative, technical and physical safeguards designed to (a) ensure the security and confidentiality of NPI, (b) protect against anticipated threats or hazards to the security or integrity of NPI, (c) protect against unauthorized access or use of NPI, and (d) ensure the proper disposal of NPI. All personnel handling NPI shall be appropriately trained in the implementation of such information security policies and procedures. Each Party shall regularly audit and review its information security policies and procedures and systems to ensure their continued effectiveness and determine whether adjustments are necessary in

DocuSign Envelope ID: E7C11912-A298-4B99-B6F4-737543E2F6C3

light of circumstances including, without limitation, changes in technology, customer information systems or threats or hazards to NPI.

9.13.3    Each Party shall promptly notify the other Party of any unauthorized access of NPI related to Consumers under this agreement or any breach in security measures or systems for the protection of NPI and take appropriate action to prevent further unauthorized access or cure such breach. If a Party experiences such unauthorized access or breach, that Party shall pay all related expenses, provide any notices regarding such unauthorized access to appropriate law enforcement agencies and government regulatory authorities, affected applicants, Consumers and customers as reasonably requested by the other Party and/or as required by Applicable Law.

9.13.4    Each Party may at any time upon notice to the other Party (but in no event more frequently than once each calendar year), review and audit the other Party's information security policies, procedures and systems to verify their adequacy for protection of NPI. Each Party will correct promptly any weakness in such policies, procedures or systems identified by the other Party in its reviews thereof.

**9.14**    **Publicity**. Neither Party nor its Affiliates shall, without the consent of the other Party, issue any press release or make any other public statement regarding the transactions contemplated by this Agreement, except as may be required by Applicable Law, in which case, the Party proposing to issue such press release or make such public statement shall, to the extent legally permissible, use commercially reasonable efforts to seek the consent of the other Party (which shall not be unreasonably withheld, conditioned or delayed) before issuing such press release or making such public statement; provided, however, that either Party or its Affiliates may make public statements that are not inconsistent with (or more expansive than) previous press releases or public statements made in accordance with this Section.

**9.15**    **Headings**. The presence and use of headings throughout this Agreement are for the convenience of the Parties and have no legal significance or meaning, and they shall not be used in interpreting this Agreement.

**9.16**    **Entire Agreement and Modification**. This Agreement supersedes all prior agreements, whether written or oral, between the Parties with respect to its subject matter and constitutes a complete and exclusive statement of the terms of the agreement between the Parties with respect to its subject matter. Except as provided in Section 3.2.3 (with respect to Program Specifications and Pricing Specifications), this Agreement may not be amended, supplemented or otherwise modified except by a written agreement executed by both Parties. For the avoidance of doubt, with respect to any transaction or matter between Installer and Loanpal other than those described in this Agreement, Installer's rights and obligations with respect to such transaction or matter shall be governed solely by the separate documentation entered into pursuant to such transaction or matter, and not by this Agreement entered into in connection therewith.

*[Signature page follows.]*

DocuSign Envelope ID: E7C11912-A298-4B99-B6F4-737543E2F6C3

IN WITNESS WHEREOF, the Parties, by their authorized officers or representatives, have executed this Agreement as of the Effective Date.

Loanpal:
Loanpal LLC,
A California Limited Liability Company

By: *Paul Stephan* _____
    └─ 93D902B3A42543C...
Name: Paul Stephan _____

Title: Executive Vice President _____

Loanpal LLC,
A California Limited Liability Company

By: *Matthew Dawson* _____
    └─ 928819870BA74EE...
Name: Matthew Dawson _____

Title: COO _____

Installer:
Zenith Security
A Idaho Limited Liability Company

By: *Oscar Luna* _____
    └─ 134BA4B165FE42E...
Name: Oscar Luna _____

Title: Owner _____

CONFIDENTIAL

Signature Page to Program Agreement

EXHIBIT A
FORM OF PRICING SPECIFICATION

| PRICING SPECIFICATIONS | | | | |
|---|---|---|---|---|
| **Issued by:** | LOANPAL | | | |
| **Effective Date:** | 7/7/2020 | | | |

| Product | Loan Term | Applicable Consumer APR | Applicable Program Fee (%): | Minimum Loan Amount ($): |
|---|---|---|---|---|
| A | 7 YR | 2.99% | 16.75% | $5,001 |
| B | 7 YR | 3.49% | 14.75% | $5,001 |
| C | 7 YR | 3.99% | 12.75% | $5,001 |
| D | 7 YR | 4.99% | 8.75% | $5,001 |
| E | 7 YR | 5.99% | 5.75% | $5,001 |
| F | 7 YR | 6.99% | 3.49% | $5,001 |
| G | 7 YR | 7.99% | 0.00% | $5,001 |
| H | 10 YR | 2.99% | 18.25% | $5,001 |
| I | 10 YR | 3.49% | 16.25% | $5,001 |
| J | 10 YR | 3.99% | 14.25% | $5,001 |
| K | 10 YR | 4.99% | 10.25% | $5,001 |
| L | 10 YR | 5.99% | 7.25% | $5,001 |
| M | 10 YR | 6.99% | 4.75% | $5,001 |
| N | 10 YR | 7.99% | 1.25% | $5,001 |
| O | 12 YR | 2.99% | 19.99% | $5,001 |
| P | 12 YR | 3.49% | 18.25% | $5,001 |
| Q | 12 YR | 3.99% | 16.75% | $5,001 |
| R | 12 YR | 4.49% | 15.25% | $5,001 |
| S | 15 YR | 3.49% | 19.75% | $5,001 |
| T | 15 YR | 3.99% | 18.25% | $5,001 |
| U | 15 YR | 4.49% | 16.49% | $5,001 |
| V | 15 YR | 4.99% | 14.75% | $5,001 |
| W | 20 YR | 2.99% | 22.99% | $5,001 |
| X | 20 YR | 3.99% | 19.75% | $5,001 |
| Y | 20 YR | 4.49% | 17.75% | $5,001 |
| Z | 20 YR | 4.99% | 15.99% | $5,001 |
| AA | 20 YR | 5.99% | 11.75% | $5,001 |
| AB | 25 Year | 2.99% | 28.99% | $5,001 |
| AC | 25 Year | 3.99% | 25.59% | $5,001 |
| AD | 25 Year | 4.49% | 23.49% | $5,001 |
| AE | 25 Year | 4.99% | 20.89% | $5,001 |
| AF | 25 Year | 5.99% | 15.99% | $5,001 |
| AG | 25 Year | 6.99% | 10.99% | $5,001 |

*Maximum Loan Amount equal to: $100,000 for FICO >= 700; $50,000 for FICO 650 – 699.

Exhibit B

CONFIDENTIAL

DocuSign Envelope ID: E7C11912-A298-4B99-B6F4-737543E2F6C3

**OL**   **25 year product access is based upon retaining a Delinquency Rate no higher than 1.5%**

Loanpal:
Loanpal LLC,
A California Limited Liability Company

By: _Paul Stephan_ _____
      93D902E3A42543C...

Name: Paul Stephan _____

Title: ____Executive Vice President____

Loanpal LLC,
A California Limited Liability Company

By: _Matthew Dawson_ _____
      9288198708A74EE...

Name: Matthew Dawson _____

Title: ____COO____

Installer:
Zenith Security
A Idaho Limited Liability Company

By: _Oscar Luna_ _____
      134BA4B165FE42E...

Name: Oscar Luna _____

Title: Owner _____

**EXHIBIT B**
**FORM OF PROGRAM SPECIFICATION**

Exhibit B

CONFIDENTIAL

DocuSign Envelope ID: E7C11912-A298-4B99-B6F4-737543E2F6C3

| PROGRAM SPECIFICATION | | | |
|---|---|---|---|
| **Effective Date:** | 7/7/2020 | | |
| **Issued by:** | Loanpal | | |

**General Terms & Requirements:**

| **Territory:** | TX | | |
|---|---|---|---|

**Milestone Requirements/Terms:**

| **Milestone #** | **Name** | **Payments** | **Deadline** |
|---|---|---|---|
| **Milestone 1** | Consumer Credit Offer Date | 0% | NA |
| **Milestone 2** | Consumer Acceptance | 0% | Within 90 days of Consumer Credit Offer Date |
| **Milestone 3** | Loan Funding Date | 100% of Installer Price | Within 150 days of Consumer Credit Offer Date |
| **Milestone 4** | Permission to Operate ("PTO") | 0% | Within 90 days of Loan Funding Date |

**Conditions to Milestones:**

| **Milestone 1:** | **Consumer Credit Offer Date** |
|---|---|
| **Consumer Deliverables** | • Residence Address, Residence City, Residence State, Residence Zip Code<br>• Borrower First Name, Borrower Last Name, Borrower Date of Birth, Borrower Email, Borrower Phone Number, Borrower Stated Income<br>• (If applicable) Same Information for Co-Borrower<br>• Loan Amount<br>• Loan Product Selected |
| **Milestone 2:** | **Consumer Acceptance** |
| **Installer Deliverables** | • Notification of Consumer's desire to accept Consumer Credit Offer<br>• Final details of the Home Improvement Contract, including the final Loan Amount |
| **Consumer Requirement** | • Any stipulations related to the Consumer Credit Offer have been satisfied |
| **Milestone 3:** | **Loan Funding Date** |
| **Installer Deliverables** | • Signed final Home Improvement Contract<br>• Installation of the Solar System has been completed, and notification to Loanpal has been delivered<br>• All Permits and other applicable approvals, including but not limited to HOA approvals, have been granted, and notification to Loanpal has been delivered<br>• Final System Details:<br>   o System Size (kW) (DC)<br>   o Expected monthly production (kWh)<br>   o Tilt, Azimuth, and Shade<br>   o Modules (Quantity, Make, Model, Capacity)<br>   o Inverter(s) (Quantity, Make, Model, Capacity)<br>   o Battery Storage System(s) (Quantity, Make, Model, Capacity)<br>• Non-Approved items (i.e. other home improvement products, cash outs, vacations, etc.) cannot be financed and will be deemed a failure of this condition. |
| **Consumer Requirements** | • Statutory rescission periods related to Loan Agreement and Home Improvement Contract have |

CONFIDENTIAL

Exhibit B

DocuSign Envelope ID: E7C11912-A298-4B99-B6F4-737543E2F6C3

| | |
|---|---|
| | expired |
| Other Conditions | • Installation and Testing Complete. Solar System has been fully installed, tested and commissioned and has been shown capable of operating in a reliable and continuous manner for its intended purpose and producing electricity in the estimated amounts. |
| | • Title to System. Legal title to and control of the Solar System has been conveyed to Consumer with no other liens or encumbrances. |
| | • Ready for Interconnection. There are no known issues or reasons that would cause the Solar System to not be able to be interconnected and receive permission to operate from the Utility. |
| | • No Breach. Contractor is not in material breach of any of its obligations under the Program Agreement. |
| | • Compliant Installation. Solar System has been designed and installed in strict compliance with the requirements of: |
| |    — The Program Agreement |
| |    — This Program Specification |
| |    — The Project Specifications |
| |    — Applicable Law (including national, state and local engineering, construction, safety and electrical codes and standards) |
| |    — Applicable Utility requirements (including net metering rules) |
| |    — Good Solar Industry Practices |
| | • Contract Compliance. The Installation was performed in compliance with the applicable Home Improvement Contract, including Job Site clean-up. |
| | • Equipment. All equipment incorporated into the Solar System is new, unused and undamaged. |
| | • True Representations. Contractor's representations and warranties in the Program Agreement are true. |
| **Milestone 4:** | PTO |
| Installer Deliverables | • Notification of issuance of PTO approval by Utility |
| Other Conditions | • Interconnection. The Solar System has been interconnected and net metering, if any, is in effect with respect to the Utility's system |
| | • Notification that all Permits and other applicable approvals, including but not limited to HOA approvals, have been closed |
| **Consumer Credit Offer:** | |
| Extension: | • Loanpal may extend the Consumer Credit Offer and the related Consumer Acceptance deadline in its sole discretion, subject to the Consumer's continued qualification for such Consumer Credit Offer |
| Eligible Consumer Signatory: | • At least one Consumer signatory must be an owner or occupant of the residence where the applicable Solar System will be installed |
| | • If home is owned by a trust, at least one of the signatories must be the Trustee |
| Minimum FICO Score | • If Loanpal determines, in its sole discretion, that the credit quality of the original Consumer originated by the Installer, and any subsequent Consumer assuming any loan extended to the original Consumer, do not meet Loanpal's underwriting standards, Loanpal may increase the minimum FICO score for any credit decision. |
| **Project Specifications:** | |
| **Products Financed:** | • Standalone Retrofit Solar System only up to $5.50/W |
| | • Retrofit Solar System with upgrades related to the Solar System $7.00/W |
| | • All above Products may include a Battery/Energy Storage System. The cost of the Battery/Energy Storage System will not be included in the $/W caps. |
| Equipment Specifications: | • The Home Improvement Contract (or other Generic-approved format) identifies the Equipment used in the Solar System as follows: |
| |    — Modules (Quantity, Make, Model, Capacity) |
| |    — Inverter(s) (Quantity, Make, Model, Capacity) |
| |    — Battery Storage Systems (Quantity, Make, Model, Capacity) |
| Solar System Size: | • System Size in Watts or Kilowatts DC STC is set forth in the Home Improvement Contract or mutually agreed-upon format |
| Battery/Energy Storage Systems: | • One Battery/Energy Storage System unit (maximum funding $20,000) |
| | • Two Battery/Energy Storage System units (maximum funding $35,000) |

CONFIDENTIAL

Exhibit B

DocuSign Envelope ID: E7C11912-A298-4B99-B6F4-737543E2F6C3

| | |
|---|---|
| | • Three Battery/Energy Storage System units (maximum funding $50,000) |
| **Eligible Equipment Manufacturers:** | • The approved manufacturers will be listed in the Partner Portal or as otherwise communicated by Loanpal. |
| **Ineligible Properties:** | • Condominiums<br>• Investment Properties<br>• Mobile Homes<br>• Other Residences with Shared Roofs<br>• Co-Ops<br>• Commercial Property |
| **Eligible / Ineligible Improvements:** | • Solar ready add-ons (excluding Battery/Energy Storage Systems) may not exceed **35%** of the Loan Amount and will not have any additional Program Fees.<br>• Permissible Solar ready add-on Expenses included but not limited to:<br> — Re-roofing required to install solar system<br> — Landscaping<br> — Upgrading the home's main panel<br> — Trenching<br> — Rafter Upgrades<br> — Generators<br> — Other Add-on costs that are needed to install the solar/storage system<br> — Other Energy Efficient items up to $2500 or 10% of the Loan Amount, whichever is greater.<br><br>Ineligible Improvements include but not limited to:<br>• <u>Any cost related to goods or services that are not directly required to install the solar/storage system.</u> |
| **Monitoring / Solar System Performance Data Reporting:** | • Solar System to include inverter(s) (or other monitoring method) enabled with performance monitoring services provided by the inverter manufacturer or other third party monitoring company (the "monitoring provider")<br>• Such inverters or other monitoring method shall include capability for quarterly delivery of production data to Loanpal for the period of the Workmanship Warranty<br>• Monitoring shall be enabled for Consumer, with online monitoring access available for such Consumer, to allow Consumer to review daily performance of the Solar System via the monitoring provider's online portal |

Loanpal:

CONFIDENTIAL

DocuSign Envelope ID: E7C11912-A298-4B99-B6F4-737543E2F6C3

Loanpal LLC,
A California Limited Liability Company

By: _Paul Stephan_ _____
    ⌐DocuSigned by:
    └─03D90283A42543C...

Name: Paul Stephan _____

Title: Executive Vice President _____

Loanpal LLC,
A California Limited Liability Company

By: _Matthew Dawson_ _____
    ⌐DocuSigned by:
    └─9288198708A74EE...

Name: Matthew Dawson _____

Title: COO _____

Installer:
Zenith Security
A Idaho Limited Liability Company

By: _Oscar Luna_ _____
    ⌐DocuSigned by:
    └─134BA4B165FE42E...

Name: Oscar Luna _____

Title: Owner _____

CONFIDENTIAL

Exhibit B

DocuSign Envelope ID: E7C11912-A298-4B99-B6F4-737543E2F6C3

**EXHIBIT C**
**INSTALLER INFORMATION**

**Loanpal Solar Financing**
**Program**

| | |
|---|---|
| Date: | |
| Installer: | |
| Split Pay Distributor Partner: | Soligent |
| Distributor Address: | |
| Distributor Contact: | |
| **Address for Written Notice** | |
| Company Name: | |
| Attn: | |
| Address: | |
| Email: | |
| Fax: | |
| **Program/Pricing Specification Updates** | |
| Email Address 1: | |
| Email Address 2: | |
| **Installer Account for Payments by Loanpal:** | |
| Bank Name: | |
| Account Name: | |
| Account Number: | |
| Routing Number: | |

*(Installer may update this Exhibit from time to time by sending Loanpal an updated version, to the notice address set forth in the Program Agreement.)*

CONFIDENTIAL

DocuSign Envelope ID: E7C11912-A298-4B99-B6F4-737543E2F6C3

**EXHIBIT D**
**INSTALLER HOME IMPROVEMENT CONTRACT**

CONFIDENTIAL

DocuSign Envelope ID: E7C11912-A298-4B99-B6F4-737543E2F6C3

**ADDENDUM to SOLAR / STORAGE FINANCING PROGRAM AGREEMENT**

This ADDENDUM to SOLAR / STORAGE FINANCING PROGRAM AGREEMENT, dated as of June 26, 2020 (this "**Addendum**") is entered into by and between Loanpal, LLC., a California limited liability company, and Zenith Security, a Idaho Limited Liability Company ("**Installer**").

RECITALS

WHEREAS, the parties hereto have entered into a Loanpal Solar/Storage Financing Program Agreement, as amended, restated, supplemented or otherwise modified from time to time in accordance with the provisions thereof (the "Program Agreement"). Capitalized terms used and not otherwise defined herein are used as defined in the Program Agreement.

WHEREAS, Loanpal and Installer wish to update the Program Agreement with this Addendum.

NOW, THEREFORE, for good and valuable consideration, the receipt and legal sufficiency of which is hereby acknowledged, the parties agree as follows:

1.  Bonus.  Loanpal will pay a bonus to Installer for all Bonus Eligible Loans for any calendar month that the Installer meets or exceeds the metrics in the table below and complies with all other terms and conditions of the Program Agreement and this Addendum.  The amount of the bonus shall be the basis points (BPS) indicated in the table below applied to the collective Loan Amounts for the Projects funded by Loanpal in such month.

| Bonus Eligible Loans | BPS |
|---|---|
| Loans 100-149 funded in a month | 150bps |
| Loans 150-199 funded in a month | 175bps |
| Loans 200+ funded in a month | 200bps |

2.  Confirmation Documentation.  Installer shall provide from time to time, upon Loanpal's request such documentation as reasonably required by Loanpal to confirm compliance with this Addendum.  Loanpal may request such documentation before or after payment, and any payments made that are not confirmed by such documentation shall be returned or set off against any other payments owed by Loanpal to Installer, as elected by Loanpal.

3.  Execution in Counterparts, Etc. This Addendum may be executed simultaneously in any number of counterparts. Each counterpart shall be deemed to be an original, and all such counterparts shall constitute one and the same instrument. The parties agree that this Addendum and signature pages may be transmitted between them by facsimile or by electronic mail and that faxed and PDF signatures may constitute original signatures and that a faxed or PDF signature page containing the signature (faxed, PDF or original) is binding upon the parties.

4.  Severability. Any provision of this Addendum that is prohibited or unenforceable in any jurisdiction shall, as to such provision and such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions of this Addendum or affecting the validity or enforceability of such provision in any other jurisdiction, and the remaining provisions shall be construed without giving effect to the prohibited or unenforceable provision.

In WITNESS WHEREOF, the parties hereto have caused to be duly authorized, executed and delivered, as of the date first above written, this Addendum.

Loanpal:

CONFIDENTIAL

DocuSign Envelope ID: E7C11912-A298-4B99-B6F4-737543E2F6C3

Loanpal, LLC,
A California Limited Liability Company

By: _Paul Stephan_____
93D902B3A42543C...

Name: _Paul Stephan_____

Title: _Executive Vice President____

Loanpal, LLC,
A California Limited Liability Company

By: _Matthew Dawson_____
9288198708A74EE...

Name: _Matthew Dawson_____

Title: _COO_____

Installer:
Zenith Security
A Idaho Limited Liability Company

By: _Oscar Luna_____
134BA4B165FE42E...

Name: _Oscar Luna_____

Title: _Owner_____

CONFIDENTIAL

DocuSign Envelope ID: E7C11912-A298-4B99-B6F4-737543E2F6C3

**EXHIBIT F**
**Installer and Distributor Funding Instructions**

Split Payment Type:

1. Paid at 100% Completion of Installation

2. Funded Loan Disbursement:

   a. Purchase Order Amount to Distributor

   b. Funded Loan Balance Minus Dealer Fees to Installer

Installer:
Zenith Security
A Idaho Limited Liability Company

By: _Oscar Luna_____
     └─ 134BA4B165FE42E...

Name: Oscar Luna_____

Title: Owner_____

CONFIDENTIAL